```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3       United States of America,      ) Criminal Action
                                        ) No. 21-cr-175
 4                       Plaintiff,     )
                                        ) DETENTION HEARING
 5       vs.                            ) BY VIDEO
                                        )
 6       Charles Donohoe,               ) Washington, DC
                                        ) April 21, 2021
 7                       Defendant.     ) Time:  3:13 p.m.
         _____
 8
                         TRANSCRIPT OF DETENTION HEARING
 9                                HELD BEFORE
                     THE HONORABLE JUDGE G. MICHAEL HARVEY
10                       UNITED STATES MAGISTRATE JUDGE

11       _____

                           A P P E A R A N C E S
12

13       For the Plaintiff:       Jason McCullough
                                  U.S. Attorney's Office
14                                555 4th Street NW
                                  Washington, DC  20530
15                                (202) 252-7233
                                  Email:  Jason.mccullough2@usdoj.gov
16
         For the Defendant:       Lisa Costner
17                                952 W 4th Street
                                  Suite 200
18                                Winston-Salem, NC  27101
                                  (336) 748-1885
19                                Email:  Lisa@lisacostnerlaw.com

20       Pretrial Services:       John Copes

21       Proceedings reported by audio recording.
         _____
22
         Transcribing Court Reporter:
23                                Janice Dickman, RMR, CRR, CRC
                                  Official Court Reporter
24                                United States Courthouse, Room 6523
                                  333 Constitution Avenue, NW
25                                Washington, DC  20001
                                  202-354-3267
```

1          THE COURT:  Good afternoon.  This is Judge Harvey.

2     Mr. Tran, please call the case.

3          THE COURTROOM DEPUTY:  This is case 21-cr-175, United

4     States of America versus Charles Donohoe.  This is scheduled to

5     be a detention hearing held by video.  Would the parties please

6     introduce themselves to the Court, beginning the government.

7          MR. McCULLOUGH:  Good afternoon, Your Honor.  This is

8     Jason McCullough for the United States.  And I'm joined by my

9     colleague, Luke Jones.

10          MS. COSTNER:  Good afternoon, Your Honor.  It's Lisa

11     Costner, and here representing Mr. Donohoe.

12          THE COURT:  Good afternoon.

13          PRETRIAL SERVICES OFFICER:  Good afternoon, Your

14     Honor.

15          THE COURT:  Go ahead, Mr. Copes.  Sorry.

16          PRETRIAL SERVICES OFFICER:  John Copes, pretrial

17     services.

18          THE COURT:  Mr. Donohoe, I want to make sure you can

19     hear me.

20          THE DEFENDANT:  Yes, Your Honor, I can hear you

21     perfect.

22          THE COURT:  All right.  Well, let me first start by

23     reminding everyone listening on the public line, that pursuant

24     to Chief Judge Howell's standing order 2020, recording and

25     rebroadcasting of these proceedings here today is strictly

1    prohibited.  If you were to record these proceedings, either by

2    audio or video, you can be subject to sanctions, including

3    removal of court-issued media credentials, restricted or denial

4    of entry to future proceedings, and other sanctions that might

5    be necessary.  So, please, no recording or rebroadcasting of

6    these proceedings here today.

7              This matter has been scheduled for a detention

8    hearing.  Is the government ready to proceed?

9              MR. McCULLOUGH:  Yes, Your Honor.

10             THE COURT:  Is defense ready do proceed?  And is

11   Mr. Donohoe willing to waive his right to an in-person

12   proceeding and proceed by video here today?

13             MS. COSTNER:  Yes, Your Honor.

14             THE COURT:  All right, then.  For the parties'

15   information, I did have the chance yesterday to read through

16   Judge Kelly's written decision with respect to Mr. Nordean and

17   Biggs -- I should say, the transcript.  I saw a draft of the

18   transcript.  Ms. Costner, I don't know if you were able to get

19   your hands on a copy yet?  I imagine not.

20             MS. COSTNER:  No, Your Honor.  I did prepare an OFT

21   to request a transcript, but at this point that hasn't even

22   been -- I haven't seen by Evoucher that that's been approved

23   yet.  So I don't have a transcript.

24             THE COURT:  Okay.  All right.  Well, I will have some

25   questions as these -- this proceeding goes forward.  I do ask

1     that both parties, you know, address any similarities or

2     differences between Mr. Donohoe and Mr. Biggs and Mr. Nordean

3     with respect to the detention decision.

4          With that, Government, I turn it over to you.  I know

5     you've submitted exhibits.  I have my PowerPoint and I have

6     looked at the videos a few times.  So, go right ahead.

7          MR. McCULLOUGH:  Thank you, Your Honor.  The

8     government is here today seeking the pretrial detention of

9     Charles Donohoe.  There are -- there is no condition or

10    combination of conditions that can adequately protect the

11    public.  The government posits that defendant Donohoe poses an

12    articulable threat that cannot sufficiently be mitigated by

13    release conditions.

14         As set forth in the indictment, through Mr. Donohoe's

15    leadership and planning, as well as the leadership and planning

16    of his codefendants, there were coordinated actions that were

17    taken to conduct -- carry out criminal offenses.  He brought

18    together, he and his codefendants, brought together a group of

19    men from across the country and they successfully disrupted the

20    peaceful transition of power at the Capitol.

21         As Charles Donohoe plainly states, "We stormed the

22    Capitol, unarmed, and we took it over, unarmed."  The

23    terminology that Charles Donohoe speaks in throughout, both

24    contemporaneous and afterwards, celebrating the event, are of

25    the group conquest.  And that is the significant danger here

1     that's posed by Charles Donohoe.  And that is consistent with

2     the danger that is posed by defendants -- codefendants Nordean

3     and Biggs.

4          The danger is that he has the resources and

5     capabilities to organize and mobilize a group to travel to a

6     location across the country that interferes.  And the kind of

7     conditions in the country are not substantially different

8     today.  Therefore, there is a continuing threat that Donohoe

9     presents.  And by Charles Donohoe's own words, even after Biden

10    takes office, "It's never too late, ever."  He says that

11    plainly in the kind of celebration and post event of January

12    6th.

13         So for that reason -- for the reasons set forth in

14    the indictment, as well as the reasoning that we'll go through

15    today, all four factors weigh heavily in favor of detention.

16    As Your Honor has certainly read the transcript from Judge

17    Kelley, the strength of those different factors -- some are

18    stronger than others -- but they weigh in favor of detention.

19         As I said, the ability -- the resources and

20    capabilities to organize, his acknowledgment of criminal

21    activity, the contemporaneous encouraging of advancing on the

22    Capitol and his personal physical actions to push forward

23    toward the Capitol all strongly show that the -- the nature and

24    circumstances of the offense are quite concerning.

25         So, I mean, as Your Honor would certainly ask, why is

1    this guy dangerous?  Why is Charles Donohoe so dangerous that

2    we need to detain him?  Let's just start with, kind of, January

3    4th.  In the wake of the arrest of the --

4         THE COURT:  Let me ask you just a few threshold

5    questions.

6         MR. McCULLOUGH:  Of course.  Please.

7         THE COURT:  And I want you to do what you're about to

8    do, because --

9         MR. McCULLOUGH:  Of course.

10        THE COURT:  -- it's helpful to me.  I've read the

11   indictment, I've read -- Judge Kelly did just an incredible job

12   at laying out, through multiple documents, all the government's

13   alleged allegations and evidence in this case, sort of in

14   chronological order.  I found it very helpful.

15        But, you know, distinguishing this defendant's

16   conduct from the other defendant is something you could help me

17   with.  I think I've got a good grasp on it, but I would be

18   interested in getting your perspective.

19        But, first, so is -- the government is seeking his

20   detention as a danger, is that correct?

21        MR. McCULLOUGH:  That is correct, Your Honor.

22        THE COURT:  What about risk of flight?  Just as --

23   are you arguing that he's a risk of flight?

24        MR. McCULLOUGH:  Your Honor, the government is not

25   arguing risk of flight here.  The defendant is proceeding on

1    the basis of danger to the community.

2              THE COURT:  Okay.  So now let's just talk about the

3    basis for this detention hearing and whether or not there is a

4    rebuttable presumption.  I've read the government's brief, and

5    I think I understand your position -- Ms. Costner, I'm going to

6    have the same question for you, as to whether or not there's

7    any dispute as to whether or not a rebuttable presumption is

8    applicable.  But, it is the government's position that there is

9    a rebuttable presumption in this case, given that he's being

10   charged with felony destruction of property that has ten years

11   as its maximum, which is a provision that is listed, an offense

12   listed in Section 2332b(g)(5)(B), is that correct?

13             MR. McCULLOUGH:  That is correct, Your Honor.  So

14   there are two bases for the detention hearing.  The basis for

15   the rebuttable presumption is exactly as Your Honor mentioned.

16   It comes from 3242(e)(3)(C), and that is that there's a

17   rebuttable presumption that no condition or combination of

18   conditions will adequately protect the public, if the defendant

19   has -- if there's probable cause to find that the defendant

20   committed an act that's enumerated -- a criminal action that's

21   enumerated in 2332b(g)(5)(B); (5)(B) is just an enumerated list

22   of statutes, among them is 1361.  3161, destruction of

23   government property.  That is part of the returned indictment.

24   And under *U.S. v. King*, it's well settled that the return of an

25   indictment makes conclusive the existence of probable cause.

1          So, Your Honor, the government would submit that with

2     the return of an indictment charging Mr. Donohoe with 1361,

3     which is one of those enumerated offenses in 2332b(g)(5)(B),

4     there is a rebuttable presumption.

5          In addition to that, the other basis for a detention

6     hearing more broadly is 3142(f)(1)(A), which, similarly,

7     provides -- the language is different, but provides,

8     basically -- again, focusing on the 1361 crime -- it basically

9     says that upon motion of the government in a case that involves

10    a crime enumerated in 2332b(g)(5)(B).  So again --

11         THE COURT:  Lesser standard than the one that would

12    trigger the rebuttable presumption.  I think there's even case

13    law that suggests that it doesn't have to be a charged crime,

14    that the Court would have, in an appropriate case, could find a

15    basis for detention if the acts, as alleged, you know, involve

16    one of those triggering events.

17         In any event, here you have an indictment.

18         MR. McCULLOUGH:  Yes, Your Honor.  And so the

19    government submits that it has met the standard for rebuttable

20    presumption under 3142(e)(3) -- sorry, (e)(3)(C), and also

21    we're appropriately having a detention hearing under

22    3142(f)(1)(A).  So, under both of those standards.

23         THE COURT:  Well, I hear you.  Ms. Costner, I want to

24    hear from you on that in a few minutes.  But, just -- let's get

25    the statute, all these numbers out of the way.

1            You also make, in passing, an argument that 1361, as

2       alleged here in the indictment, would qualify as a federal

3       crime of terrorism, which is one of the topics, facts, the

4       Court is instructed to consider as part of that first factor

5       under 3142(g), the nature and circumstances of the offense.  It

6       lists right there, Is it a federal crime of terrorism?  I don't

7       believe that that term is defined in the Bail Reform Act.  You

8       have found the definition elsewhere in the code.  And it's

9       right there in a provision which is cited in the Bail Reform

10      Act, but not adopting this, best I can figure out.  It's

11      definitional -- the definitional section of 2332b(g).

12           So, I've never seen the argument before.  I've never

13      quite had a case like this before.  I don't know if you know of

14      case law that would suggest that that's an appropriate

15      definition to use and analysis in this case, which, you know,

16      may well fit that definition.  Which, my second question, on

17      what basis does it fit the definition?

18           MR. McCULLOUGH:  So, Your Honor, the -- as it is

19      defined in 2332b(g)(5)(A) -- or, I should say, b(g)(5)

20      generally. (A) and (B) combines, effectively, to define what is

21      a crime of terrorism.  And by the Bail Reform Act's reference

22      repeatedly to 2332b(g)(5) in defining -- or, kind of

23      articulating where we've got a rebuttable presumption, as well

24      as where it's appropriate to have a detention hearing, it's

25      clear that Congress is aware that this statute existed, and

1    it's using the same terminology, crime of terrorism, that is

2    explicitly defined in 2332b(g)(5)(A) and (B).

3         So, I believe that Congress intended for that

4    definition to be applied here.  And that definition, it

5    basically has an enumerated set of statutes, as we've talked

6    about, 1361 being one of them.  But b(g)(5)(A) says that it is

7    a crime of terrorism when it's calculated to influence or

8    affect the conduct of government by intimidation or coercion or

9    to retaliate against government conduct.  That is the standard

10   that's set forth in 2332b(g)(5)(A).

11        This indictment, Your Honor, charges a conspiracy to

12   obstruct an official proceeding.  And it wasn't just any

13   official proceeding, Your Honor, it was the official proceeding

14   taking place at the Capitol.  And as set forth in the

15   indictment, Defendant Donohoe's co-conspirators were very clear

16   about their refusal to accept the results of the election,

17   believing that this election was stolen, and believing -- and

18   the government would submit that the purpose of this crime, the

19   purpose of obstructing the official proceeding was an attempt

20   to influence the government, was an attempt to basically stop

21   it -- basically -- to explicitly stop the peaceful transition

22   of power in this country.

23        That is, Your Honor, could not be, in some ways, more

24   squarely the definition of crime of terrorism, when we're

25   talking about destruction of government property to achieve

1     that end.

2               THE COURT:  Okay.  Thank you.  I won't ask you about

3     another statute.  I think those are all my statute questions.

