UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 21-CR-175-1 (TJK) |
| | : | |
| ETHAN NORDEAN, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**UNITED STATES' SURREPLY TO DEFENDANT NORDEAN'S
MOTION TO DISMISS**

In his 45-page reply (ECF 113) ("Reply"), Defendant Nordean attempts to manipulate the facts and law in his favor. Such tactics may succeed elsewhere, but not here. While Defendant can tell this Court that "Capitol video shows a law enforcement officer authorizing Nordean's entrance" (Reply at *44), after its review of the video, the Court will see that such statement is grossly inaccurate.[1] While Defendant can claim to have "images of protestors who broke through Capitol Police barricades and entered Congress" on October 6, 2018 (*Id.* at *14), the Court will immediately recognize that one of the images depicts protestors on the steps of the Supreme Court.

---

[1] Defendant doubled down on this baseless claim in a separate pleading he filed today, ECF 129. There, Defendant claims that the video depicts an officer "hold[ing] the door open as the first protestor enters the building through the Upper West Terrace Door." *Id.* at *3. That is false; the video depicts an outnumbered Capitol Police officer attempting to redirect rioters out of the Capitol when others begin to enter.  Defendant also claims that the video depicts a police officer "*prop[ping] the door open* and mov[ing] a box out of the way of protestors entering the building." *Id.* (emphasis added).  That is also false; the video depicts outnumbered Capitol Police officers being overrun by rioters unlawfully breaching a Capitol entrance.  In actuality, the video as a whole depicts a riotous mob forcibly breaching the Capitol and endangering the lives of, among others, law enforcement who swore to protect the Capitol, the public servants who work there, and private citizens who, unlike Defendant, lawfully and peacefully petition the Legislative Branch. Notably, Defendant did not submit in support of his claims the video itself.  The Government will. Consistent with the Protective Order, the Government will file the videos under seal for the Court's review.  Defendant's repeated counterfactual claims further demonstrate that that his legal claims are baseless and should be denied.

And while the Defendant can state that the D.C. Circuit has "determine[ed] that the use of subpoenas was determinative" as to whether or not a proceeding exists (*Id.* at *7), the case law simply does not say that. And the list goes on.

The Government files this brief surreply to address newly raised issues in Defendant's Reply. Defendant's newly raised issues cannot save his argument.

The Constitutionally-mandated Joint Session of Congress to count votes, hear objections, determine "the result," and to certify the peaceful transition of power is an official proceeding under 18 U.S.C. § 1512(c)(2). Additionally, the submission of electoral college certificates to the Congress and the attendance of elected representatives need not be the result of a subpoena—compulsion of appearance by directive of the Constitution and statute more than fits the bill. *See*, *e.g.*, 3 U.S.C. § 11 (The state certifications "shall forthwith" be sent "by registered mail . . . to the President of the Senate at the seat of government."). Finally, the statute is not vague, and certainly not vague as applied to Defendant. Defendant took aim at the certification proceedings on January 6, and he disrupted them through unlawful acts. This combination of intent and wrongfulness satisfies the "corruptly" element of the statute.

The civil disorder statute applies to Defendant's actions with equal force. The civil disorder at the Capitol on January 6 "obstructed, delayed, and adversely affected" the "conduct and performance of a federally protected function" within the meaning of 18 U.S.C. § 231(a)(3). The plain language of the statute reflects Congress's intent to criminalize any interference with firemen and law enforcement during and incident to a "public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. 232(1) (defining "civil disorder"). That describes the conduct at the Capitol on January 6, and Congress signaled no intent

to extend the statute broadly to "instrumentalities" of the Executive branch while failing to address civil disorders that targeted Congress or the courts. As described herein, the language and context of the statute says otherwise. And even if the term "federally protected function" were limited to the Executive and its instrumentalities, there were numerous federally protected functions underway on January 6. Indeed, the second-in-command of the Executive branch was in attendance and performing a Constitutional duty to certify the election of the Executive.

For these and the reasons set forth in the Government's Opposition (ECF 106), the Defendant's Motion to Dismiss should be denied.