4     But you were about to start running through the analysis.

5               MR. McCULLOUGH:  Thank you, Your Honor.  So, in the

6     wake of the arrest of the Proud Boys chairman on January 4th --

7     the Proud Boys chairman entered Washington, D.C. and was

8     arrested for conduct that happened in December.  But in the

9     wake of that arrest, Charles Donohoe stepped into the void and

10    became a leader in organizing, ensuring that this group that

11    had assembled on Telegram and begun the move to descend on

12    Washington, D.C. would remain organized and in order.

13              The Defendant Donohoe --

14              THE COURT:  Let me ask you a question.  I just can't

15    help myself.  I know I want you to get through your argument,

16    but, leader is one of the things that I've got in my mind.  It

17    seems to be important.  Some courts have looked at that with

18    respect to detention decisions in these cases.  I notice, in

19    the opening allegations in the indictment, you run through who

20    the four co-conspirators are.  You allege that Mr. Donohoe was

21    the president of his local chapter in North Carolina -- in the

22    city that he lives in, not the whole of North Carolina.  I

23    believe the other defendants also fell in that category.  But

24    you also suggest, in another allegation, that there's something

25    called the Elders Committee Group, some sort of executive

1   committee sounds like, to me, that assists the chairman in

2   running the organization.  You allege, I think, that

3   Mr. Nordean is such an elder.  You do not allege that

4   Mr. Donohoe is.

5          So, when you say he's a leader, it may well be.  I

6   just want to understand what you mean by that, consistent with

7   the government's allegations and evidence in the case.

8          MR. McCULLOUGH:  Yes, sir, and understood.  And so,

9   to answer the -- Your Honor's question, Charles Donohoe is not

10  understood to be a member of the Elders Chapter.  So, Defendant

11  Nordean is -- the other codefendants are not understood to be

12  members of the Elders Chapter.

13         Nonetheless, the structure of the organization is in

14  some ways hierarchical, as Your Honor's clearly, kind of, has

15  honed in on with the idea of a chairman, an Elders Chapter.

16  But even beyond that, there are different levels of ascending

17  the, kind of, pecking order of being a Proud Boy.  A first

18  degree Proud Boy is, instead of -- kind of the initiation

19  level.  There are then steps to become a fourth degree Proud

20  Boy.  So, there is, kind of, hierarchy embedded in the

21  organization itself.

22         So that's just kind of context.  Specifically as to

23  Charles Donohoe, Charles Donohoe, he steps into the void,

24  creates these Telegram channels.  And one of the Telegram

25  channels -- or, message groups, I should say, that's been

1    created, is a small group of which Nordean, Biggs, Rehl, and a

2    handful of others are talking.  And much of the discussion and

3    planning that takes place is among that smaller group.  So he

4    is, in that sense, the defendant, among this, kind of, set of

5    leaders.  But more importantly than that, Your Honor, he is --

6    he also speaks to the individuals who have come to the Capitol,

7    and he speaks with a degree of authority that is followed, and

8    asserts a degree of authority.

9          So one prime example, Your Honor, is that when

10   Charles Donohoe explains to the small group that I just

11   referred to, he says, "I'm on my way to the Washington

12   Monument," where they're going to meet at 10 a.m., he said, "I

13   have the keys until so Nordean and Rehl show up."  Effectively

14   stating that he is in charge until he has to cede to Nordean

15   and Rehl, who would presumably have a higher degree of pecking

16   order.

17         In addition to that, he is also an individual who is

18   telling people where to go, what to wear, and effectively, you

19   know, what channel to turn to in the communication devices.

20   Those are statements that are followed.  People do show up at

21   10 a.m.   Now, there are other people that make those

22   statements as well and direct the group to meet at the

23   Washington Monument, and in some cases Charles Donohoe merely

24   repeats what others have said.  But, that is a degree of

25   leadership and authority that is -- that should be

1    appropriately considered.

2           So while he may not be an elder, he is, nonetheless,

3    within this group considered -- considers himself, and

4    certainly the reactions of the group appear to indicate that he

5    is a leader of some repute within the group.

6           THE COURT:  Pause for a moment.  I assume the

7    government thinks it's significant that he's a member of the

8    Proud Boys; it's all over the indictment.  I want to understand

9    how that's significant to the decision I have to make.  I see

10   the government's one-paragraph description of what the Proud

11   Boys are.  And I don't know if you want to add to that.  You

12   know, just a moment ago I received these indications, whenever

13   anything I do comes up in the press.  And so, you know, in that

14   article they suggested the Proud Boys were an extremist group,

15   a violent nationalist street gang, I think was the quote.

16   What's the United States's position and how should that fit

17   into the decision that I have to make, with respect to the

18   Proud Boys?

19          MR. McCULLOUGH:  So, Your Honor, I think that this

20   is -- I think what we're dealing with when we're talking about

21   the Bail Reform Act, is we're talking about an individual's

22   characteristics.  And so, we are here, we are focused on the

23   individual characteristics of Charles Donohoe.  The reason that

24   the government points out the membership and relationship with

25   the Proud Boys is because it is, if you will, an association in

1    fact that basically defines the group of individuals with whom

2    Charles Donohoe came to Washington, D.C. and carried out this

3    criminal activity.

4         Now, does that mean that all Proud Boys are

5    responsible for this?  No.  That is not the government's

6    position.  And whatever reputation or position that the Proud

7    Boys have, writ large, is not at issue and that's not the issue

8    before you.  What's at issue before you is the conduct of a

9    group of individuals that coordinated their activity and

10   attacked the Capitol.  And those individuals happen to be

11   associated by virtue of their Proud Boys membership.  And that

12   relationship and that, if you will, brotherhood, that connotes

13   a certain degree of loyalty to one another, and leadership and

14   structure in the way that they operate.

15        So, we are not here to discuss the Proud Boys writ

16   large, but, rather, this group of individuals that are Proud

17   Boys that carried out a coordinated attack on the Capitol.

18        THE COURT:  You said somewhere, I don't know -- I

19   think it was you, some government attorney in -- I think it was

20   the argument before Judge Kelly with respect to Mr. Nordean and

21   Mr. Biggs.  So not Monday, but the week before, whenever that

22   argument occurred.  I think it was you.  Said something about

23   describing, sort of, the danger here as being the difference

24   between opening a bottle of wine or a bottle of champagne,

25   which I thought had something to do with the group.  And maybe

1    I over-read it.  So, maybe you could explain that to me?

2    Because I certainly want to understand what the government's

3    position is with the Proud Boys and how that fits in and what

4    you meant by that.

5            MR. McCULLOUGH:  Yes, certainly.  So, Your Honor, it

6    was me.  It was me.  So, I apologize that the metaphor was --

7    if the metaphor was clumsy.  The issue -- the issue that I was

8    referring to, Your Honor, is some of the discussion that

9    actually took place as Charles Donohoe was on his way to the

10   Capitol.  And, so, it's set out in one of the exhibits, but

11   I'll just -- I can just read it briefly.  It's the colloquy

12   that happens at approximately 7:18 a.m.  And Donohoe asks

13   another member whether they're here -- understood to mean are

14   you here in Washington, D.C.?  That Unindicted Co-conspirator

15   1 responds, "No, I'm not."  Donohoe says, you know, well,

16   effectively, too bad, that's unfortunate.  UCC-1 responds,

17   "There will be plenty more, I'm sure.  LOL," suggesting that,

18   you know, this kind of thing is just going to keep happening,

19   and then "LOL" to suggest that he's being sarcastic perhaps.

20           He then goes on to say, "I want to see thousands of

21   normies burn that city trash there."  Another person says,

22   "Would be epic."  UCC-1 says, "The state is the enemy of the

23   people."  Person 2 then says, "We are the people."  UCC-1 says,

24   "F yeah."  Person 3 says, "God let it happen.  I will settle

25   the scene and smash some pigs to dust."  Person 2 says, "F

1    these common traitors."  Person 3 says, "It's going to happen.

2    The normie cons have no ability to control, they're like a pack

3    of wild dogs."  Donohoe then says, "I'm leaving with a crew of

4    15 at 0830 to hook it to the monument, no callers."  And Person

5    2 says, "Fuck it, let them loose."  Person 3 says, "I agree."

6              Charles Donohoe is involved in this exchange.

7              THE COURT:  I hear you, but hardly.  I mean, I gotta

8    tell you, I didn't know what to make of this slide.  First of

9    all, are all these UCCs -- are you alleging that they're part

10   of this -- they're part of the Proud Boys?  I guess it doesn't

11   matter to you, if they're part of the Proud Boys at all.

12   They're part of the group that you think is planning to do

13   something at the Capitol.

14             MR. McCULLOUGH:  They're part of the group that is

15   discussing the plans that are laid that day.  The government

16   asserts that this is a circumstance in which part of that plan

17   means going into plain view.  And that plan then, we see that

18   plan carried out.

19             So, when the Proud Boys arrive at 10 a.m. at the

20   Washington Monument, they march, not to the ellipse to hear

21   President Trump speak, they marched to -- President Trump and

22   others speak, they march to the Capitol.  They arrive at the

23   west side of the Capitol, they march to the east side of the

24   Capitol, they march back to the west side of the Capitol.

25             When they arrive there, within four minutes the first

1    three barriers are breached and the people that had been

2    marching with Nordean, Biggs, Rehl, Donohoe surge forward,

3    cross over the trampled barriers, and individuals that they

4    have been marching with take -- advance forward and take

5    coordinated action to remove barriers.

6           The government included one of the photographs of

7    Pezzola and Pepe, who surged forward and take concerted

8    effort --

9           THE COURT:  Are Pezzola and Pepe Proud Boys?

10          MR. McCULLOUGH:  Yes, they are, Your Honor.

11          THE COURT:  Okay.  And part of this group?  Yes?

12          MR. McCULLOUGH:  And part -- correct, Your Honor.

13   And William Pepe was part of one of the Telegram group

14   messages.  I would not be able to speak to whether Dominic

15   Pezzola was at this point.  But, William Pepe was a member of

16   one of these Telegram messages.

17          So, going back to your question, Your Honor, in terms

18   of the difference between uncorking a bottle of wine or

19   uncorking a bottle of champagne, the point is that there is a

20   group of individuals who have been kind of moved into position,

21   along with this idea of the -- you know, kind of, the crowd

22   that has been riled up, the normie cons, as they're referred

23   to.  And this idea of let them loose is, Your Honor, what I was

24   perhaps inartfully referring to, is it's not simply removing a

25   barrier when there's no one behind you.

1          You know, if myself and Mr. Jones walked over to the

2     Capitol and removed a barrier, probably not a lot is going to

3     happen.  But, the difference between Mr. Jones and I walking

4     over to the Capitol with 15, 80, 100 people who have been

5     marching with us, and we remove a barrier with that crowd

6     surging behind us, an organized hierarchical structured group,

7     it has a different meaning.  It has a different purpose.  And

8     when it -- when the leaders surge forward and -- for instance,

9     Nordean and Biggs shake and push down one of the barriers and

10    then continued to advance, that's a meaningful push forward.

11    That is, you know, if you will, colloquially, leading by

12    example, that we were moving forward, we are going to push past

13    these barriers.

14          THE COURT:  I am going to go back to the slide.

15    There is the fourth slide of your PowerPoint.  What is a

16    normie?  And what's a normie con?  And are they the same thing?

17          MR. McCULLOUGH:  The government's understanding is

18    that a normie and a normie con are the same thing.  Certainly,

19    that is based strictly on the context on which the government

20    has gleaned from the discussions here.  The government's

21    understanding of normie or normie con, generally, are people

22    that are, effectively, civilians.  They are not part of an

23    organized group, such as the Proud Boys or some organized group

24    such as the militia.

25          THE COURT:  All right.  But for me, the slide is

1  suggesting that someone on the chat thinks it's -- and they

2  would be happy to see the normies burn the city to the ground.

3  But those aren't Proud Boys, doesn't sound like it.  And they

4  suggest the normie cons have no adrenaline control, if you can

5  infer that the person who said that thinks that he does.

6         So again, if it's the normies and normie cons that

7  are in this bottle of champagne, are you saying that I should

8  somehow hold the Proud Boys in this conspiracy that involves

9  them, these four co-conspirators, assess their danger based on

10  that?  I mean, it's one thing -- and I think I understand, you

11  know, 50 -- however many, 50, 60 people in this group -- would

12  love to know how big the group was -- for which Mr. Donohoe had

13  some leadership responsibility, some organizational

14  responsibility, I get that that's more dangerous, both that day

15  and in the future, were he able to marshal that group again.

16  But, I don't know if they're marshalling all the normie cons.

17         Maybe I'm misunderstanding the slide.  But, I didn't

18  see a lot to it.  That, plus the fact that seems that

19  Mr. Donohoe just said meet me at the Monument at 8:30.  I mean,

20  he's not agreeing with any of these statements, whatever --

21         MR. McCULLOUGH:  Your Honor, well, Your Honor, so the

22  indictment has not charged Nordean, Biggs, Rehl, Donohoe with

23  kind of -- some sort of Pinkerton liability for the acts of the

24  normie cons.  What they have been charged with, their own

25  action.  And so these individuals did move forward, advance

1    unlawfully onto Capitol grounds, with the intent to obstruct

2    the proceedings on -- at the Capitol.  They then interfered

3    with law enforcement; Donohoe, in particular, interferes with

4    law enforcement by driving toward the stairs leading from the

5    west plaza up into the west terrace.  And that video, Your

6    Honor, is -- is very indicative of the kind of group conduct

7    here.

8            Now, in that video, Your Honor, an individual that

9    has been referred to as Milk Shake is at the front of that

10   group.  That is the same individual that is alleged to have

11   said, "Let's storm the fucking Capitol," and is admonished to

12   not say that.  Not don't do that, but don't say that.  That

13   individual is at the front of that line in the video.  We can

14   see that individual begin an altercation with law enforcement

15   officers as they begin a push up those stairs.

16           Now, what's important here is that Charles Donohoe is

17   a few people back, but Charles Donohoe has pulled his mask up

18   over his face and he is watching intently at what is happening

19   at the front of that line.  And as there is a push at the front

20   of that line, Charles Donohoe joins in that push to surge with

21   the crowd past law enforcement.  That action effectively

22   springs -- or, allows Dominic Pezzola to move up the steps with

23   the stolen riot shield.

24           Now, they are responsible for the acts of their

25   co-conspirators, those acts of Dominic Pezzola in then

1     advancing further to the side of the Capitol and violently

2     breaking a window on the west side of the Capitol which allowed

3     others to enter.  That, again, is consistent with this idea

4     that, effectively, we will let them loose.