## I. Defendant's New Arguments Cannot Salvage His Motion to Dismiss Counts One and Two

### A. The Structure of the Statute Makes Its Breadth Clear; *Ejusdem Generis* Has No Application

Defendant's invocation of *Yates v. United States*, 574 U.S. 528 (2015) is entirely misplaced. Reply at *9-12. To begin, *Yates* concerned the application of Section 1519, not 1512(c)(2). Whereas 1519 contains a single clause, 1512(c) contains two clauses that function independently. Accordingly, while the Supreme Court's discussion of "tangible object" in Section 1519 ("Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, *or tangible object*…") might offer some guidance on the use of "other object" as used in Section 1512(c)(1) ("Whoever corruptly [] alters, destroys, mutilates, or conceals a record, document, or *other object* …"), *see Yates*, 574 U.S. at 541-42 (comparing § 1512(c)(1) and § 1519), it has no bearing on the omnibus clause found at 1512(c)(2). Indeed, as discussed below, the addition of an omnibus clause after a general term underscores the breadth of the statute.

Congress intended the omnibus clause in Section 1512(c)(2) to apply broadly. As courts have explained, Section 1512(c)(2) "operates as a catch-all to cover otherwise obstructive behavior

3

that might not constitute a more specific offense like document destruction, which is listed in (c)(1)." *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (affirming conviction under 1512(c)(2) for false statements), quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014). Courts have repeatedly upheld its application to obstructive acts that reach beyond the impairment of financial records. *Id.* (collecting cases concerning violations of 18 U.S.C. § 1512(c)(2) by virtue of the use of false statements); *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009) (upholding conviction under Section 1512(c)(2) for disclosing the identity of an undercover federal agent to thwart a grand jury investigation); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (upholding conviction under Section 1512(c)(2) for providing false testimony to a grand jury); *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (upholding conviction for 18 U.S.C. § 1512(c)(2) for the burning of building to conceal two bodies of murder victims).

      In an effort to save his argument, Defendant resorts to Latin. Defendant calls on *ejusdem generis* and *noscitur a sociis* to artificially limit the statute. Neither applies. The Supreme Court has made clear that the canon is only applicable when a statute sets forth "a list of specific items separated by commas and followed by a general or collective term." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008). The structure of such a list suggests that Congress "remained focused on [a] common attribute" when promulgating the statute. *Id.*; *see also* Scalia and Garner, Reading Law: The Interpretation of Legal Texts, 169 (2012) ("When the initial terms all belong to an obvious and readily identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage."). The statute at issue here is no such list. Congress established two separate clauses of the statute, which makes plain that Congress did not "remain[] focused on [a] common attribute" when promulgating the omnibus clause in Section 1512(c)(2). Indeed, Section

1512(c)(2) speaks nothing of "impairing" an "object's integrity or availability." *Compare* 18 U.S.C. § 1512(c)(1) *with* 1512(c)(2). "The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali*, 552 U.S. at 225 (citing *United States v. Aguilar*, 515 U.S. 593, 615, (1995) (Scalia, J., concurring in part and dissenting in part) for the proposition that the canon did not apply to the omnibus clause in 18 U.S.C. § 1503 because it is "one of ... several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable"). And just as the *ejusdem generis* canon did not apply to the "catchall" omnibus provision in Section 1503, *see Aguilar*, 515 U.S. at 598 (describing omnibus provision in Section 1503 as a catchall that is "far more general in scope than the earlier clauses of the statute"), so too does not it apply to the catchall provision in Section 1512(c)(2).

Further contextual cues underscore the expansive nature of Section 1512(c)(2). Section 1512(c)(1) already contains a list of specifics followed by a general term, *i.e.*, "record, document, or *other object*." (emphasis added). Far from limiting the omnibus clause, Congress's addition of an omnibus clause to include anyone who "otherwise obstructs, influences, or impedes any official proceeding" must be read as Congress intended—broadly. The "expansive language offers no indication whatever that Congress intended the limiting construction" that Defendant encourages. *See ITECH U.S., INC. v. Tracy Renaud,* No. 20-5235, 2021 WL 3043302, at *4 (D.C. Cir. July 20, 2021); *see also United States v. Ring*, 628 F. Supp. 2d 195, 224 (D.D.C. 2009) ("[T]his Court need not read § 1512(c)(2)'s use of "otherwise" as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering.").

To the extent one should look beyond the text, which one need not do where, as here, the language of the statute is clear, *see United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 251-52 (S.D. Tex. 2020) (denying defendant's motion arguing that § 1512(c)(2) is limited to document destruction under the *noscitur a sociis* canon and declining to consider legislative history), the obstruction statute's legislative history also demonstrates that Defendant's invocation of the *ejusdem generis* and *noscitur a sociis* canons is misplaced. Congress enacted Section 1512(c) in 2002 as part of the Sarbanes-Oxley Act, Pub. L. 107-204; Section 1102 of the law is titled "Tampering with a Record or Otherwise Impeding an Official Proceeding." In other words, Congress made clear that the prohibition in Section 1512(c)(2) on "otherwise impeding an official proceeding" was distinct from the prohibition on "tampering with a record" in Section 1512(c)(1).