5              So, you're saying -- and I appreciate Your Honor's

6     view on the exchange.  But, the exchange on slide 4 is

7     consistent with the actions that are carried out, which is

8     moving -- that this group is going to unlawfully advance on the

9     Capitol grounds, and going to dismantle those barriers that

10    would inhibit others from continuing to advance.  And Dominic

11    Pezzola opens a window on the west side of the Capitol, which

12    allows others to enter into the Capitol as well.  This idea

13    of --

14             THE COURT:  About Mr. Pezzola, he is not part of this

15    indictment.  He's in a different case, also before Judge Kelly.

16    Is he an unindicted co-conspirator?  Why -- to what extent

17    should I consider -- on what legal basis should I consider what

18    he did to assesses the danger of Mr. Donohoe, when he's not

19    even in this case?

20             MR. McCULLOUGH:  So, Your Honor, the acts of -- so he

21    is a co-conspirator that is charged in a separate indictment.

22    A co-conspirator --

23             THE COURT:  Okay.  So you believe he is a

24    co-conspirator to Mr. Donohoe, Mr. Biggs, Mr. Nordean and

25    Mr. Rehl?  Yes?

 1          MR. McCULLOUGH:  That is correct.  Yes, Your Honor.

 2          THE COURT:  I'm sorry, is he a Proud Boy member?

 3          MR. McCULLOUGH:  Yes, he is.

 4          THE COURT:  Okay.  Keep going.

 5          MR. McCULLOUGH:  Your Honor, the co-conspirator need

 6   not be charged in the same indictment in order for the -- those

 7   members of the conspiracy to be responsible for those acts of a

 8   co-conspirator.  So Dominic Pezzola is a co-conspirator to the

 9   charged indictment.  He is just charged in a separate

10   indictment with Pepe, and now what has just been, I believe,

11   made public, the indictment of a third individual in that

12   conspiracy.

13          Now, they are -- with respect to Charles Donohoe,

14   Charles Donohoe effectively adopts the actions of Dominic

15   Pezzola.  Dominic Pezzola robs a Capitol police officer of

16   their riot shield.  Donohoe reports on the Telegram messages,

17   "Got a riot shield."  As defense counsel notes, there's no

18   evidence that Charles Donohoe actually stole a riot shield.  So

19   he's referring to the acts of Dominic Pezzola as one of ours.

20   You know, when Dominic Pezzola -- sorry, when Charles

21   Donohoe -- when there's later discussion, believed to be about

22   the persons who smashed the window of the Capitol, Charles

23   Donohoe reports that "He's one of ours," meaning that he is a

24   part of this group that stormed the Capitol.

25          So -- and then in combination with -- as we talked

1    about, the Exhibit C, showing the video that shows Milk Shake

2    pushing up the stairs, joined by Charles Donohoe behind, and

3    then Dominic Pezzola as part of that, who sprung up the stairs,

4    that is -- that is all consistent with the kind of coordinated

5    effort by this group that unlawfully interfered with Congress,

6    unlawfully advanced onto the Capitol grounds in unison and

7    removed barriers to allow for others to do the same.

8          THE COURT:  Is Milk Shake a co-conspirator?

9          MR. McCULLOUGH:  Your Honor, Milk Shake has not been

10   charged and he's not been referenced in the indictment.  I

11   think we are -- the government is still assessing his criminal

12   culpability.

13         THE COURT:  Okay.  You just referred to it.  And he's

14   also -- makes the statement which you think is important for me

15   to assess what this group's objective was.  It was Milk Shake

16   who made the comment about storming the Capitol?

17         MR. McCULLOUGH:  Yes, Your Honor.

18         THE COURT:  Is he part of the group or not?

19         MR. McCULLOUGH:  Your Honor, the government would

20   assert that he is part of the group and he had knowledge of the

21   plan.  And as Your Honor points out, in terms of he is an

22   unindicted co-conspirator at this point.  Where and whether he

23   will be indicted is a separate issue.

24         THE COURT:  Is he a Proud Boy member?

25         MR. McCULLOUGH:  Your Honor, I -- I would say I

1    believe he is.

2            THE COURT:  Okay.  All right.

3            MR. McCULLOUGH:  And so, Your Honor, I mean, I have

4    mentioned much of the, kind of, conduct on the ground.  I'm

5    happy to work back through that.  But, I think, again, would

6    refer Your Honor to the numerous comments that are made by

7    Charles Donohoe in celebration of this event, both

8    contemporaneous and after the event.

9            So, Charles Donohoe, in an exchange that is

10   referenced in the PowerPoint on slide -- slide 8, there is a

11   question of -- there's a statement by UCC-1, she pushed inside,

12   then continues, "Find some eggs and rotten tomatoes."  Donohoe

13   responds, "We are trying."  The government would assert that he

14   is certainly indicating here, based on the context of his later

15   actions, that he is responding that we are trying to push

16   inside the Capitol.

17           After this --

18           THE COURT:  What about this?  So you see -- and,

19   again, confusing to me, "We are trying," that is a response to

20   UCC-1, you believe, "Push inside.  Find some eggs and rotten

21   tomatoes"?

22           MR. McCULLOUGH:  Yes, Your Honor.

23           THE COURT:  So when Person 2 says, "They deployed the

24   mace yet?"  I read it as Donohoe saying, "We are trying."  We

25   are trying to deploy the mace.  So you're saying that's not how

1    to read this?

2              MR. McCULLOUGH:   Your Honor, that may very well be

3    that he is referring to deploying the mace, he may be referring

4    to one or both of those things.  I -- Your Honor, the point is,

5    that there are two people that are encouraging continued

6    conduct towards the Capitol and continued criminal conduct,

7    push inside, which is criminal, deploying the -- if in fact

8    person two is referring to co-conspirators, deploying mace,

9    that is also an unlawful act.  The response by Donohoe is, "We

10   are trying."  So whether -- I mean, frankly, whether it's in

11   response to --

12             THE COURT:  To what?

13             MR. McCULLOUGH:  Push inside the Capitol, commit a

14   criminal act there, or assault a police officer, "We are

15   trying."  Or assault a police officer with mace, "We are

16   trying."  He is indicating a commitment to carrying on this

17   criminal conduct.  And this criminal conduct is taking place

18   now at this point, when Donohoe is on -- unlawfully on the

19   grounds of the Capitol and these items are taken -- this

20   conduct is taking place.

21             In addition to that, Your Honor, as we pointed out in

22   the brief, Charles Donohoe at -- just after the 3 o'clock hour,

23   indicates that, you know, we are regrouping with a second

24   force.  Indicating that there's some effort to kind of continue

25   this conduct.

1          Now, the defendant points -- the defendant argues

2     that -- that Charles Donohoe was actually trying to -- you

3     know, he parroted back the statement of Mike Pence,

4     Vice President Pence, in an effort to get people to leave the

5     Capitol.

6          THE COURT:  I don't have those texts, they weren't

7     provided to me.

8          MR. McCULLOUGH:  I -- Your Honor, we would be happy

9     to provide them to you.  It was actually the -- the -- we

10    reference the -- this idea that he says we are regrouping with

11    a second force.  That is in the indictment, is also referenced

12    in our brief.  I would be happy to provide the text itself.

13    And, Your Honor, the government can submit that to you --

14         THE COURT:  Well, I'm most concerned at seeing it in

15    context.  Ms. Costner seems to suggest that there are later

16    texts which maybe can put that in a different light, including

17    sending out a text with respect to passing on Mike --

18    Vice President's Pence's request that the Capitol assault stop.

19         MR. McCULLOUGH:  Yes, Your Honor.  Well, the

20    government will be prepared to submit that, that in the

21    immediate aftermath of Charles Donohoe referencing, "We are

22    regrouping with a second force," he submits a series of -- he

23    distributes a series of messages that indicate that there are

24    defense forces mobilizing.  He publishes -- so, it's at 3:38

25    that he says, "We are regrouping with a second force."  At 3:43

1    he then says, "Incoming National Guard and DHS agents."

2              At 3:44 he says, "Security forces staging, ready to

3    move in."  At 3:45 he says, "Virginia National Guard and 200

4    state troopers are now being deployed to Washington, D.C."  At

5    3:45, he says, "President Trump orders the deployment of the

6    National Guard."  It is then, after all of that, that he

7    says -- he repeats the message from Vice President Pence which

8    says, "The violence and destruction taking place at the U.S.

9    Capitol must stop, and it must stop now.  Anyone involved must

10   respect law enforcement officers and immediately leave the

11   building.  Peaceful protest is the right of every American, but

12   this attack on our Capitol will not be tolerated and those

13   involved will be prosecuted to the fullest extent of the law."

14             So, Your Honor, in context, Charles Donohoe's

15   statements there are referring to the idea that the defense has

16   been mobilized and that people are going to be prosecuted for

17   the criminal misconduct that's taking place at the Capitol.

18   So...

19             THE COURT:  What does that signify to you?

20             MR. McCULLOUGH:  What it signifies, Your Honor, is

21   a -- much like the initial messages, an awareness that this was

22   criminal conduct.  An awareness by Charles Donohoe that this

23   was criminal conduct.  As he says on January 4th, "Everyone

24   stop what you're doing.  I need to be put into whatever plans

25   are being made, we could facing gang charges."  A clear

1    understanding that some type of criminal activity is afoot on

2    January 4th.

3            And on January 6th, the immediate aftermath of this,

4    he says we are regrouping with a second force -- a second

5    force, presumably, to continue to carry on the attack on the

6    Capitol, the interference with the counting Electoral College

7    vote, and a series of messages that indicate that, you know,

8    wait a minute, they are actually mobilizing a defense and

9    they're going to start prosecuting people.

10            So, it's, again, an awareness of criminal activity

11    and acknowledgment of criminal activity, Your Honor.

12            THE COURT:  You don't think it's a suggestion that

13    he's withdrawing from the conspiracy?

14            MR. McCULLOUGH:  No, Your Honor, because the

15    continued messages from Charles Donohoe celebrate the acts of

16    the conspiracy.  There's no -- there's no indication of a

17    withdrawal by Charles Donohoe.  Acknowledging that we had --

18    you know, that there is a -- that law enforcement has mobilized

19    and that there may be criminal prosecutions does -- voicing

20    that is merely an acknowledgment that what has taken place to

21    date is criminal.  There's no withdrawal from -- the statements

22    by Charles Donohoe that are made after that point celebrate the

23    criminal activity.

24            "I stood on that front line and pushed it twice.  I

25    feel like a complete warrior.  We stormed the Capitol."  These

1      statements, in the context of others, his codefendants who are

2      also celebrating this achievement by the group, "We took it

3      over," says Defendant Rehl.

4              THE COURT:  Okay.  Well, I'm going to ask that you

5      submit those texts.  I think Ms. Costner finds them

6      significant.  I would like to read them in context.  I hope

7      there is times associated with them.

8              You know, a question I've had is, he didn't --

9      there's no evidence, it sounds like so far, that the government

10     has that places him inside the Capitol.  So something happened.

11     He runs up the stairs and he never makes it into the Capitol.

12     That's maybe because the government just doesn't have evidence

13     yet.  But, I can only go on what you've been able to prove --

14     or believe you can prove.

15             So, you know, I'm trying to figure out what happened.

16     And I know about this one statement, which is that he's

17     marshalling some sort of second force.  So that's why it's

18     important.  I want to see all of these texts in context, as I

19     try to figure out what to make of the fact that he apparently

20     didn't go into the Capitol.

21             MR. McCULLOUGH:  Well, Your Honor, I think what to

22     make of the fact that he didn't go into the Capitol is that

23     there's a conspiracy and there is a group goal to obstruct the

24     proceedings.  And so the celebration of we stormed the Capitol

25     by somebody who did not enter the Capitol is an indication that

1   this individual has -- much like, "Got a riot shield," this

2   individual is adopting the accomplishments of the group.  And

3   that is, you know, further indicia of the conspiracy and

4   Charles Donohoe's commitment to achieving the conspiracy's end

5   goals.

6            THE COURT:  What -- do you have any more evidence

7   concerning the second force?  Whether or not it existed?  Was

8   it armed?  Why didn't it act?  Do you know anything more, other

9   than Mr. Donovan's text -- Donohoe's, excuse me, text saying

10  that he was somehow getting the second force ready?

11           MR. McCULLOUGH:  No, Your Honor.  The government has

12  no more evidence.  The government would point out, again, that

13  Charles Donohoe indicates he is regrouping with a second force,

14  indicating that he is intending to continue the conduct.  And

15  that conduct is not carried out, presumably because Charles

16  Donohoe reports, within minutes, that law enforcement is -- law

17  enforcement is adding to the defense at the Capitol.

18  Additional forces are on the way to the Capitol.

19           THE COURT:  I've read in another case -- and again,

20  public reporting.  I don't mean to have you confirm something,

21  if it's not public.  But I think it's the Oath Keepers case,

22  some suggestion of a quick reaction force, maybe an armed one.

23  So I didn't know -- sounds like the answer to the question is

24  you don't know anything about there being a quick reaction

25  force, armed, incorporating this Proud Boys forcible storming

1    of the Capitol?

2              MR. McCULLOUGH:  No, Your Honor.  The government is

3    not asserting -- so, the government is not asserting that

4    the -- Charles Donohoe's statement about regrouping with a

5    second force has -- bears a relationship to the quick reaction

6    force.

7              THE COURT:  But you don't know if there was an armed

8    force with respect to this conspiracy?  All you know is what's

9    said in that text?

10             MR. McCULLOUGH:  That is correct, Your Honor.

11             THE COURT:  Okay.  That's fine.  Again, I'm trying to

12   assess danger here, and that text is ominous.  So, I want to

13   know what you have.  And I understand you have the text.  So I

14   would like to see the other texts, to put all of that in

15   context.

16             MR. McCULLOUGH:  Yes, Your Honor.

17             So, Your Honor, the government -- the government

18   would basically tell you that the point of this, the danger of

19   Charles Donohoe is his ability to -- his resources and ability

20   to bring a group of men to the Capitol and to advance with that

21   group of men onto -- unlawfully into Capitol grounds; removing

22   barriers, removing obstructions, interfering with law

23   enforcement in such a way that would allow additional

24   individuals to proceed onto the Capitol grounds.