### B. Defendant's "Fair Notice" Arguments are Misplaced

The statute at issue provides fair notice to all that interfering with a joint session of Congress could expose one to criminal liability. The relevant question is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Sineneng-Smith*, 982 F.3d 766, 775 (9th Cir. 2020), quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997). The statute here makes criminal the obstruction of an official proceeding. Official proceeding is defined to include "proceedings before Congress." On January 6, 2021, Defendant plainly intended to interfere with the Congressional proceeding, and he engaged in criminal activity to achieve his purpose. The statute provided fair notice as to Nordean.

Defendant's attempts to manufacture a parallel between the criminal activity during confirmation hearings for Justice Kavanaugh and the events of January 6 should remain on the Internet—they do not fare well when included in a legal brief. Among the distortions of fact and

6

law in his brief, Defendant claims that on October 6, 2018, protestors "burst through Capitol doors and 'stormed' the Senate chamber" during confirmation hearings for Justice Kavanaugh. That is not accurate.[2] The confirmation hearings were public, and the gallery of the Senate Chamber was open to the public on the day of the vote to confirm Justice Kavanaugh. *See* C-SPAN, Final Confirmation Vote for Judge Brett Kavanaugh, Oct. 6, 2018 available at *https://www.c-span.org/video/?452583-11/final-confirmation-vote-judge-brett-kavanaugh*. Indeed, Vice President Pence twice reminded the "guests" in the Gallery that expressions of approval or disapproval were not permitted. *Id.* Protestors who demonstrated inside the Senate Chamber on October 6 did so *after lawfully accessing the building* and being subjected to security screening.[3] *See, e.g.,* Public seating at Kavanaugh hearing cut in half, then restored again, PBS News Hour, Sept. 5, 2018, *available at https://www.pbs.org/newshour/politics/public-seating-at-kavanaugh-hearing-cut-in-half*. No serious parallel can be drawn between the two events.[4]

Even if the events were comparable, the fact that others may have gone unpunished for conduct that plainly falls within a statute "does not excuse [a defendant's] actions; multiple violations of a law do not make those violations legal or create vagueness in the law." *United*

---

[2] In his Reply, Defendant included two pictures of protestors who had "stormed" the Capitol. The pictures alone underscore the frivolous nature of Defendant's argument. But there is another problem—the protestors in the second photograph were on the steps of the Supreme Court.

[3] Those entering the earlier confirmation hearings reportedly had to pass through multiple identification checks. Members of the public were required to "first wait in line outside the building to go through an initial screening" before being "escorted in small groups to a holding area outside the committee room itself."

[4] During the riot on January 6, the Capitol suffered millions of dollars in damage—including broken windows and doors, graffiti, and residue from pepper spray, tear gas, and fire extinguishers. Hundreds of rioters illegally entered the Capitol building, and thousands more stormed the Capitol grounds outside. More than 80 members of the Capitol Police and 50 members of the Metropolitan Police Department were assaulted.

*States v. Kay*, 513 F.3d 432, 442 (5th Cir. 2007). The law does not require perfect notice. It is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Id.* Defendant took aim at the certification proceedings on January 6, and he disrupted them through a series of unlawful acts. He didn't try to skirt the line between criminal conduct and lawful protest activity—he charged through it.

### C. Defendant Misunderstands *Poindexter* and *Morrison*

Defendant confuses the issues presented in *Poindexter* and *Morrison*. As Defendant repeatedly notes, but then ignores, the promulgation of Section 1512(c)(2) (after *Poindexter* and *Morrison* were decided) served to expand the reach of the obstruction statute to cover direct actions by the defendant. Accordingly, whereas the *Poindexter* court's fixation on "transitive" versus "intransitive" is an interesting academic exercise, it has no bearing on Section 1512(c)(2), which expressly covers acts by the defendant (as compared to acts taken by the defendant to corrupt another as in Section 1512(b)).