25             But, frankly, all of this goes to the goal of

1    interfering with the lawful counting of the Electoral College

2    votes.  And that was celebrated in statements by Charles

3    Donohoe and others.  It is -- it is -- they are achieving their

4    objective as we storm the Capitol.  It did not require -- did

5    not require that they enter the interior of the Capitol.  The

6    disruption of the proceedings was sufficiently interfered

7    with by the mere presence of this incredible throng in the west

8    alcove of the Capitol -- in the west plaza of the Capitol.

9         THE COURT:  Do you have evidence which you want to

10   share with me -- you can choose not to -- of what the goal of

11   this conspiracy was, other than what they did?  And that's

12   pretty powerful; I'm not saying that that's not powerful.  We

13   know what they did, and they did it in concert.  But beyond

14   that, and beyond the statement made by Milk Shake, is there any

15   other evidence that their goal, their plan was to storm the

16   Capitol?

17        MR. McCULLOUGH:  Yes, Your Honor.  So the

18   contemporaneous statements of both individuals who are in the

19   Telegram messages to the -- as the government included in the

20   messages, as the group advances past the barriers at the First

21   Street gate, there are individuals that also use that same

22   phraseology, you know, Storm the Capitol, We are storming the

23   Capitol, Get there, We are storming the Capitol right now.

24   Those statements are made shortly after individual -- after

25   this group rushes past the initial First Street gates.  At the

1      same time, Your Honor, at the same time --

2              THE COURT:  Did you show me -- is that slide 7?  Is

3      that what you're referring to?

4              MR. McCULLOUGH:  That is correct, Your Honor.

5      Storming the Capitol building right now, Get there, Storming

6      the Capitol building right now.  There's contemporaneous

7      audio -- or, it's a video of Joe Biggs as he is walking down

8      that First Street pedestrian gate.  Joe Biggs, in advancing

9      past those barriers, is using the same terminology:  We are

10     storming the Capitol.  We are advancing past -- you know, we've

11     advanced past every barrier.  That is -- that's significant,

12     Your Honor, the same -- the idea that this is the same

13     terminology being used on the Telegram messages and

14     contemporaneously by Joe Biggs as he is, in fact, doing exactly

15     that, as were all these individuals.  Doing exactly that,

16     storming the Capitol.  Unlawfully advancing on the Capitol

17     grounds in such a way that interfered with law enforcement,

18     interfered with the official proceeding that was taking place

19     at the Capitol.  That is --

20             THE COURT:  Okay.  But these texts, slide 7, they

21     seem to be contemporaneous with the storming.  They're all

22     happening at the same time.  That's some evidence, too, of what

23     their intent was, say, even ten minutes before.  But is there

24     anything prior to the 6th, evidence of what their plan or goal

25     was coming to Washington, D.C.?  Was it to storm the Capitol or

1   not?

2            MR. McCULLOUGH:  So, Your Honor, the government would

3   point, again, to an awareness on January 4th, Charles Donohoe

4   is plainly referring to plans to carry out criminal activity.

5   Everyone stopped.  The planning needs to stop now.  Everything

6   needs to stop.  We could be facing gang charges.  So, there are

7   plans to conduct and carry out criminal activity.

8            We know -- we can see that this group made its way to

9   that First Street gate within four minutes, advanced forward,

10  there were then coordinated actions to remove barriers.  And

11  this, again, you have an individual in this group saying,

12  shortly before, "Let's take the fucking Capitol," and he's

13  admonished, "Don't say that."  There's another individual in

14  the background that said, "Don't say it, do it."  There's then

15  contemporaneous language about storming the Capitol at the --

16  effectively at the same time.

17           On Telegram they are saying, "Storming the Capitol

18  building right now."  Biggs is saying the same thing as he is

19  unlawfully advancing with the throng onto the Capitol grounds.

20  There --

21           THE COURT:  Understood.  No, I understand.  I get it.

22  That's, you know -- you know, often the proof of what the

23  conspiracy is up to is what the group does in concert together,

24  what actually happens.  So, I hear you.  And they've got their

25  contemporaneous statements as well.  But this -- Milk Shake's

1    statement, do you know when that was made?  I mean, how -- that

2    scene when they were just milling around, the storming hadn't

3    begun yet, and yet he's saying, "Let's storm it.  Let's do it,"

4    and everyone tells him to be quiet.  So the question is, when

5    was that statement made?  When in the timeline?

6              MR. McCULLOUGH:  Your Honor, that -- I cannot give

7    you a precise minute.  I do not have the precise minute in

8    front of me right now.  That statement was made shortly --

9    between the 11 and 12 o'clock hour.  So --

10             THE COURT:  Between the 11 and 1 o'clock hour, is

11   that what you said?

12             MR. McCULLOUGH:  11 and 12 o'clock hour.  Between 11

13   and 12.

14             THE COURT:  Okay.

15             MR. McCULLOUGH:  All right.

16             THE COURT:  I want to talk about arms, weapons.  Is

17   there any evidence of weapons being used by this group, this

18   conspiracy?  Shields, I hear you, Pezzola, shields, I mean, he

19   at least used it to break a window.  Any other weapons?

20             MR. McCULLOUGH:  The four co-defendants and Dominic

21   Pezzola are not alleged to have had any weapons on their

22   person.

23             THE COURT:  Okay.  What about Mr. Donohoe?  Did he

24   have any tactical gear?  Did he have a vest on or those knuckle

25   gloves?

1    MR. McCULLOUGH:  Your Honor, Charles Donohoe is not

2    known to have had any knuckle gloves or tactical gear.  Charles

3    Donohoe was wearing a large leather jacket, bomber style

4    leather jacket, as Your Honor has observed in the video.  It's

5    the government's understanding that several individuals were

6    wearing tactical vests underneath jackets.  The government does

7    not -- cannot say at this point one way or the other whether

8    Charles Donohoe had such tactical vest underneath his bomber

9    jacket.

10   THE COURT:  Well, was there anything found at his

11   house when he was arrested, in terms of tactical equipment,

12   weapons?

13   MR. McCULLOUGH:  There was -- Your Honor, Charles

14   Donohoe was arrested in March, there was no tactical gear or

15   equipment found in his -- at least seized from his apartment.

16   THE COURT:  Ms. Costner suggested that there was

17   some -- I don't know, shirts, clothing with Proud Boys logos on

18   them.

19   MR. McCULLOUGH:  That is correct, Your Honor.

20   THE COURT:  Let's talk about these chats.  I think

21   there were two times, both before the event and after the event

22   when he was talking about nuking the chats, is that correct?

23   Did that happen twice?  So why don't you walk me through --

24   MR. McCULLOUGH:  That's correct, Your Honor.  So

25   there are statements made at -- statements made at the outset,

1    after the Proud Boys chairman was arrested.  At that point --

2    at that point, Your Honor, made statements as to -- Charles

3    Donohoe says, "We are transferring the chats over.  The Proud

4    Boys chairman got pinched."  He notes that -- there are

5    comments about whether they would -- whether law enforcement

6    would have Enrique Tarrio -- sorry, the Proud Boys chairman's

7    phone.  There is someone that then asks about which chat the

8    group should be in and Charles Donohoe says, "No, we are nuking

9    that one.  Leave that one.  I am consolidating all our guys.

10   We are going to be a boots-on-ground directing."

11        He says, in a separate chat, "Each one of us should

12   personally clear out our history of that MLSD chat."  He then

13   makes a series of statements about not adding the Proud Boys

14   chairman into any of these chats until there's confirmation

15   that it's, effectively, him and not law enforcement.  That's

16   not said explicitly, but there's statements about do not add

17   Proud Boys chairman to these chats until we get verbal

18   confirmation he's in possession of his phone.

19        In a later point someone added Proud Boys chairman to

20   the MLSD name and I just booted him.  "I'd like him to come in

21   here first.  These kind of operational security measures, in an

22   effort to ensure that law enforcement does not get access to

23   the planning and discussions of these events."  That's being

24   done January 4th and 5th, before this incident.

25        And then after the -- after this incident --

 1          THE COURT:  Let's just focus on before the 6th, first

 2  of all.  MLSD, what does that mean?

 3          MR. McCULLOUGH:  The government understands that

 4  refers to ministry of self-defense.

 5          THE COURT:  Was -- to your knowledge, did he

 6  successfully nuke the old chats to January 6?  Something you

 7  can check?

 8          MR. McCULLOUGH:  I'm sorry, Your Honor.  I think I

 9  misunderstood the question.  We just had a technical issue

10  there.  I'm sorry.

11          THE COURT:  Did he successfully nuke the chats prior

12  to January 6th?

13          MR. McCULLOUGH:  Your Honor, I don't think that I can

14  answer that question.

15          THE COURT:  Okay.  And I don't -- again, I don't --

16  if there are some things you don't want to share.  The point of

17  my question is, the chats were not nuked, but they don't

18  disclose any criminal planning, then, that may be

19  significant -- that's the point that Ms. Costner has made,

20  that, you know, who says that there is anything unlawful?  And

21  you want me to draw that inference, that the reason that

22  there's so much security, the reason they're doing encrypted

23  chats, the reason he's telling them to nuke prior chats is

24  because they're planning something unlawful.  You want me to

25  draw that inference.

1          Well, I hope that that's what the chat -- that the

2    government doesn't have the chats, and that they are totally

3    benign and innocent, if you want me to draw that inference.

4    So, that's why I asked.  Does the government have the chats

5    that Mr. Donohoe thought he nuked pre-January 6th?

6          MR. McCULLOUGH:  Your Honor, the government is not

7    prepared to answer that question.

8          THE COURT:  Okay.  But you want me to draw that

9    inference?

10          MR. McCULLOUGH:  Your Honor, Charles Donohoe's

11    statement indicates plainly, Everything is compromised and we

12    can be looking at gang charges.  That indicates some awareness

13    of criminal activity and criminal conduct.

14          THE COURT:  All right.  Let's talk about after

15    January 6.  He tried again to nuke chats, right?  I think that

16    there's some suggestion that he was -- all I know is that it

17    ended with a "humm," meaning that maybe he was unable to do it.

18    He even thought he was unable to do it.

19          MR. McCULLOUGH:  That is -- Your Honor, that is

20    correct.  There is, again, discussion at the conclusion of

21    this, after one of the individuals is arrested.  There is

22    public reporting that one of those individuals is arrested, and

23    there is an immediate response to that of, We do not need

24    people seeing what we wrote.  We need to -- we need to nuke

25    these chats.  And those statements are made by others.  Charles

1    Donohoe then says, "Won't need to nuke it."  And he is

2    directed, "Yes, nuke it."  There's a period of time that goes

3    by and Charles Donohoe then is told that, "It didn't nuke it,"

4    and Charles Donohoe says, "Humm," as you say.  I think that

5    indicates that Charles Donohoe asked whether people wanted him

6    to nuke it and that there was an effort by him to in fact nuke

7    the chats.

8              THE COURT:  I want to switch to another point the

9    government makes.  And admittedly other judges have made it,

10   too.  No expression of remorse from Mr. Donohoe, that the

11   government is aware of.  Ms. Costner makes a footnote to

12   suggest that to require that -- or, to ask that question, to

13   answer it, says he hasn't done it and use it against him is

14   essentially taking his silence and using it against him,

15   violation of the Fifth Amendment.  What's the government's

16   response?

17             MR. McCULLOUGH:  Your Honor, it's not a violation of

18   the Fifth Amendment.  The government is not -- is not requiring

19   that Charles Donohoe publicly state some contrition for the

20   conduct.  The point is that Charles Donohoe, in the wake of

21   January 6th, is continuing to celebrate the events of January

22   6th.  And in his own words, you know, it made him feel like a

23   complete warrior.

24             So, Your Honor, the government would point to the

25   fact that Charles Donohoe indicated, you know, not that -- you

1    know, anything that had happened was, in fact, you know, kind

2    of a bad outcome.  Rather, he's really celebrating that event.

3    And when he is -- when he is told by one of his -- by another

4    individual in the Telegram messages, you know, when Biden

5    becomes president it will be all over.  Charles Donohoe says,

6    "It's never too late."  Right?  Charles Donohoe is indicating

7    that this is a -- this is a fight that can continue.  It is

8    never too late to, basically, challenge the lawful functions of

9    government.  And Charles Donohoe --

10              THE COURT:  Well, yeah, let's talk about that,

11    because I found it a little confusing, although not as

12    confusing as some of the other slides.  Let's go to slide 12.

13    I think this is the one you're referring to.

14              MR. McCULLOUGH:  Yes.

15              THE COURT:  So, tell me what you think this slide --

16    what it says and what you think it means, these chats.

17              MR. McCULLOUGH:  So, this begins with -- the top line

18    is Defendant Rehl, who says -- who, after learning that Joe

19    Biggs has left the area, says, "Ah, shit, forgot.  Knew Biggs

20    had to roll.  Was hoping to have some celebratory beers with

21    you all after this epic fucking day.  I'll drink one for you."

22              Biggs says, "We will one day.  This day lives in

23    infamy, or" -- I think he means "for" -- "the ages."  Donohoe

24    then says, "Yeah, I feel like a complete warrior.  I stood on

25    that front line the entire time and pushed it twice.  Thank God

1     we were not wearing colors.  We should never wear colors ever

2     again for any event.  Only for meet-ups."

3          That exchange, Your Honor, is both Charles Donohoe's

4     acknowledgment of having pushed the line, pushed -- interfered

5     with law enforcement.  "I stood on that front line the entire

6     time and pushed it twice."  Your Honor, the video evidence

7     indicates that there is at least one incident that the

8     government has seen where Charles Donohoe does push up that

9     police line.  Again, kind of -- a joint understanding of what

10    we accomplished, in effect.

11          There is then a -- then there's a 12-minute gap, as

12    the government points out, with no messages in the message

13    thread.  And then Donohoe said, "Stop right there."  Now, what

14    is Donohoe responding to there?  Your Honor, I -- Your Honor,

15    one might say, you know, perhaps we've all experienced this

16    where you get a message in one chain and respond to the wrong

17    one.  That could be what's happening there.  The government

18    does not know, but I think that's a reasonable way to read it,

19    that he's responding to someone saying something, but he says,

20    "Stop right there.  All of what you said doesn't matter.  We

21    stormed the Capitol unarmed and took it over unarmed.  The

22    people are fucking done."  And then he says, "Wait when Joe

23    Biden tells us we are all criminals."

24          Person 2 says, "By then, it's too late."  He says,

25    "No, it's not.  It's never too late, ever."  There are two

1    unrecovered audio files, and then Donohoe says, "Facial

2    recognition doesn't mean shit when you got 5.56 green tip."