Defendant's actions here fall squarely within the reach of the statute, which prohibits acting "corruptly" with the intent to "obstruct[], influence[], or impede[] any official proceeding." Contrary to Defendant's distorted recitation of the Government's argument, he is not charged with obstruction of Congress "by virtue of his physical presence inside" the Capitol. Reply at *11. Rather, the term "corruptly" requires that the Government show that Defendant acted wrongfully and acted with an intent to obstruct. By acting unlawfully—that is, *inter alia*, by trespassing into a restricted area and by interfering with law enforcement—Defendant has acted wrongfully. And through his words and actions, Defendant evinced an intent to obstruct the proceedings through his wrongful acts. *See, e.g.*, Indictment at ¶¶ 32, 34, 58 (Nordean: "What's more disturbing to me than the Dems trying to steal this election, is how many people . . . just accepted Biden won, despite the obvious corruption . . . [l]uke warm Patriots are dangerous." Nordean: "We tried playing nice

and by the rules, now you will deal with the monster you created. The spirit of 1776 has resurfaced . . .").

The mere fact that multiple criminal statutes apply to an individual's conduct does not render prosecution under one or more of those statutes suspect. Indeed, "overlap" is "not uncommon in [federal] criminal statutes." *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014); *accord Hubbard v. United States*, 514 U.S. 695, 714 n.14 (1995) (opinion of Stevens, J.) ("Congress may, and often does, enact separate criminal statutes that may, in practice, cover some of the same conduct."); *see also United States v. Batchelder*, 442 U.S. 114, 123 (1979) ("So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied.").

### D.  Defendant Distorts the Government's Arguments . . . and Case Law

Defendant on more than ten occasions suggests the Government has "conceded" or "forfeited" certain arguments. That characterization is incorrect—and in many instances patently distortive. Defendant also misreads the pertinent case law.

For example, Defendant offers the Court an inaccurate recitation of the case law concerning "official proceeding." Defendant repeatedly cites case law for the proposition that the issuance of a subpoena is *determinative* as to whether an "official proceeding" exists or not. Reply at *7 ("The D.C. Circuit relied on precedent from this Circuit as well as others in determining that the use of subpoenas was *determinative* of the 'proceeding' *vel non* question." (emphasis in original) (citing *United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994)).[5] Defendant misstates the holding.

---

[5] According to Defendant, "the investigation in *Kelley* qualified as a 'proceeding' because, pursuant to the investigation at issue, the Inspector General was empowered to, and did, 'issue subpoenas and compel sworn testimony in conjunction with an investigation of agency activities.'" Reply at *7. Defendant again has it wrong. *Kelley* explained that because the Inspector General "is

9

In fact, the case law cited by Defendant addresses the term "proceeding" when evaluating preliminary investigations by agencies. The inquiry there, as such, is for the court to determine whether someone can be held to account for obstruction of *any* preliminary inquiry launched by *any* employee of the government. *See*, *e.g.*, *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008) ("These considerations bring us to the conclusion that an internal, informal investigation, in its most preliminary stages, of employee violations of an agency policy is not an 'official proceeding' within the meaning of § 1512(c)."). When evaluating preliminary internal investigations by agencies, courts have found that the issuance of a subpoena can signal the kind of formality that would constitute a proceeding, but the issuance of a subpoena is not some kind of talismanic requirement. *See*, *e.g.*, *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009 (Finding an official proceeding for purposes of Section 1512 during an agency's internal investigation when a "Use of Force Report is prepared, a review panel of senior officials, including the [w]arden and the [a]ssociate [w]arden [of BOP], is convened and required 'to determine if policy was adhered [to], and complete the standard After–Action Report (BP–E586), indicating the nature of the review and findings.'").

Throughout his arguments, Defendant studiously avoids acknowledging the grave significance of the Electoral College certification process—a process whereby elected officials decide how each states' votes shall be counted.[6] He claims that a Joint Session of Congress to

---

empowered to issue subpoenas and to compel sworn testimony" that an agency investigation could qualify as a "proceeding" for purposes of 18 U.S.C. §§ 1505 and 1512.

[6] 3 U.S.C. § 15 ("…no electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to according to section 6 of this title from which but one return has been received shall be rejected, but *the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified*.") (emphasis added).

count votes, hear objections, determine "the result," and to certify the peaceful transition of power is not the kind of "proceeding before the Congress" that Congress sought to guard against interference.