3              THE COURT:  What does that mean?

4              MR. McCULLOUGH:  Your Honor, the government's

5    understanding, that 5.56 green tip refers to ammunition for

6    assault rifles.  In particular, green tip ammunition is

7    ammunition that has a steel casing on its head, and is at least

8    colloquially referred to as being armor-piercing.  I think

9    there are distinctions drawn under regulatory requirements as

10   to whether it is in fact armor-piercing.  But, it is a -- I

11   think would be considered a lethal and -- lethal ammunition

12   used for assault weapons, which has increased penetration

13   capabilities.

14             THE COURT:  So now -- what does this slide mean to

15   the government?  What are you saying this slide means,

16   especially those last few lines?

17             MR. McCULLOUGH:  Your Honor, the government

18   submits -- these are Charles Donohoe's words.  I mean, so, you

19   know, the government didn't, kind of, make these up out of

20   whole cloth.  This is what Donohoe is saying to us.  Donohoe is

21   saying, you know, he felt like a complete warrior, he

22   successfully contributed to this effort.  He celebrates, "We

23   stormed the Capitol unarmed, and wait until Joe Biden tells us

24   we're all criminals."  And when he's told, you know, by the

25   time Joe Biden is president it's going to be too late.  And he

1    says, "It's not too late, ever."  And I think, Your Honor,

2    quite simply, that that refers to the fact that, as I said at

3    the outset, the conditions -- the conditions in the

4    United States where the election may have passed, the

5    conditions are not so substantially different that someone with

6    motivation to attack the Capitol on January 6th and interfere

7    with the transfer of power would forswear any further efforts

8    to interfere with lawful government functions.

9            THE COURT:  Well, let's just talk about that in

10   *Munchel*.  So, the Circuit, most clearly in the dissent,

11   concurring opinion, critical of the District Court's conclusion

12   in that case, that *Munchel*, you know, posed a danger to act

13   against Congress in the future.  But there was no explanation

14   from the Court as to how the defendants would be capable of

15   doing so, quote, now that the specific circumstances of January

16   6 has passed, or in the words of that -- the concurring and

17   dissenting judge in *Munchel*, quote, the transition has come and

18   gone and that threat -- by that I think he met the threat that

19   the defendants would attempt to stop or delay the peaceful

20   transfer of power -- had long passed.

21            There's suggestion of this concept as well, but not

22   quite as clear in the main opinion, where, again, they state

23   that the -- the District Court found that the appellants were a

24   danger to act against Congress in the future.  This is what I

25   just read.  But there was no explanation of how the appellants

1     would be capable of doing so now that the specific

2     circumstances of January 6 have passed.

3             So this concept that this moment has passed, the

4     transition has occurred, that we have to consider that.  And

5     maybe -- I mean, you know, if you take it to its logical

6     conclusion, if that was determinative, then no one, in any of

7     these cases, should be held because the moment has passed.  You

8     know, you may disagree personally with that, but the concept is

9     there and the Circuit has said it.  So what do we do with that?

10            MR. McCULLOUGH:  Your Honor, as you've said, I think,

11    you know, if we take that to -- what I would say, sort of, the

12    illogical conclusion, there's no one that could be considered a

13    danger to -- you know, interfering with lawful government

14    functions in the future.  I just don't think that is the case

15    here.  I don't think that's what *Munchel* was getting at.

16    *Munchel* plainly states that it is -- it is focused on

17    dangerousness and whether we've met this kind of threshold

18    question of whether the individual poses a danger.  And, I

19    think the circuit was there, in *Munchel*, really wrestling with

20    this issue, does this individual pose a danger?

21            And I think the reason, frankly, that case was

22    remanded down to the District for that question, as to whether

23    this person poses danger, it wasn't foreclosed that, ah,

24    January 6th has passed and you can't do anything in the future.

25    So I don't think that's what the District concluded -- what the

 1    Circuit Court was getting at.

 2            With respect to why Charles Donohoe was different.

 3    The *Munchel* decision addresses this idea that those who aided,

 4    conspired, planned, coordinated the actions of advancing

 5    unlawfully onto the Capitol grounds, of interfering with this

 6    lawful function of the government, these people pose a danger.

 7    And I think when we're talking about Charles Donohoe and the

 8    codefendants, we are not talking about a group that for the

 9    first time mobilized to go to a different city and, you know,

10    was able to, kind of, marshal these resources.  We're talking

11    about individuals that have the ability, the resources and

12    capability to marshal a group, a disparate group -- we're not

13    talking about, you know, the Wolf's Lodge in, you know,

14    Shreveport, Louisiana that all got together and came up here

15    together.  We're talking about disparate forces from across the

16    country that Donohoe and codefendants have the ability to

17    marshal those -- organize and marshal those forces into a

18    position in Washington, D.C.  And, as --

19            THE COURT:  I hear you and I get you, and I get

20    that's what's different between *Munchel*.  *Munchel* was a unique

21    circumstance for him and his mother because they weren't part

22    of a group.  There wasn't a big plan.  There wasn't a large

23    conspiracy, other than between the two of them.  And they were

24    only able to have any success on that day, if they had any,

25    because they were just there with this whole other larger group

1    that, sort of, you know, they -- they got on board and they

2    went inside and they walked out.  I hear that.  Donohoe and

3    other conspiracies like this, you know, there is a group, there

4    is planning, they're able to, as you say, to marshal the

5    resources, they can bring together, you know, 100 guys intent

6    on doing something.  So, I get that distinction.  But I keep

7    coming back to -- and I hear you as well -- that the majority

8    opinion in *Munchel* suggests that it is but a factor; not the

9    only thing for the Court to consider, the passing of the

10   political moment.

11         But, your indictment says that the object of this

12   conspiracy was to, you know, block the vote and, implicitly,

13   stop the transition.  That is done.  It's over.  So is there

14   something else that we should be concerned about with respect

15   to the Proud Boys, this group, these four codefendants?

16   Perhaps their goals are broader than just stopping the

17   transition.  But --

18         MR. McCULLOUGH:  Your Honor --

19         THE COURT:  -- what's your argument?

20         MR. McCULLOUGH:  And, Your Honor, I think while the

21   conspiracy alleged in the indictment may be over, the, kind of,

22   broader -- Judge Harvey, did we lose you?

23         (Pause.)

24         MR. McCULLOUGH:  Mr. Tran, I don't know if you still

25   see --

1          THE COURT:  Hold on a second, guys.  I'm having a

2     problem here.  Hold on.  My VPN just went down.  Wait a second,

3     guys.  Can you hear me now?

4          THE COURTROOM DEPUTY:  Yes, Judge.

5          MR. McCULLOUGH:  I can hear you.

6          THE COURT:  All right.  Well, my VPN just stopped.  I

7     don't think I need it, but I think that that's what caused it.

8     So everyone froze.  I hope I -- maybe I froze for you.

9          The last I heard is that, yes, the indictment was

10    focused on the transition, but --

11          MR. McCULLOUGH:  Yes, Your Honor.  So, the

12    indictment, the conspiracy that's charged in the indictment,

13    that, you know, obstructing the official proceedings that are

14    taking place on January 6th, that's the indictment.  The -- if

15    we look to the defendant's words, the co-defendants in this

16    case, it is not simply, you know, this is all about the

17    transition of power from Trump to Biden.  There is -- the words

18    are much broader.

19          And, so, frankly, the idea that Defendant Biggs makes

20    a number of statements where he says, "It's time to fucking

21    roar if they steal this shit."  So, this idea that, you know,

22    if the election is stolen, it's time for war.  There are

23    references by Defendant Ethan Nordean, this idea that, "We

24    tried playing nice and by the rules, now you will deal with the

25    monster you created.  The Spirit of 1776 has resurfaced and

1    created groups like the Proud Boys."  Goes on to say, "We're

2    unstoppable, unrelenting, now unforgiving.  Good luck to your

3    traitors in this country you so deeply love.  You're going to

4    need it."

5            There are, you know, again, on the day of January 6,

6    as Ethan Nordean was leading the group to the Capitol, he

7    references this idea that we represent the Spirit of 1776 and

8    we are here to, effectively, remind those who have forgotten

9    what that means.

10           This talk, this broader talk of war and revolution,

11   this idea that this fight is not done, it's not over, it's not

12   confined to peaceful transition of power January 6, January 20.

13   The government would submit that the defendant's words indicate

14   that this is a broader ideological struggle, and one in which

15   they, you know, in some ways view themselves as carrying out

16   acts of patriotism by taking physical action, rather than

17   simply sitting at home and writing words on social media.  And

18   that's --

19           THE COURT:  Never too late.  Ever.  Got it.  Okay.

20   I've heard enough from the government.  Ms. Costner.

21           MS. COSTNER:  Yes, sir.

22           THE COURT:  Go right ahead.  Your turn.

23           MS. COSTNER:  Okay.  Thank you, Your Honor.  Does the

24   Court want me to, I guess, respond to the government, or just

25   sort of go into --

 1          THE COURT:  However you want to do it.  You heard my

 2     questions, you heard the responses.  You probably had a

 3     presentation.  You know, I took a lot of time with the

 4     government on Mr. Donohoe.  Bear up, see if we can't finish

 5     today.  I can't imagine -- we've gone an hour and a half.

 6          MS. COSTNER:  Yes, Your Honor.

 7          THE COURT:  Just got to talking.  So, I'll give you

 8     as much time as you need.  Don't feel rushed, is my point.  You

 9     do what you're going to do, Ms. Costner, and we'll get to my

10     questions at the end.  Tell me what you want to tell me.

11          MS. COSTNER:  Yes, Your Honor.  Thank you.  And, Your

12     Honor, as you've referenced my response, my 21-page response,

13     which is pretty detailed and so I don't want to be repetitive.

14     Under -- you know, I think what I would like to do is talk

15     about the -- about what you just heard from the government.

16     And I'm interested, I think, in the Court's questions, as well,

17     as we go along.  And so I think I would like to start maybe by

18     just addressing the nature and circumstances of the offense.

19          It's sort of one of those things, yes, I prepared a

20     presentation, but I think I'd like to tailor what I say going

21     forward more to what the Court has heard, and understanding

22     that the Court also reviewed the transcript of the hearing on

23     Monday with Judge Kelly.  And, hopefully, although I don't have

24     a transcript, can try to answer the Court's questions along the

25     way.

1          I'm going to try to do a combination of addressing

2     what the government said and, also, referring to my memorandum

3     as well.

4          THE COURT:  Ms. Costner, I'll say one more time, do

5     not feel rushed.  If we're not done at 5, we'll just schedule

6     another time tomorrow.  All right?  So don't feel rushed

7     because I spent so much time talking to the government.

8          MS. COSTNER:  Thank you, Your Honor.  I appreciate

9     that.  Your Honor, I think -- what I would like to do first is

10    just talk about Mr. Donohoe and distinguishing him from his

11    co-defendants.  And I think that there's a lot of facts that do

12    distinguish him.  And the Court, you have pointed out several

13    of them as you have engaged in dialogue with Mr. McCullough.

14          First and foremost, Mr. Donohoe is not an elder, not

15    a -- he is president of a local chapter, Kernersville, North

16    Carolina, population, I think, about 24,000 people, give or

17    take.  So it's a very small -- small community.  So I would

18    just contend that, you know, this was not a man who was

19    marshalling a large group of Proud Boys or running a large

20    organization.  And, in fact, when -- in the Telegram messages

21    to support this, he -- when he came to Washington, D.C. --

22    first of all, he didn't leave until, I think, around 2 a.m.

23    He wasn't going to, to begin with.  Arrived in Washington

24    around 6, 7 a.m.  And nobody from the Kernersville chapter of

25    the Proud Boys came with him.  He came alone from his chapter.

1    Now there may have been other people there from North Carolina,

2    I don't know, but they certainly were not anybody that, I

3    guess, one would consider to be under Mr. Donohoe's chapter.

4         Your Honor heard about -- just looking through.  In

5    looking at the telegraph messages -- Telegram.  I always want

6    to call it telegraph -- the Telegram messages, you know, around

7    January 4th and before.  I mean, first of all, I think I would

8    just echo, or say, I have yet to see any messages prior to that

9    time in any channel allegedly nuked by Mr. Donohoe that in any

10   way shape or form showed a plan to do anything at the Capitol,

11   such as storm it, take it over, disrupt the vote, anything like

12   that.  And I would say at this point, if those existed, I would

13   like to think I would have them and they would be before the

14   court.  But I haven't seen them and, at least for me, they

15   don't exist.

16        So you have this conversation that begins on January

17   4th where they are talking about, you know, changing or nuking

18   or starting this new group.  And certainly -- did we lose him?

19        THE COURT:  He's there.

20        MS. COSTNER:  Okay.  I'm sorry, the (unintelligible)

21   shifted and I didn't see.  So I thought maybe there had been

22   something that had happened.

23        MR. McCULLOUGH:  My apologies, I was simply closing

24   my blinds and I was trying to do it in a way that would not

25   disrupt.  My apologies.

1          MS. COSTNER:  It disrupts my very remedial Zoom

2     skills, as much as anything else, and I apologize for that.

3          So these conversations between, you know,

4     Mr. Donohoe -- or, these messages that he sends out to others

5     are, by and large, communications from others, where he is, you

6     know, putting them forward.  You know, saying he stepped into

7     the void and became a leader just because he set up some other

8     channel I think is a large exaggeration.

9          And if you look at the Telegram messages, you'll see

10    that, you would see that.  In fact, he has a hard time doing

11    that and he says, This is a lot of work, can other people do

12    this?  Can other people help me?  So he is not some master, you

13    know, Telegram administrator where he just, you know, changes

14    up things and starts new channels.  And I think that's also

15    evidence, you know, just when you see that he can't really add

16    everybody.  Other people are adding, other people are sort of

17    doing all of that.  And communicating from -- you know, he's

18    communicating the messages of others.