Against that backdrop, Defendant then claims—without basis—that the Government "selectively omitted" judicial discussion of the cases that it presented in its opposition, *e.g.*,

> Here is what the government omitted from its description of *Perez*. The Second Circuit held there that the BOP's investigation qualified as an "official proceeding" because "the review panel must '*determine*' if there has been a violation of BOP policy, must make '*findings*,' and may '*decide*' to refer the matter to senior departmental authorities . . ." *Perez*, F.3d at 169 (emphasis added). The government selectively omitted that portion of *Perez* because none of those attributes is true of a hearing in Congress that is not pursuant to its investigative power, nor does the government contend otherwise.

Reply at *6 (emphasis as added in Defendant's Reply). In fact, the same language from *Perez* appears in full in the Government's brief. Opposition at n.4. And it proves the Government's point. The Electoral College certification proceeding involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]." 3 U.S.C. § 15.  That body convenes to render judgment on whether to certify the votes cast by Electors in the presidential election.  As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it.  *Id.*  And just as a jury does not recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result."  3 U.S.C. § 16.

Boiled to its essence, we are talking about a mandatory proceeding in which some of the most senior members of our government convene to debate and declare the result of the election of the President of the United States of America. Even if a proceeding had to be "quasi-

11

adjudicative" to qualify as "official" for purposes of the obstruction statute, the proceeding on January 6 would fit the bill.

## II. The Civil Disorder on January 6 Obstructed, Delayed, and Adversely Affected a Federally Protected Function.

The civil disorder at the Capitol on January 6 "obstructed, delayed, and adversely affected" the "conduct and performance of a federally protected function" within the meaning of the statute. As the Supreme Court has repeatedly advised, an inquiry into the meaning of a statute begins with "the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S. Ct. 1026, 1030, 103 L. Ed. 2d 290 (1989) quoting *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985). When the language is plain, the "sole function of the courts is to enforce it according to its terms." *Id.*

Here, the plain language of the statute reflects Congress's aim—to criminalize any interference with firemen and law enforcement during and incident to a "public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. 232(1) (defining "civil disorder"). All of the surrounding language in the statute underscores Congress's intent to broaden the statute's application. For example, "law enforcement officer" is defined expansively to include "any officer or employee of the United States, any State, any political subdivision of a State, or the District of Columbia, *while engaged in the enforcement or prosecution of any of the criminal laws of the United States*, a State, any political subdivision of a State, or the District of Columbia[.]" 18 U.S.C. § 232(7) (emphasis added); *cf.* 18 U.S.C. §§ 111 & 1114 (providing a narrower definition of a law enforcement officer).

This conclusion is furthered by an examination of the definition and use of the term "federally protected function." It appears only three times in the United States Code—exclusively

in connection with the civil disorder statute at issue here. *See* 18 U.S.C. §§ 231(a)(1), 231(a)(3), and 232(3). As used in Section 231(a)(1) and (3), the term "federally protected function" appears alongside a broad invocation of Congress's power to regulate under the commerce clause, *e.g.*:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder *which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function*

18 U.S.C. § 231(a)(3) (emphasis added). When presented in this manner alongside the commerce clause language, the term "federally protected function" plainly signals an effort by Congress to ensure that its anti-riot statute could reach any unlawful interference with law enforcement during a civil disorder that the federal government had authority to regulate. The breadth in the term is also apparent in its definition. "Federally protected function" is defined as "any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails." 18 U.S.C. § 232(3).

   Defendant argues that "department"—as used in the definition of federally protected function—includes only the executive branch. Reply at *27-28 (citing 18 U.S.C. § 6). But the definition of "department" in Section 6 explicitly provides that the term can expand when the "context shows that such term was intended to describe the executive, legislative, or judicial branches of the government." 18 U.S.C. § 6. The civil disorder statute, with its expansive jurisdictional language and surrounding context, is exactly such a circumstance. The context and language of the statute alone provides the "powerful showing" that is required to defeat the presumption in Section 6.

Rather than engage with the language of the statute at issue here (18 U.S.C. § 231(a)(3)), Defendant argues that the Supreme Court's interpretation of a different statute (18 U.S.C. § 1001), which deals with an *entirely* different subject matter and crime, is controlling of the issue before the Court. Defendant is wrong. Indeed, even the case relied upon by Defendant emphasizes the unremarkable conclusion that courts must begin with the language of the statute *at issue in the case at bar*. *See Hubbard v. United States*, 514 U.S. 695, 701, 115 S. Ct. 1754, 1758, 131 L. Ed. 2d 779 (1995) (Explaining that the "proper method of analyzing a statutory term's 'context' to determine when a presumptive definition must yield" requires a court to examine only "the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts"; the "review of other materials is not warranted.").