19         So once he gets in the -- I guess, gets a ride to

20    Washington, D.C. -- and you can tell, he says he's with a

21    couple other people, one person is a Proud Boy, but I don't

22    know that that person is somebody with him or it's just some

23    random person.  He doesn't even have a place to stay.  He is

24    trying to figure out where he's going to stay.  He's asking,

25    are you in a hotel, are you in a camp ground?  He doesn't even

1  have a ride home when it's all over because the people he was

2  with leave him.  And I would say that if he were such a leader,

3  that wouldn't happen.  I mean, there would have been -- you

4  would see more planning on his part.

5          And more importantly, Your Honor, what you don't hear

6  from Mr. Donohoe throughout these Telegram messages, on his

7  part or any social media or anything like that, is that the

8  election was stolen, that, you know, that they need to disrupt

9  this election, that -- some plan to go to Washington, D.C. and

10  conduct a raid on the -- you know, on the Capitol and somehow

11  stop this transition of power.  You don't hear anything from

12  him like that.

13          And, so, that -- I think that's -- that's important

14  and -- just a minute.  So, he gets there and he does parrot

15  information from others, you know, about what time to meet,

16  that sort of thing.  The government points out this

17  conversation that took place at 7:18 a.m. where Mr. Donohoe

18  says, "Are you here?"  And somebody says, "No, I'm not."  And

19  he says, "Too bad," and then there's all this other

20  conversation about wanting thousands of people to burn and all

21  this other stuff.  He doesn't engage in that conversation.

22  Instead, later, he says, "I'm leaving with 15 people."  And you

23  see about 15 people, him and about 15 people walking over to, I

24  guess, some sort of meeting place.  Nobody has a weapon.  They

25  may be chanting some stuff about F Antifa or some chants like

1    that.  But you don't hear conversation about a plan to, you

2    know, stop the count or -- you know, the one guy that says

3    something, this Milk Shake, he's chided by the other members to

4    stop saying that, don't say that.

5              Now, the government will say that's because he's

6    announcing their secret plan, but it also could be because he's

7    saying stuff that they don't agree with and they don't want him

8    saying it because it will get them in trouble if somebody hears

9    that.  And while they're walking, there is a person, a Proud

10   Boy, I think, he's in a wheelchair, and he's saying all kinds

11   of just stuff, talking about, you know, hey, girls, look at

12   this guy, some things like that.  So this isn't a serious

13   group -- I mean, I would say, walking in lockstep, you know,

14   announcing their plans to take over anything.  There's a lot of

15   horseplay going on and some stuff being said.

16             So, when they get to the Capitol where these barriers

17   are being -- have been already removed or destroyed or

18   something, again, the government is, you know, trying to say

19   that somehow this happened -- I don't know, at the command, the

20   behest, because Mr. Donohoe and others wanted it to happen.

21   They do go past these barriers.  No evidence at all that they

22   told anyone to do that, that there was any plan in advance,

23   saying, Hey, if you get there first, knock down these barriers,

24   ignore the security guards.

25             I mean, there is a large group of people doing this,

1    and they are certainly part of that group of people and they

2    certainly are walking along with other people, but there's no

3    evidence, at least in the video, especially, of Mr. Donohoe

4    doing anything to, you know, to tell someone to do that, to

5    instruct someone on Telegram to do that or anything like that.

6    And he doesn't do that.

7         And talking about when he gets to these -- well,

8    let's just back up for a minute.  You do see him on the video

9    touching the shield with Mr. Pezzola.  He walks past that in

10   the video.  His hand is on the shield.  No question about that.

11   We can't -- you know, Mr. Donohoe is pretty recognizable,

12   which, you know, while I'm saying that, you know, you've heard

13   a lot about not wearing colors, not wearing, you know, Proud

14   Boy uniforms.  If Mr. Donohoe really wanted to be incognito,

15   maybe having a long blonde ponytail and a bushy beard might be

16   something that would make somebody stand out.  And certainly he

17   does nothing to disguise himself by the way he looks or

18   anything like that.  He's very recognizable.

19        The video that you see is a good distance away from

20   the Capitol where, you know -- so there is no -- and there's no

21   video whatsoever that I've been provided with that shows

22   Mr. Donohoe touching that shield, any way, shape or form, or

23   speaking with Mr. Pezzola, conferring with Mr. Pezzola, helping

24   Mr. Pezzola navigate through the crowd.  You see them all

25   standing in sort of the same general area on the west side of

1       the steps, but not with each other, not next to each other, not

2       speaking to each other.  And then to say that somehow, you

3       know, Mr. Donohoe was, like -- I'm not a football player, but

4       he's, like, you know, charging up, clearing the way for

5       Mr. Pezzola, the video doesn't support that.  This is a crush

6       of people.  And there's no evidence that Mr. Donohoe told those

7       people, had any dominion over those people, that those people

8       were under him, or even Proud Boys.  They also are moving up

9       the stairs and he moves with them.

10             Now, I'm not saying he was dragged up those stairs or

11      somehow he didn't, you know, use his own volition to go up.

12      But there's no evidence that somehow he's leading the charge,

13      or even in the middle of the pack, kind of clearing the way.

14             In fact, it looks like he gets whacked in the head,

15      it looks to me like a Gatorade bottle or some kind of an orange

16      liquid bottle, as he's going up the stairs.  And he goes to the

17      left and he is never seen again.  And we never see him again,

18      or I've not been provided of any video showing Mr. Donohoe.

19      What we do see and what I do see in the video provided by the

20      government is that Mr. Pezzola (indiscernible) at the top of

21      the stairs, and he remains there for a long time, holding his

22      shield, yelling at people, yelling at security guards, you

23      know, using obscenities, and just up there harassing some

24      people.  And then later we know that Mr. Pezzola uses that

25      shield to bust out that window.  You know, that certainly is

1      true.

2           Again, no evidence that Mr. Donohoe had one thing to

3      do with that.  Mr. Donohoe never sets foot in the Capitol.

4      Mr. Donohoe -- there is no evidence whatsoever of that.

5      Mr. Donohoe does not hit anyone, assault anyone, had nothing to

6      do with that shield in terms of taking the shield.

7           And Your Honor asked some questions about the second

8      force.  His saying -- well, I will say, Mr. Donohoe says, "Got

9      a riot shield."  That does come out of the Telegram.  Now, was

10      that just boasting, he touched a riot shield?  I mean, there's

11      no evidence he got a riot shield.  He didn't take a riot

12      shield, he didn't walk around with a riot shield, he didn't use

13      it for, you know, anything.  But he did have his hand on a riot

14      shield, that much we do know.

15           Before Mr. Donohoe says anything about this

16      regrouping of the second force, he says, "I'm relaxing and

17      regrouping."  That's just about -- let's see, probably about 21

18      minutes or so before the second force comment.  Then somebody

19      says, Are people in the senate -- still in the Senate?  He

20      says, "I have no clue."  Then a minute or so later he says, "I

21      can't get service."  Then he says, "I had to walk five blocks

22      away from the Capitol to get service."

23           So, I mean, I think one can assume at this point he's

24      about five blocks away from the Capitol because he didn't have

25      any cell service.  And he says -- excuse my language -- "Fuck.

1    I'm fucking worn-out.  Holly shit."  And then he says, three

2    minutes later, "We're regrouping with the second force."  No

3    evidence whatsoever.  And Judge Kelly found in his order that

4    there's no evidence that there was ever a second force or ever

5    a regrouping.

6           And the government argues that this -- these comments

7    that are in the things he starts posting about, incoming

8    National Guard and the other law enforcement agencies that were

9    being sent out by President Trump and everyone else is some --

10   you know, some way that shows he knew that he or his

11   co-conspirators are guilty of crimes.  The government also

12   alleged that -- if he's that far away and he sees that that is

13   happening, he could also just be saying to the others in the

14   chat room, look, you all need to stop what you're doing.  You

15   know, law enforcement is coming and, you know, you need to stop

16   or you're going to get in trouble, you're going to get

17   arrested.  You know, whatever you're doing, stop it.  You

18   shouldn't -- you don't need to be in trouble.  And he Tweets

19   out what Vice President Pence says and now everyone is

20   stopping.

21          So, you know, I think it can be construed more than

22   one way.

23          THE COURT:  You mentioned a text.  But, of course,

24   you heard the government's response --

25          MS. COSTNER:  I'm sorry, Your Honor, say that -- tell

 1     me what you said.

 2                THE COURT:  I said, I want to look at those texts.

 3     But, you heard the government's response, they refer to, I

 4     think the conversation later that evening, where he indicates,

 5     you know, filled with some pride about some of the things he

 6     did that day.

 7                MS. COSTNER:  Your Honor, yes.  And I characterize

 8     that in my response.  The evidence shows, I think, they're all

 9     sitting around drinking beers, saying stuff.  And they

10     shouldn't say it, perhaps, you know.  It was an unfortunate

11     twist of words, yes.  Does that mean that somehow he is now

12     admitting, by saying those things, that he had planned, along

13     with all these other people, to disrupt the -- you know, the

14     government -- I mean, you know, the certification in Congress

15     and all of those things?  You know, I think that's a pretty far

16     stretch, Your Honor.

17                There was a large group of people, an enormous group

18     of people.  They were not all Proud Boys.  And certainly

19     Mr. Donohoe did not marshal a large group of people at all.  I

20     mean, if anything, maybe a few people walked with him to the

21     Capitol.  But there's just no evidence that he was some leader.

22                And, Your Honor, you know, there's no evidence that

23     prior to the events, that he was, you know, saying things about

24     that or, you know, disparaging the election, saying it was

25     stolen.  There is -- and, you know, when I look at the

1    distinctions of the things that Judge Kelly said about his

2    co-defendants, you know, Donohoe, again, they had been

3    parroting the folks that were in charge and giving out

4    information.  He did not hold a radio.  He had a cell phone

5    during this time.  He did -- you know, did do some messaging on

6    this cell phone, but not to the extent he's giving orders to

7    people or telling people what to do.  You know, he never

8    touched a barricade.  He never turned a barricade over or moved

9    anything.  Never went into the Capitol.

10         So, I think that that's just a lot of distinctions

11   that can be made that show that Mr. Donohoe is not a danger as

12   we look at the nature and circumstances, you know, of the

13   offense itself and Mr. Donohoe's alleged role in it.  Again, we

14   can't say he wasn't there; he was.  But, certainly we can make

15   distinctions.  And then, you know -- and then the government,

16   you know, in terms of them talking about the likelihood of

17   Mr. Donohoe being a further danger to the community, I mean,

18   there's just no -- there's nothing to support that, Your Honor.

19         Mr. Donohoe, what did he do after all this was over?

20   Well, first of all, you know, he -- in terms of the Telegram

21   messages, he made have said to them, "Nuke it," but he didn't

22   nuke 'em.  And whether that was because he couldn't or he

23   didn't, the fact is they aren't nuked and there's no evidence,

24   at least from what I can see in Telegram, of some effort, other

25   than people saying you're not nuking them, and he'll say,

1    "Humm."  No effort or no other, you know, conversation that I

2    can see is made.

3           He gets a ride, somehow, out of Washington, D.C.,

4    because his ride is gone.  So he didn't plan, you know, that

5    very well.  Gets back to Kernersville and, you know, what does

6    he do when he goes to Kernersville?  He goes home.  He lives

7    with his girlfriend, where he's lived before, you know, his

8    house, his home, and continues to spend time with his son,

9    continues to work at his job and does not hide, does not, you

10   know, do anything to try to, you know, disguise himself.

11          You can see how he looks right now.  Not that

12   different than, you know, how he looked in these videos,

13   except, you know, for the fact that he's not wearing orange in

14   them.  And I would just say, in response, you know, to the

15   government in terms of a leather jacket, no evidence at all

16   that he had any type of, you know, military gear on under it.

17   He's wearing, I think, a pair of jeans and this jacket and a

18   shirt.

19          When, you know, Your Honor hopefully looked at the

20   link that I included in my response, there was a large story in

21   the area about a missing young girl and, you know, there was a

22   hunt for her.  Mr. Donohoe has -- has trained his dog for

23   search and rescue, Blitz, his German Shorthaired Pointer.  You

24   can see him in the video helping to find, working with Blitz.

25   He's not hiding.  He's out there trying to help.  So he's not

1    acting, you know, like somebody that's trying to evade the law

2    or obstruct in any way, shape or form.  And when he is taken

3    into custody, you know, he is cooperative.  He hands over the

4    articles of clothing that Proud Boys letters on it, that he's

5    asked to do by the arresting officers, and he goes into

6    custody.

7         So, I think that you can distinguish in that way just

8    his actions after -- after the events of January 6th.  And, you

9    know, these comments about the green tip and, you know, it's

10   never over, it's never too late, ever.  Well, again, Your

11   Honor, I think that we can interpret that in many ways.  The

12   fact that he says it's not too late ever, does that mean that

13   he is somehow going to marshal a large group of people to go

14   and try to take over the Capitol?  Or does it just mean that in

15   the future we can continue to lawfully protest?  When the

16   election time comes, we can vote.  And, you know, and we can,

17   you know, exercise our rights as citizens to unelect or to you

18   know, elect who -- you know, a candidate that we're in favor

19   of, as opposed to Biden, who they were not in favor of.

20        "This facial recognition doesn't mean shit when you

21   got 5.56 green tip," Your Honor, you see right before, there's

22   two unrecovered video -- I'm sorry, audio files.  I don't know

23   what those audio files said.  Maybe they said, maybe those

24   audio files said something that that was a relevant

25   (indiscernible) because it kind of doesn't make sense with "No,

1    it's not, it's never too late, ever," and then facial

2    recognition?  I mean, I would contend there must have been

3    something in the audio files that led to some response.  And we

4    don't know what they are.  But, I think the Court can -- that's

5    a reasonable explanation.