As discussed herein, the "context [of Section 231(a)(3)] shows that such term was intended to describe the executive, legislative, or judicial branches of the government." 18 U.S.C. § 6. Accordingly, no further analysis is required to conclude that the events of January 6 obstructed, delayed, and adversely affected a federally protected function.

Were there any doubt that the context of Section 231(a)(3) overcomes the presumptive definition, there are numerous "federally protected functions" that were interfered with during the riot on January 6. To name but a few examples:

- Pursuant to 2 U.S.C. § 1961, the U.S. Capitol Police is responsible for the protection of the United States Capitol building and its grounds. The civil disorder on January 6 obstructed and adversely affected the protection of the building and its grounds.

- Pursuant to 2 U.S.C. § 1970, executive departments and executive agencies may assist the United States Capitol Police in the performance of its duties by providing, *inter alia*, services (including personnel) and equipment, including when requested during an emergency. The civil disorder on January 6 obstructed and adversely affected the emergency response by executive departments and executive agencies.

- Pursuant to 3 U.S.C. § 6, the Archivist of the United States has the responsibility to safeguard the electoral certificates submitted by the states. The civil disorder on January 6 obstructed and adversely affected the maintenance of such certificates.

- Pursuant to 3 U.S.C. § 15, the Vice President, as President of the Senate, presides over the final counting of the Electoral College vote, and the Vice President is responsible for declaring the winner of the election. *Id.* (Vice President "shall announce the state of the vote."). The civil disorder on January 6 obstructed and adversely affected the execution of the Vice President's Constitutional and statutory duties.

- Pursuant to 3 U.S.C. § 101, the term of office for President "shall, in all cases, commence on the 20th day of January next succeeding the day on which the votes of the electors have been given." The civil disorder on January 6 obstructed and adversely affected the counting of the votes of the electors, that is, the federally protected function of the election of the President and Vice President.

- Pursuant to 18 U.S.C. § 3056, the United States Secret Service is authorized to protect, among others, the Vice President and the Vice President-elect. The civil disorder on January 6 obstructed and adversely affected the conduct and performance of the Secret Service in the performance of this federally protected function.

- Pursuant to 40 U.S.C. § 1315, the Department of Homeland Security has the responsibility to protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government and persons on the property. The civil disorder on January 6 obstructed and adversely affected the conduct and performance of the Department of Homeland Security in the performance of this federally protected function.

Defendant argues that the statute would be rendered "incoherent" if law enforcement officers who are interfered with were the same officers responsible for carrying out the federally protected function. Reply at *30. There is no incoherence in such a result. If law enforcement officers were engaged in the performance of a federally protected function when a civil disorder interfered with that function, it is axiomatic that law enforcement would seek to quell the disturbance. Indeed, courts have upheld convictions under Section 231(a)(3) under similar circumstances. *See United States v. Dodge*, 538 F.2d 770, 780 (8th Cir. 1976) (law enforcement officers responding to civil disorder on federal enclave were "engaged in a federally-protected function"); *United States v. Jaramillo*, 380 F. Supp. 1375, 1377–78 (D. Neb. 1974) (Upholding conviction under Section 231(a)(3) for interfering with FBI agents when they were responding to

15

the Wounded Knee reservation for the purpose of "investigating [] reported crimes and the operation of the post office"; both were found federally protected functions and "there was interference of both by the occupation of Wounded Knee").

### III. Defendant's Remaining Arguments are Unavailing

To the extent that Defendant has raised any new arguments in Sections III and IV of his brief, those arguments are unavailing and largely duplicative of arguments to which the Government has responded. To the extent additional questions remain, the Government stands prepared to answer in further briefing or during oral argument.

### CONCLUSION

For the reasons set forth herein and in the Government's Opposition (ECF 106), the Defendant's Motion to Dismiss should be denied.

        Respectfully submitted,

        CHANNING D. PHILLIPS
        Acting United States Attorney
        DC Bar No. 415793

By:   /s/ *Jason McCullough*
        JASON B.A. MCCULLOUGH
        D.C. Bar No. 998006; NY Bar No. 4544953
        LUKE M. JONES
        VA Bar No. 75053
        Assistant United States Attorneys
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 252-7233
        jason.mccullough2@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel via the Electronic Case Filing (ECF) system, on July 29, 2021.

By: /s/ Jason McCullough
JASON B.A. MCCULLOUGH
D.C. Bar No. 998006
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7233
jason.mccullough2@usdoj.gov