6            Your Honor, you know, in my response you see all the

7    things I've said about Mr. Donohoe and his service to this

8    country, an Eagle Scout, a person with ties to his community,

9    family in his community, a son who lives in his community that

10   he has custody of three days a week for visitation, you know,

11   that he's trying to raise.  You've seen the letter from his

12   employer, he's a great worker.  He's somebody that would be

13   hired back, although we understand that the recommendation, at

14   least from U.S. probation, is some incarceration.  And

15   Mr. Donohoe certainly understands what that means, and it does

16   mean he can't work.  And he's certainly willing to abide by

17   those terms and conditions.

18           I think you can consider what his employer says in

19   just, you know, your analysis and your evaluation of

20   Mr. Donohoe and any risk that he might impose -- or, pose and,

21   you know, just his character in general.

22           You see the letter from his grandparents.  And, you

23   know, his grandparents love him, for sure, but, you know, his

24   grandfather writes all of the accomplishments that he's had.

25   And, you know, just, I would proffer, his grandfather told me

1     that the reason Charlie got into the Marines is because his

2     grandfather served in the Marines.  And, you know, he's highly

3     influenced by his grandparents, and that's a good thing.

4           You know, you see the letter from his girlfriend,

5     Stephanie, just about what she observes about him as a father.

6     And most important -- or, as important, the letter from his

7     brother, his twin brother, and the things that he says about

8     the two of them and what they did for Scouts, what Charlie did

9     to save somebody's life during a ski accident.

10          You know, you see the military service, the two tours

11    of combat, where he was in the infantry, working for the

12    Department of State, you know, for six years afterwards, with

13    security clearance.  He served our country well and he has been

14    physically injured as a result of that.  He's partially deaf in

15    both ears.  And, again, he's given a lot to our country.  And,

16    you know, so I think all of those characteristics, all of those

17    things about him are things that are really important, Your

18    Honor, and they show that he's not a danger, that he would

19    follow any recommendations, anything that this Court set forth

20    as far as terms of pretrial release.

21          You know, even in our response, his time in the Proud

22    Boys, you saw, you know, he was engaged in charitable

23    endeavors.  He wasn't just a member being angry and trying to

24    overthrow the government or to be violent or to do damage.

25    There were other parts of that that are important to him, and

1    that is giving to the community.  And again, that's supported

2    by just what you've seen about his efforts to help find a young

3    girl who was missing.

4              So, you know, I mean, I think you can take what

5    happened January 4th, 5th, and 6th as maybe a slice of time.

6    But even when you look at that, the actions and the words of

7    Mr. Donohoe, compared to everyone else, Your Honor, I just

8    don't think that they rise to the level where he poses a danger

9    to others, to the community now and in the future and, really,

10   even then.

11             There was a lot of people involved on that day and

12   Mr. Donohoe was one of thousands.  Thousands.  And to say that

13   he somehow marshalled and conducted -- exercised control over

14   all of these people, or a large majority of the people, I think

15   it's just not supported by the evidence that's before the

16   Court.

17             So, Your Honor, we would ask that you follow the

18   recommendations of the U.S. probation officer in the pretrial

19   services report and allow him pretrial release under those

20   conditions.  He will abide by every one of them.  There is no

21   reason to believe -- I mean, he will be on home incarceration,

22   he will have electronic monitoring, he will have a curfew.

23   They're willing to -- you know, this is at his grandparents.

24   There's not a problem with, you know, technology or, you know,

25   him getting on, you know, social media.  He's not on social

1    media anyway.  There's -- he's not on Facebook, he's not on

2    Instagram or whatever other, you know, Snapchat or whatever

3    else there is.  Normally, with respect to Telegram, he would

4    not be on that either.

5            So, Your Honor, we are asking that the Court grant

6    him pretrial release.

7            THE COURT:  Let me ask you a few questions,

8    Ms. Costner.  Thank you for that.  First of all, the rebuttable

9    presumption, are you contesting -- I know that your position is

10   that the rebuttable presumption has been rebutted.

11           MS. COSTNER:  Yes.  Yes.

12           THE COURT:  Are you contesting that a rebuttable

13   presumption has been triggered in this case?

14           MS. COSTNER:  Your Honor, I would say at least -- let

15   me get to my -- you know, in terms of the fact that this is an

16   offense listed in 18 U.S.C. 32 -- 2332b(g)(5)(B), a maximum

17   term of imprisonment is ten years or more, I don't know that I

18   can argue that that is not the case.

19           THE COURT:  Okay.  All right.  I just wanted to make

20   sure.  And I totally understand your position that it has been

21   rebutted for all the reasons that you've said.  The government

22   is not arguing that he's a risk of flight, so I don't need to

23   ask you about that.

24           Oh, let's talk about this expressions of remorse and

25   contrition and your footnote about the Fifth Amendment.  You

1    heard the government's response, that at least in this case

2    there's a distinction that can be made between your client's

3    statements that he did make, which would suggest his

4    endorsement -- his continued endorsement of the views of the

5    group, whatever it was that was motivating him that day -- I

6    take one point you would probably make as well, that it was

7    just that evening, it was over beers, adrenaline was running.

8    We don't know what he thinks after that.

9           But, you know, other courts have gone farther in this

10   jurisdiction.  They have gone farther with the government.  I

11   mean, the government just says, well, you could certainly use

12   his statements that he made, which shows no contrition, no

13   change of views.  I still think that's true, that's not a

14   violation of the Fifth Amendment.  But other Courts have

15   suggested that because the evidence -- the record lacks any --

16   you know, I don't like "remorse" -- but what about just

17   repudiation of the views, or in this case maybe Proud Boys,

18   that, therefore, that that's a factor the Courts have looked at

19   to consider, well, whatever is motivating this individual to

20   act in that way that day, his views, hasn't changed, because he

21   hasn't renounced his views.

22          MS. COSTNER:  Your Honor, I mean --

23          THE COURT:  Is that fair in a violation of the Fifth

24   Amendment?

25          MS. COSTNER:  That's a -- let me just say this, too,

1    Your Honor.  I mean, first of all, what views?  Because so far,

2    you know, we hear what he said, like he said sort of in the

3    heat of the moment or the after -- you know, the adrenaline.

4    What views did we hear before all of that?  And there are no --

5    there's no evidence of any view of We need to go, we need to

6    destroy, you know, the Capitol, we need to attack the Capitol,

7    we need to stop the vote, we need to stop the steal, this is

8    unfair.  There is no evidence that he expressed those views.

9        And, so, I think he may be (indiscernible) and then

10   just, you know, like I said, this powerful moment where you're

11   sort of caught up in a crowd of people, just -- I mean, you

12   know, doing what they did, you know, and feeling that that --

13   maybe that rush, that -- as you said, that adrenaline, I think

14   there's a difference, Your Honor, and that's what I would

15   argue.  And so now to hold it against him because he hasn't

16   made some official announcement, you know, I don't think that

17   that's really a reasonable expectation.

18       There's no -- there's nothing.  There's nothing,

19   other than these messages, you know, at 7 p.m. and then, you

20   know, this, "You want me to nuke the channel?"  There's no

21   evidence that he got on Facebook and said, you know, anything,

22   Well, I still pull the sleigh or, you know -- you know,

23   anything like that.  So, that's what I would argue about that,

24   Your Honor.

25       THE COURT:  Do you want to say anything about

1    *Munchel*?

2              MS. COSTNER:  Yes.  Well, in terms of -- you mean as

3    far as is he able -- I mean, can this -- is there a risk that

4    this be recreated?

5              THE COURT:  Yes.

6              MS. COSTNER:  I would say this -- I agree with that,

7    yes.  And this -- this was a -- I hate to say -- I would like

8    to say a one-off.  I mean, not before and not -- well, not

9    since.  Of course, it hasn't been that long.  But, you know,

10   this has been -- this was an unusual, unique event, is what I

11   would say.  And the likelihood of Mr. Donohoe being put on

12   pretrial release and somehow, from his parents' home in

13   Winston-Salem, North Carolina, being able to somehow marshal a

14   group and, you know, create this event again, I would say the

15   chances are slim and none.

16             And so I do think within that context, you know,

17   he -- a lot of this is, you know -- he just doesn't have any --

18   and it's not proof in the Telegram messages, that he has that

19   kind of influence over people.

20             THE COURT:  Okay.

21             MS. COSTNER:  Or in the video, for that matter.

22             THE COURT:  Say it again?

23             MS. COSTNER:  I said, or in the video.  He's not

24   leading people, he doesn't have a bullhorn, he's not, you know,

25   having, you know -- he's with a group of 15 people.  Well, you

1    know, so he walked over with 15 people.  There's no evidence

2    that he was in front of those 15 people, leading the charge to

3    do anything, much less anyone else.

4             THE COURT:  Okay.  Mr. McCullough, I have a few

5    questions for you.  I want to give you an opportunity to

6    respond.  This is what we're going to do.  I do want to finish

7    the argument and then I will recall the case tomorrow and I

8    will give my decision.  I'm not going to keep us here until

9    7 o'clock tonight.  And I need to think about some of the

10   things, as well, that have been presented to me today.  It's

11   been a good argument.

12            Mr. McCullough, though, I do want to finish the

13   argument, so we're going to push a little bit past 5:15.

14            Mr. Tran, do I have a court reporter?  I don't have a

15   court reporter trying to quit, right?

16            THE COURTROOM DEPUTY:  No, judge.

17            THE COURT:  Okay.  Good.  Just everyone else.  I

18   don't know why I'm only focused on the court reporter.

19            Mr. McCullough, you might want to respond.  I do have

20   a few questions for you.  So why don't we start with my

21   questions.  Just, very particular, the post-January 6th attempt

22   to nuke the chats, what date and time was that?  Was that on

23   the 6th or the 7th, or when?

24            MR. McCULLOUGH:  Your Honor, court's indulgence.

25            (Pause.)

1            MR. McCULLOUGH:  On January 13th, Your Honor, that --

2       that follows --

3            THE COURT:  Okay.  January 13th?

4            MR. McCULLOUGH:  January 13th, yes, Your Honor.

5            THE COURT:  And Ms. Costner did make the argument

6       that -- well, she made two arguments:  One, that there's no

7       evidence of his beliefs prior to the 6th.  And, second, that,

8       you know, the one thing that he said, which she says was being

9       a braggart and in the heat of the moment and filed with

10      adrenaline -- I think I said that.  All that happened the

11      evening of the 6th.  So, you know, what -- whatever happened

12      after that that would suggest that he continues to believe or

13      be motivated by whatever he was motivated that day.

14            So you've given me one data point, which is the

15      attempt to nuke the chats, which happened on June (sic) 13th,

16      so that wasn't the evening over beers.  I don't know if there

17      are other things.  But I think her bigger point is, we don't

18      know what he thinks because there's no evidence of it -- or,

19      direct evidence, anyway.  So she says.  I don't know, I'm not

20      looking at all of the chats.

21            MR. McCULLOUGH:  So, Your Honor, two points there.

22      One, I think we know what he thinks in the way that he acted.

23      And so, I mean, Ms. Costner kind of raises this point that

24      maybe he's talking about just lawfully protesting and going and

25      voting.  Your Honor, that's -- I mean, we wouldn't be here if

1    we were talking about somebody that lawfully protested and went

2    and voted.  We're here because Charles Donohoe and the people

3    he was with unlawfully entered the United States -- the grounds

4    of the United States Capitol, and many of them went inside the

5    U.S. Capitol.

6          With respect to other data points in terms of what

7    Charles Donohoe -- kind of where his head is, one of the things

8    that was brought up in the argument with respect to Ethan

9    Nordean, was that Ethan Nordean was considering moving.  And he

10   was in communications with Charles Donohoe at the end of

11   January, where Charles Donohoe was engaged in communications in

12   some effort to help Ethan Nordean get set up with a place to

13   live in -- in or around North Carolina.

14         Now, I mean, that, again, I mean, the -- this is --

15   this is a conspiracy case, this is a co-conspirator with whom

16   he was involved in a small group in discussing the plans for

17   January 6th and making arrangements for people to go certain

18   places when -- talked about, kind of, the repudiation point.

19   This is kind of a continued commitment to this kind of -- this

20   kind of conduct and the relationships with these individuals.

21   And so, I think, Your Honor, I think that's quite meaningful.

22         In addition, Ms. Costner raises this idea that he

23   didn't change his appearance or alter his appearance in any

24   way.  One think that -- I think it's an interesting point, and

25   I think it speaks volumes about what was happening at the

1    bottom of the stairs.  So, we know the, kind of, broad timeline

2    here.  Dominic Pezzola steals a riot shield.  Now, Dominic

3    Pezzola is from Albany -- the Albany area, upstate New York.

4    Charles Donohoe is then carrying that shield with Dominic

5    Pezzola.  Right?  And so it's not that he's touching the riot

6    shield, he's carrying the riot shield.  And Charles Donohoe was

7    in front of Dominic Pezzola, and he's kind of marching forward

8    in some direction.  So, in some ways Charles Donohoe was

9    controlling where Dominic Pezzola is going, at least in that

10   moment.  Right?  So we have that video evidence that Charles

11   Donohoe is walking in front of Dominic Pezzola and carrying

12   this riot shield with him.

13          When they get to the bottom of the stairs, Charles

14   Donohoe has pulled up a mask over his face, that no

15   confrontation has started, as Ms. Costner points out.  The

16   crowd is there.  And Charles Donohoe pulls the mask over his

17   face.  We have Charles Donohoe with the mask over his face.

18   And then -- and he's watching intently.  And when the

19   confrontation starts, Charles Donohoe is there.  And Dominic

20   Pezzola is there.  And, so, you know, we're talking about, kind

21   of, what evidence is there of, you know, a conspiracy, what

22   evidence is there that Charles Donohoe wanted anything to

23   happen than just peaceful protest in the west plaza of the

24   Capitol?

25          I mean, even that, criminal, by the way, but setting

1   that to the side, what do we know?  We know through his

2   actions.  You don't have to rely on his words, you don't have

3   to look at "We stormed the Capitol.  I feel like a warrior," we

4   don't have to look at that.  We can just look at what he did.

5   And Ms. Costner points out, didn't alter his appearance, but

6   for that moment seemed to know what was happening.  I think

7   that, you know, you can draw the inference that he knows what's

8   about to happen there.

9          Now, maybe he inferred it, maybe it was preplanned,

10   that's kind of the question that one has to answer.  But, he's

11   certainly there, four rows deep, and he participates in this

12   action to storm the Capitol.

13          And the other thing I would point out, Your Honor, is

14   this point about, you know, nothing to encourage people's

15   actions or otherwise.  Charles Donohoe is contemporaneously in

16   the Telegram messages where other participants in this riot

17   were, the people that he traveled there with.  And people say,

18   you know, push inside and he says, "We are trying."  I mean,

19   it's not a -- you know, it's not as direct as "Get there," but,

20   "We are trying."  And his actions play that out.

21          And so, Your Honor, I think, you know, some of this

22   commentary about, well, we can't look inside his head, I mean,

23   that's the case with every defendant in every case.  We've

24   got -- but here we do have a defendant that was instrumental in

25   organizing and grouping these men together in the wake of the

1    arrest of the Proud Boys chairman, helping get them to the

2    right place and, more importantly than anything, at that kind

3    of -- at the critical moments here, during the riot at the

4    Capitol, he's taking an active role in furthering that

5    conspiracy.  And he's doing that -- sorry, Your Honor.

6              THE COURT:  How many were in the group?  Can you tell

7    me?  I mean, how many -- is it -- I've seen 15 somewhere.  I

8    don't know whether that was Ms. Costner or if I saw that in a

9    text, I'm unsure.  But, how many is in this group?

10             MR. McCULLOUGH:  Yes.  So, Your Honor, when

11   Ms. Costner is referring to 15 people, that's 15 people that

12   Charles Donohoe was reportedly walking to the Washington

13   Monument with.  There is a larger group that then joins at that

14   point.  It is -- it's difficult to quantify.  We're watching,

15   kind of, video evidence of this.  But, as the group moves, it

16   is on the magnitude of, certainly, dozens of people.  And I

17   would say, Your Honor, my estimation of this group size is, as

18   they are approaching the First Street pedestrian gate, it

19   appears to be on the magnitude of 40 or 50 people.

20             THE COURT:  40 to 50.  I've seen those pictures, too,

21   and it's a large group.

22             MR. McCULLOUGH:  I've not counted heads, Your Honor.

23   I mean, I'm offering you my best estimate based on that review.

24   But, that is --

25             THE COURT:  What about conditions of release?

1    Ms. Costner says, you know, strict conditions, put him with his

2    grandparents, they don't understand electronics, we can -- home

3    incarceration, never to ever leave during the pendency of this

4    case; no criminal record, blah, blah.  I agree with all of

5    those, those are all points that are in his favor.  But why is

6    home incarceration not sufficient here?  And a prohibition on

7    use of -- I mean, go so far as to say the internet, you know,

8    just keep him off the internet.  He doesn't really have an

9    internet presence either, Ms. Costner tells me, he's not an

10   internet person.

11             MR. McCULLOUGH:  Yes, Your Honor.  So, a couple

12   things.  First, this -- all of these messages that we're

13   talking about, the messages that we're talking about from

14   July -- from, rather, January 4th, 5th, the communications as

15   to where people should go and what they should wear, those take

16   place from his home.  So, the people -- the people that speak

17   highly of him, they were all right there when this conduct is

18   being plotted and planned and discussed.

19             Too, I mean, in terms of the internet connection,

20   this -- by its nature, this is conduct that is taking place in

21   an effort to hide from law enforcement.  There are efforts to

22   be evasive of law enforcement.  This is -- I mean, this is

23   taking place over Telegram, not Facebook or Twitter, and in

24   particular, Your Honor, Telegram, as Your Honor may know.

25             THE COURT:  I really don't know what it is.  One line

1        on Telegram would be helpful to me.

2                MR. McCULLOUGH:  Certainly.  So, Your Honor, Telegram

3        is a -- the government understands that Telegram is a messaging

4        application that operates in a way that's kind of similar to

5        the way that Twitter operates, in a way that people can form

6        accounts and they can chat with one another in direct messages

7        or in group messages, as well as in, kind of, these groups that

8        can be created.

9                Telegram reports, self reports that it has never

10       responded to legal process.  So it is, if you will -- any

11       servers at Telegram are, kind of, beyond the reach of law

12       enforcement.  So, when we're talking about, kind of, nuking or

13       removing ourselves from chats, the understanding of the

14       participants here was presumably based on what Telegram says,

15       which is it is not possible to -- that Telegram does not

16       respond to lawful process.

17               So, I think that's important when we think about the

18       steps that are being taken to evade detection by law

19       enforcement.  This is the platform that's specifically chosen,

20       as opposed to Facebook or Twitter.

21               Finally, Your Honor, in terms of the defendant's

22       likelihood of abiding by the conditions of release, Ms. Costner

23       and I have spoken prior to this hearing.  As it's mentioned in

24       the pretrial services report, Defendant Donohoe did have a DUI

25       in October of 2020.  Now, there's a next date pending.  That

1    is -- that is not, kind of, a -- certainly it's not -- the type

2    and manner and means of crime is certainly different, but it

3    does go to the history and characteristics of the individual,

4    that he is engaged in this conduct on the heels of that.

5            So, it is not, kind of, without --

6            THE COURT:  Was he under supervision in that case?

7    That case is still pending?  He may not have any conditions of

8    release.  I don't know how DUI works in North Carolina.

9            MR. McCULLOUGH:  Your Honor, I'm not aware of any

10   particular conditions, but just wanted to mention this idea

11   that -- I mean, we're talking about history and

12   characteristics, someone's ability to, kind of, abide by the

13   law.  I mean, the recent history here would at least call into

14   question whether Charles Donohoe would remain committed to

15   abiding by lawful activity, or conducting himself lawfully.

16           THE COURT:  Okay.  Anything else, Government?  We are

17   at the 5:30 mark.  I really think we have to bring it to a

18   close.

19           MR. McCULLOUGH:  Nothing further, Your Honor.

20           THE COURT:  Okay.  So I do want to get the chats.

21   And I would like to get them tonight.  I mean, I don't know how

22   many chats there are.  I really don't -- I don't think I need

23   every chat.  I'm most focused on the use of force -- you know,

24   the second force, that whole string, which Ms. Costner has made

25   some good points.  I want to see that in context.

1              You also suggested that there were -- there was some

2      chats with respect to, you know, pre-January 6th discussions as

3      well.  I don't know if it was about nuking them or -- the sort

4      of directives that he was giving on -- you know, in those

5      chats.  You read a number of chats that I haven't seen.  So,

6      you thought they were significant enough to tell me about it,

7      you should probably -- I want to see them.  I don't want 100

8      pages of chats, though.  So --

9              MR. McCULLOUGH:  Understood, Your Honor.

10             THE COURT:  -- whatever you read to me, you should

11     give to me.

12             The same to you, Ms. Costner.  If you've got chats

13     that you've read or you think I should look at, then you need

14     to send them to me this evening.

15             You also mentioned, Mr. McCullough, something about

16     Mr. Nordean.  So, after the 13th moving to North Carolina.  I

17     assume that's because you've got that in chats, I don't know.

18     But if there are chats related to that, I guess I would want to

19     see it.  That was news to me, and could be significant.

20             So, I need to get the chats tonight.  I want to

21     schedule a time tomorrow to issue my decision, to come out and

22     tell you what my decision is.

23             Ms. Costner, I'm happy to give you one minute, if you

24     want it, to respond to anything else.  You don't have to take

25     it, but -- I anticipate coming in tomorrow and issuing my

1  decision.  So I'm not hearing further argument.  If you've got

2  any more to make, let me know.

3  MS. COSTNER:  Thank you, Your Honor.  I'll do the

4  best I can in one minute.  And before I -- I apologize, I

5  neglected to tell the Court that Mr. Donohoe's grandmother is

6  at my office, she's out in the lobby.  I had her come in case

7  the Court wanted to see her or ask any questions of her.  So I

8  wanted to make sure that the Court knew that.

9  Your Honor will see the chats about the move to

10  North Carolina.  I would just contend that that's Mr. Nordean

11  wanting to move to North Carolina and reaching out to

12  Mr. Donohoe to see if he knew anyone in Charlotte that he could

13  refer him to, where he might live.  And Mr. Donohoe agreed to

14  help.  There's no -- I don't believe there's any chat involved

15  about, you know, hiding him or somehow helping him be on the

16  lam or anything like that.

17  With respect to, you know, my argument that maybe he

18  was talking about lawfully protesting and voting, I mean, he

19  could, in the light of what happened, be saying to others,

20  Look, this is the way we should do it, not, you know, whip up

21  another insurrection or some insurrection, and that's how we

22  need to do it going forward.

23  With respect to Mr. McCullough saying that these

24  communications took place from Mr. Donohoe's phone with all the

25  people around him that Your Honor, I guess, would release him

1     to, that's simply not true.  He lives with his girlfriend,

2     Stephanie.  That's the home he was in.  She has not been

3     approved as a third-party custodian.  His grandmother has.  Her

4     home is in Winston-Salem, it is not in Kernersville with

5     Stephanie and Mr. Donohoe.  So, no, he was not in his

6     grandparents home doing anything of that nature, you know, on

7     Telegram with these, you know, comments that the government is

8     talking about.  So we're not asking he be released to

9     Stephanie; we're asking that he be released into home

10    incarceration with his grandparents.

11            And then with respect to the DUI that is pending, it

12    is a pending charge, Your Honor.  He's been accused of it, he's

13    not been convicted of it.  There is, you know -- there's no

14    conditions of release that precluded him from traveling to

15    Washington, D.C.  He has a pending court date.  There's no

16    evidence that he's missed any court dates or any OFAs or

17    failures to appear have been an issue.

18            And so, Your Honor, yeah, at this point that's not a

19    case that's been disposed of.  So I would ask the Court not to

20    consider that against him.  And, Your Honor, I think that's --

21    those are the responses I would have to what the government has

22    said.  It may be a little ineloquent, but I've (indiscernible).

23            THE COURT:  That's fine.  I wanted to give you that

24    opportunity.  Okay.  So let's schedule this for tomorrow.  You

25    know, it's going to have to be in the afternoon again.  I could

```
1     do 3:30.  Would that work?
2                   THE COURTROOM DEPUTY:  Judge --
3                   MS. COSTNER:  Yes, Your Honor, 3:30.
4                   THE COURTROOM DEPUTY:  Judge, if I might?
5                   MS. COSTNER:  3:30 should work.
6                   THE COURT:  Mr. Tran?
7                   THE COURTROOM DEPUTY:  Judge, if I may, we already
8     have a time set aside, since it's late now, with the jail at
9     3 tomorrow, if that's okay.
10                  THE COURT:  Three is fine.
11                  THE DEFENDANT:  Your Honor, can I say something?
12                  THE COURT:  Yes.
13                  THE DEFENDANT:  They don't --
14                  THE COURT:  No, no, no, Mr. Donohoe.  No, no.  I'm
15    sorry.  I thought that was Mr. McCullough.
16                  Mr. Donohoe, I'll give you a second to meet with
17    Ms. Costner and you can share whatever it is you want to share
18    with him -- with her, and then she'll tell me.
19                  THE DEFENDANT:  Okay.
20                  THE COURT:  Mr. Tran, please put him in a room.  But
21    we're going to do this hearing tomorrow at 3.
22                  (Pause.)
23                  MS. COSTNER:  Your Honor --
24                  THE COURT:  Let's wait for him to come back.
25                  MS. COSTNER:  Okay.
```

```
1              THE COURT:  Yes, Ms. Costner?

2              MS. COSTNER:  Yes.  Thank you, Your Honor.

3    Mr. Donohoe reminded me -- or, told me that today he was

4    swabbed for COVID, and that usually means that he's going to be

5    put on a plane tomorrow.  So, obviously there's some concern

6    about whether or not he would be, you know, still here.  Is

7    there any way we can -- or, the Court can do something about

8    that?  Or order that he remain at least one more day?

9              THE COURT:  Yes.  I mean, is there a corrections

10   officer right there?  I will certainly issue an order

11   tonight --

12             THE DEFENDANT:  Your Honor --

13             THE COURT:  -- but let me speak to the corrections

14   officer.

15             UNIDENTIFIED SPEAKER:  He's under the jurisdiction of

16   the U.S. Marshals.  We don't have any say into that.

17             THE COURT:  Yeah, no.  I'm saying that we have a

18   hearing in this case tomorrow at 3.  So I'm letting you know

19   that.

20             UNIDENTIFIED SPEAKER:  Okay.

21             THE COURT:  I'll issue an order tonight, but I'm

22   letting you know, hearing tomorrow at 3 o'clock.  He's never

23   been brought to this facility in the first place.

24             UNIDENTIFIED SPEAKER:  Okay.  And it's not --

25             THE COURT:  He's been left in North Carolina, that's
```

1   where he requested his hearing.  So, in any event, we'll take

2   care of it.

3                 UNIDENTIFIED SPEAKER:  Okay.

4                 MS. COSTNER:  Thank you, Your Honor.

5                 THE COURT:  I'll tell my clerks to issue an order and

6   we'll get it to our U.S. Marshal.  You know, I hear you.

7   It's -- we have an additional -- well, we can deal with it

8   tomorrow.

9                 I'll issue an order.  I'll do my best.  Sometimes

10  this happens and they just keep moving them.

11                MS. COSTNER:  Understand.  Thank you, Your Honor.

12                THE COURT:  And that's why we're here.  So, all

13  right.  Thank you all.  We'll see everyone tomorrow at 3.

14                MS. COSTNER:  Thank you.

15                            *   *   *

16

17

18

19

20

21

22

23

24

25

1                                CERTIFICATE

2            I do hereby certify that the foregoing is a true, correct

3       and complete transcript of the audio-recorded proceedings in

4       this matter, audio recorded on April 21, 2021, and transcribed

5       from the audio recording to the best of my ability, and that

6       said transcript has been compared with the audio recording.

7                                Dated:  April 27, 2021

8

9                                /s/_____

10                               Janice Dickman
                                 Official Court Reporter
11                               333 Constitution Avenue
                                 Washington, DC  20001
12                               202-354-3267

13

14

15

16

17

18

19

20

21

22

23

24

25