IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA  CR No. 1:21-cr-00175-TJK-4

v.         Washington, D.C.
           Wednesday, June 23, 2021
CHARLES DONOHOE,    10:00 a.m.

     Defendant.

- - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:  Jason B. A. McCullough, Esq.
         Luke M. Jones, Esq.
         U.S. ATTORNEY'S OFFICE
         555 4th Street, NW
         Washington, DC 20530
         (202) 252-7233

For the Defendant:   Lisa S. Costner, Esq.
         FEDERAL PUBLIC DEFENDER FOR THE
         MIDDLE DISTRICT OF NORTH CAROLINA
         251 North Main Street
         Suite 849
         Winston-Salem, NC 27101
         (336) 631-5172

Court Reporter:    Timothy R. Miller, RPR, CRR, NJ-CCR
         Official Court Reporter
         U.S. Courthouse, Room 6722
         333 Constitution Avenue, NW
         Washington, DC 20001
         (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1            **P R O C E E D I N G S**

2            THE DEPUTY CLERK:  We are on the record in

3     criminal matter 21-175, United States of America v.

4     Defendant 4, Charles Donohoe.

5            Present for the Government are Jason McCullough

6     and Luke Jones; present from Pretrial Services is Christine

7     Schuck; present for the defendant is Lisa Costner; also

8     present is the defendant, Mr. Donohoe.

9            THE COURT:  All right.  Well, good morning to

10    everyone on the line here.

11           Let me start by apologizing to the parties.  I

12    know we had originally scheduled this a few weeks ago.  The

13    day it was scheduled, I was ill and, frankly, my throat was

14    to the point where I couldn't even speak.  So I don't take

15    Mr. Donohoe's liberties lightly, but that's the reason I

16    wasn't able to conduct the hearing that day.  And, of

17    course, we rescheduled it as soon as we possibly could with

18    regard to getting all the parties here together.

19           My plans today -- my plan today is to hear --

20    obviously, Ms. Costner, it's your motion -- is to hear from

21    you, hear from the Government, take a break -- and I've had

22    Ms. Harris try to check with the facility there in North

23    Carolina, and I think this is going to work.  In part, I

24    guess this -- how long a break depends on, I guess, how much

25    new arguments and evidence that I haven't already read you

1      all present to me, but, maybe, take a short break and at

2      least endeavor to come back and rule, but, you know, we'll

3      see.  If I feel like there -- you've given me some things

4      that I haven't thought enough about, we might have to come

5      back in a -- at a short -- in a -- after a short period of

6      time, but that's my presumptive game plan.

7              Ms. Costner, how does that sound to you?  And is

8      there anything you want to raise with me just preliminarily

9      before we begin?

10             MS. COSTNER:  No, Your Honor.  And the Court's

11     proposed schedule sounds -- is fine with me.

12             THE COURT:  All right.  And same question to

13     either Mr. McCullough or Mr. Jones.

14             MR. MCCULLOUGH:  Thank you, Your Honor.  That

15     schedule works for us, as well.

16             THE COURT:  All right.  So Ms. Costner, why don't

17     I hear you.

18             MS. COSTNER:  Thank you, Your Honor.

19             And, Your Honor, I know and from what the Court

20     said -- this hearing, Your Honor is well aware of the

21     previous hearing before Magistrate Judge Harvey.  There's

22     transcripts.  There's now five pleadings that have been

23     filed, you know?  Pleadings for the original hearing and now

24     two for this hearing by both myself and the Government,

25     myself on behalf of Mr. Donohoe.  So at this -- it's going

1   to feel repetitive, and I'll just tell the Court that I

2   don't have new evidence to offer but just want to be heard,

3   you know, on a few issues this morning.

4          THE COURT:  Absolutely.  Look, when it comes to

5   someone's detention, I'm not going to shortchange you.  So I

6   understand, because this is a -- effectively, an appeal of

7   Judge Harvey's rulings, you've effectively, sort of, briefed

8   it twice.  And so I understand that, but I will absolutely

9   give you all the time you need, Ms. Costner.

10          MS. COSTNER:  Thank you, Your Honor.

11          And just, you know, wanted to start out by just,

12   you know, at least saying that, you know, Magistrate Judge

13   Harvey found that the presumption with respect to risk of

14   flight and dangerousness had both been rebutted and based

15   his decision on -- basically, on danger to the community and

16   whether a combination of conditions could assure that he

17   would not be a danger of -- to the community; that we're not

18   really worried about risk of non-appearance.  I know that

19   Your Honor -- I listened to the hearing involving

20   Mr. Nordean and Mr. Biggs and, if I recall, Your Honor found

21   the same with them and I'm -- hopefully, I'm correct in

22   assuming at least at this point, unless the Court hears

23   otherwise, that the Court would at least be in a position to

24   find that that had -- those two issues -- or at least those

25   two presumptions had been rebutted with respect to

1          Mr. Donohoe.  So I'm happy to answer questions about that,

2     but I wasn't going to prepare an argument -- about that at

3     all unless, again, the Court had concerns where -- with

4     that.

5               And so, you know, in looking at the order that

6     Magistrate Judge Harvey filed or put forth and in his -- at

7     least in the transcript and what the Government has argued,

8     I wanted just to make a few points on behalf of Mr. Donohoe.

9     And one was that in Judge Harvey's order finding that

10    Mr. Donohoe had access to or could help marshal a network of

11    individuals who could continue to engage in force and

12    violence -- and this really goes to danger to the community,

13    I know -- and what Magistrate Judge Harvey found

14    Mr. Donohoe's role with respect to the -- what he did in --

15    with the Telegram -- in other words, he, you know, at least

16    looking at that evidence, set up a new channel.  There was

17    some discussion about shutting down the channel and the

18    communication of messages through that channel.  And I would

19    just argue, Your Honor, that the evidence doesn't really

20    support that somehow, by looking at that evidence, you could

21    find that Mr. Donohoe can marshal a group of people and

22    somehow -- if he were on pretrial release, somehow get this

23    group of people to go and commit an insurrection at the

24    Capitol or somehow attack the Capitol.

25               First of all, the communication that at least I've

1    seen on Telegram doesn't indicate that Mr. Donohoe was in

2    any type of leadership position over others.  There was

3    communication, certainly, passing along messages, but even

4    more importantly, those messages did not -- do not indicate

5    that Mr. Donohoe was encouraging others to do that, setting

6    that up, putting forth that plan, passing along that plan,

7    or that others were responding to Mr. Donohoe in a way that

8    would indicate that should he -- in the very extreme,

9    unlikely event that he would put out that sort of

10   information, that others would, in fact, you know, upon

11   seeing that, head over to the Capitol or some other

12   government office and begin to try to throw -- overthrow it.

13   And so I just think that that finding is not supported by

14   the evidence put forth by the Government or anything I've

15   seen in Telegram.

16            The -- and further, he --

17            THE COURT:  Ms. Costner, let me -- can I ask you

18   about that.

19            MS. COSTNER:  Yes, Your Honor.

20            THE COURT:  And, look, the Government will respond

21   however they respond, but let me say this.  I didn't take

22   them -- I didn't take the Government to be arguing that

23   merely because Mr. Donohoe used Telegram that that meant

24   that that was the basis for that conclusion that you

25   mentioned that Judge Harvey made about networks and

1     capabilities and the like.  I don't -- I have the

2     transcript.  I've read the transcript of his ruling.  But my

3     sense was that while it was part of Judge Harvey's

4     consideration that Mr. Donohoe had been involved in at least

5     alleged, you know -- is alleged to have facilitated, sort

6     of, the communications for the -- for this group on the days

7     leading up to January 6th, then, and that it -- there's

8     evidence to suggest that not only was he involved in

9     facilitating those encrypted communications but that, at

10    times, he was involved in efforts to at least destroy those

11    communications.  So put that aside.  I think he did weigh

12    that a little bit in terms of dangerousness.

13            But in terms of your point about networks and

14    leadership and all the rest of it, I didn't see that as just

15    a function of Telegram and use of Telegram but that it was

16    more a holistic sense of all the evidence against -- that --

17    all the evidence relating to Mr. Donohoe and, to some

18    degree, all the evidence relating to the co-defendants.  And

19    I get that, like, you know, I can only weigh that evidence

20    against the co-defendants, sort of, for what it's worth

21    here, but they are charged as co-conspirators.  And I looked

22    at him as saying, Look, Telegram aside or, you know, that

23    specific piece of evidence aside, he is a -- the -- all the

24    evidence suggests that he's part of a broader network of

25    people -- Proud Boys; maybe, other people -- who, you know,

1    have problems with the result -- election result;

2    demonstrated, according to their evidence -- we can, sort

3    of, debate this -- but, certainly, demonstrated in the

4    Government's view that on January 6th, they were willing to

5    facilitate violence because of those political views; and,

6    going forward, haven't really abandoned those political

7    views and that intention and that capability is still there,

8    the capability -- the evidence of the capability simply

9    being by virtue of a leadership position in the Proud Boys

10   and his -- all the evidence that suggests what he was doing

11   on January 6th.  So I didn't see it as just tied to, you

12   know, use of Telegram but really a broader sense of his role

13   in this group and what that role means going forward.

14           MS. COSTNER:  And I understand what the Court is

15   saying, but I think that first, especially with respect to

16   the Telegram messages prior to January 6th, there at least

17   has to be some evidence of a plan of -- and of a plan to do

18   or put or, you know -- what happened on January 6th and a

19   plan to include or to somehow persuade others to join in

20   that plan and --

21           THE COURT:  Well, that's a separate question.  You

22   can talk to me about that, but fair enough.

23           MS. COSTNER:  Yeah, and I think that that, sort of

24   -- I mean, if -- I guess, for me, the finding that he has

25   the ability or -- to marshal this network of individuals,

1     the only support I would think that at least Judge Harvey

2     would be -- consider would be the communication prior to

3     January the 6th on Telegram, because there's certainly no

4     evidence that Mr. Donohoe -- I mean, and I don't know about

5     these other individuals who are out, you know, recruiting

6     people or doing any -- in any other way other than

7     communicating on Telegram, and when I read these Telegram

8     messages I don't see that as a part of the plan.  I

9     certainly see a plan to go to Washington, D.C.; certainly

10    see a plan for people to meet at a certain place; and there

11    is certainly disagreement or dissatisfaction with the result

12    of the elections, but -- or the election, I'm sorry, but

13    that is a far cry from saying, We are disappointed with this

14    election, we believe it was stolen, and it is our plan to go

15    to January 6th and to disrupt the certification of the

16    electoral vote.

17         I mean, that's what I don't -- that's the part I

18    don't see, and certainly there's nothing illegal about being

19    unsatisfied with the election; there's nothing illegal about

20    expressing that; nothing illegal about a plan to assemble.

21    So the part, you know, that's problematic is whether there

22    was this plan and whether Mr. Donohoe was a leader or

23    somehow responsible for the development and communication of

24    that plan.  And the fact that, on January 6th, things

25    happened the way they happened, I -- the plan -- I mean, to

1   say that it was planned in advance, I would just contend

2   that there is no evidence of that.  I mean --

3           THE COURT:  That's a -- and that's a -- that's

4   more of a weight-of-the-evidence argument.  I mean, is that

5   right?  Is that fair?

6           MS. COSTNER:  Yes, I don't disagree with that.

7           THE COURT:  Okay.

8           MS. COSTNER:  And you can cherry-pick, certainly,

9   comments out of Telegram, but with, you know -- I have seen

10  thousands of pages of Telegram at this point.  And so -- and

11  I know Your Honor has -- and, you know -- and this is not an

12  evidentiary hearing in terms of, you know -- we're not

13  trying to decide guilt or innocence, you know?  You're

14  seeing what you see, but, you know, it's -- but you haven't

15  seen anything, I would contend, that shows some specific

16  plan for this to happen, much less Mr. Donohoe being somehow

17  a leader or a -- or someone marshaling others to do this.

18  And so I would say, you know, in terms of looking at a

19  danger-to-the-community aspect, you know, some finding that

20  somehow, if he were on pretrial release, he would do this is

21  not supported by what happened before.  And I would just

22  also further contend -- and I will say more about this later

23  -- that the conditions of release are such that it would

24  preclude any -- even if he were going to -- which I would

25  say that he would not -- would preclude any such actions

1    and, further, that I don't -- he just doesn't function as a

2    leader in that capacity where others would take that message

3    and take it to this ultimate conclusion that, you know,

4    apparently, at least by the order, Judge Harvey seems afraid

5    of that somehow Mr. Donohoe would make that happen.

6           And in looking at some of these Telegram messages

7    -- and I think one that was pointed out was warning others

8    about the presence of National Guard as others were driving

9    to D.C.  Well, again, Your Honor, that -- you -- looking at

10   the conversation, that has more to do with how you -- How

11   can we get to D.C.?  Are bridges blocked?  I mean, you know,

12   Are we going to be able to actually get to our hotel?  What

13   hotels are open?  Are we, you know -- are we going to be

14   able to get a room?  That type of thing, not, Well, there's

15   National Guard.  So we're going to engage in hand-to-hand

16   combat with less people?  I mean, that's not the

17   conversation that you see in Telegram.  And what we know,

18   too, is, you know, certainly, Mr. Donohoe didn't come with

19   weapons.  There's no discussion about weapons or whether or

20   not they could overtake National Guard or security or

21   anything like that.  It's just more, What is the lay of the

22   land here?  We're all coming.  Some people are camping; some

23   people are in hotels.  Are we going to get to where we're

24   going to be?

25           And his comment of, I have the keys, without any

1    evidence of a leadership role, you know, just to say, I'm

2    here, or, I'm the point person, or, This is where we're all

3    going to meet, again, Your Honor, I think that actions have

4    to back up the words, and they just don't.  He -- certainly,

5    he is a part of the group that is walking towards the

6    Capitol.  And you do hear Milkshake say, you know, Let's

7    take the effing Capitol, and he's admonished.  Mr. Donohoe

8    was not a part of that discussion.  And I think to

9    characterize that as, Oh, he tipped off the plan, as opposed

10   to people saying, Don't say stuff like that because that's

11   not what we're going to do, I mean, I think that's the more

12   reasonable interpretation that -- than that Mr. Milkshake

13   was somehow giving away the plan to overthrow the

14   government.  And, you know, so -- and I would add -- I would

15   say that the, you know -- that -- and, again, as I said,

16   Mr. Donohoe is not a part of that discussion.  He -- when

17   there was -- when the group walks past the barriers, of

18   course, they're already knocked down, you know?  Mr. Donohoe

19   doesn't touch a barrier; he doesn't touch a person; there's

20   no evidence of him harassing anyone in law enforcement;

21   saying anything to anybody --

22          THE COURT:  Ms. Costner, doesn't the video -- let

23   me just push back on you a little bit there.  Doesn't the

24   video -- and I received what -- I believe, all the videos

25   that Judge Harvey received, and I also -- if the Government

1    wants to resubmit -- I also have a little slide presentation

2    that, I think, again, I received from -- that was part of

3    the record before Judge Harvey.  I don't know if the

4    Government's going to be relying on, essentially, the same

5    slide presentation today, but that's a different issue.

6            That video, Ms. Costner, strikes me as, I don't

7    know -- it's not quite -- I mean, he is pushing -- it looks

8    like -- well, first of all, and he later says, I was

9    pushing, but put that aside.  It looks like, you know, he is

10   pushing -- he's not at the front of the group.  I take your

11   point.  He's not -- he has no -- there's no suggestion he

12   used a weapon that day.  He's no -- he is not at the very

13   front of that group engaging with law enforcement directly.

14   But it does appear that he's, kind of, pushing up against

15   other people that are creating pressure up against the law

16   enforcement barrier; isn't that fair?  I mean, I can weigh

17   that however.  I mean, I -- that's worth whatever it's

18   worth.  But isn't -- aren't those the facts?

19           MS. COSTNER:  Are you talking about the west

20   terrace steps or just --

21           THE COURT:  Yes.

22           MS. COSTNER:  -- walking along, you know --

23           THE COURT:  West terrace steps is what I was

24   talking about.

25           MS. COSTNER:  And I was going to -- I was getting

```
 1        to that as --
 2                THE COURT:  Okay.  Sorry.
 3                MS. COSTNER:  I'm happy -- no, I'm happy to answer
 4        the question, but if I can just -- I wanted to talk about a
 5        couple of things before I -- and if you -- if the Court will
 6        allow me to do that --
 7                THE COURT:  Sure.
 8                MS. COSTNER:  -- you know?  Much was made about
 9        this comment of, Are -- do you have tomatoes and rotten
10        eggs?  Is there pepper spray?  And Mr. Donohoe says, We're
11        trying.  Well, as I argued -- first of all, I -- you can't
12        really tell what he's saying, We're trying, about.  These
13        conversations -- maybe, when you get the native file,
14        there's more nesting of these comments or this conversation,
15        but with the PDFs we got it's just a list.  But even if so,
16        We're trying to get rotten eggs and tomatoes; we're trying
17        to go forward -- I mean, you know, certainly, they're not
18        trying to get pepper sprayed.  They're -- they may be
19        getting pepper sprayed, but, you know, I -- it's hard to
20        know what he's talking about.  But, again, you see what he's
21        doing, and what he's not doing is throwing eggs or throwing
22        tomatoes or pushing people or doing anything like that.
23                You then get to the Pezzola incident with this
24        shield and there's that brief video of him holding the front
25        of the shield in front of Mr. Pezzola.  And, you know, the
```

1    Government has asserted that somehow Mr. Donohoe is

2    assisting Mr. Pezzola.  He's providing him with help

3    carrying the shield?  Now, I've never carried or held a

4    shield like that, but I doubt very seriously that

5    Mr. Pezzola needed help, you know?  Security -- in law

6    enforcement, they hold their shields in front of themselves

7    for hours it appears at least in some of these.  They can't

8    be that heavy.  I mean, I -- again, I've never weighed one,

9    but I'm pretty -- would feel pretty confident that

10   Mr. Pezzola is able to carry that himself, and you see him

11   carrying that himself.  You see him, you know, at some point

12   before this push up the stairs or the, you know -- he's in

13   another part of that area holding the shield.  He goes up

14   the stairs with the shield; he stands at the stairs with the

15   shield; he then uses the shield to break a window.  So

16   there's no evidence that he needed help navigating.  I, you

17   know -- I can't answer -- you look like you have a question,

18   Your Honor.

19        THE COURT:  Well, I was going to say, I'm not --

20   what way does that -- I mean, if that -- if you're right --

21   and I don't know whether I have evidence one way or the

22   other about how heavy it was or whether it -- the help was

23   necessary, but let's say you're right.  I -- what way does

24   that really cut?  I'm not sure -- I'm just not sure it cuts

25   strongly in either direction.  I mean, let's say, yeah, they

1   -- he didn't need help with it, but nonetheless your client

2   was there with, you know, two hands on it or one hand,

3   whatever it was, but assisting -- jointly carrying something

4   that, shortly thereafter, is used to -- by someone else, yes

5   -- to break a window that allowed many people to stream into

6   the Capitol.  I guess I just don't know that at -- if the --

7   how -- if it was needed or not needed.  I'm not sure which

8   -- what -- whether that really cuts strongly in either

9   direction for or against your client.

10          MS. COSTNER:  Well, we know he didn't take -- help

11   Pezzola take the shield, and we know he didn't help Pezzola

12   use the shield to bust a window.  So I almost liken it to

13   almost, like, a selfie moment, you know, just holding it

14   there, you know?  Whether he should have or not; whether

15   that made him look, you know, tough or it was novel or, you

16   know -- some guy -- some -- you hear someone in the crowd

17   going, You got a shield?  It -- so, you know, it's the --

18   again, you've got a lot of people in -- around them and

19   there's a swell of people.  There's a swell of feeling, I

20   would say, for want of a better word, from the entire crowd

21   that it -- clearly, a lot of people get caught up in.  This

22   is not a crowd only of Proud Boys.  This is, you know --

23   this is a large group of people.

24          There's no evidence that Mr. Donohoe and

25   Mr. Pezzola knew each other from beforehand.  Now, I

1    understand that there's, you know, allegations that -- Proud

2    Boy and my client said something along the lines of the --

3    He's one of us, at least about somebody with using a shield,

4    but, you know, when you look at the Telegram chats, there's

5    no communications; there's, you know -- he's holding a

6    shield.  I mean, what, you know -- if Mr. Pezzola, I mean,

7    used the shield to hit somebody in the head, would

8    Mr. Donohoe be, you know, charged with conspiring to, you

9    know, assault somebody?  I mean, it, you know -- I think

10   just touching or holding that shield for that brief period

11   of time certainly doesn't make him a co-conspirator and

12   certainly doesn't provide proof that he, in any way, shape

13   or form, assisted Mr. Pezzola in what Mr. Pezzola chose to

14   do next.

15           And, you know, just jumping ahead for a minute --

16   and I'll get to this stair thing -- but they go up the

17   stairs, and they are not together.  They are, yes, in the

18   same vicinity, but there's no -- you don't see them talking,

19   communicating, anything like that.  Mr. Donohoe goes to the

20   left.  Mr. Pezzola goes up and he stands at the rail and he

21   stands there for a while yelling at the security and yelling

22   at other people and then ultimately he goes and breaks a

23   window.  Mr. Donohoe's gone at that point.  He didn't tell

24   Mr. Pezzola to do that.  They didn't, you know, work

25   together on a plan to do -- I mean, if that was the case,

1    why wouldn't Mr. Donohoe be with him going in, you know --

2    Pezzola beating down the window or breaking the window and

3    Mr. Donohoe going in?  That just didn't happen because they

4    were not in communication.  There was no plan that they

5    developed.  It just, you know -- I think it just happened

6    that this, you know -- unfortunately, he touched this

7    shield.

8           But in getting, you know, to the stairs, Your

9    Honor, I think to answer your question, he is in that crowd.

10   No question about that.  You can see Mr. Donohoe there; you

11   see Mr. Pezzola some distance -- not a huge distance off

12   because it's not a really large area; and you see this guy

13   Milkshake at the front, but, again, the Government, you

14   know, somehow wants you to believe -- I think it's -- they

15   say in one of their pleadings that Mr. Donohoe was staring

16   intently at Milkshake.  Well, I -- I'm -- I disagree that

17   that's what that video shows.  It shows he's looking around

18   and he's looking ahead, but Mr. Milkshake -- or

19   Mr. Milkshake -- Milkshake, the -- whatever he does, you

20   know, assaulting officers, certainly, my client had nothing

21   to do with that whatsoever.  Yes, he has that gaiter over

22   his nose and mouth, but -- and the Government would argue

23   that that was to disguise himself.  But, you know, that

24   wasn't a really good disguise, was it?  Because he's got a

25   long blond ponytail, he's got this very visible jacket, and

1    I would say that it would lend itself just as easily to the

2    idea that pepper spray is being sprayed and mace and, you

3    know, covering one's mouth and nose to, kind of, you know,

4    mitigate those fumes is also a reasonable explanation for

5    why one would pull a gaiter up.

6            And then you've got this rush up the stairs.  And

7    I am not arguing that Mr. Donohoe somehow was involuntarily,

8    kind of, carried up the stairs.  He is going up those stairs

9    of his own volition, but he is not pushing anybody.  You

10   don't see him using his hands in any way.  You -- in fact,

11   what you see is him getting hit in the head and -- with --

12   it looks like a Gatorade bottle to me, but I'm not sure, and

13   then sprayed.  There's some spray going on and, you know --

14   so he's, you know -- and he goes up and he goes to the left

15   and that's it.  We don't see him again.  He doesn't go in

16   the Capitol.  He's not seen, you know, assaulting people or

17   doing anything, and I think he leaves.

18           Now, he does say on Telegram, Coming in with a

19   second force, but that doesn't happen and there is no second

20   force and there's nobody around him and he doesn't marshal a

21   bunch of people, and I would just contend that that and

22   these other comments that are attributed to him have more to

23   do with the heat of the moment and the, sort of, rush of the

24   crowd and the energy of the crowd and just that things

25   happened that day that no one predicted; that no one

1    planned, but they were clearly, when you look at this video,

2    an outpouring of emotion of a lot of people.  A lot of

3    people.  And you hear it in their shouts; in their passions;

4    in the violence that does happen but that Mr. Donohoe is not

5    a part of.  He gets out of there.

6              And so this communication of, you know, I stood

7    like a warrior, or, I felt like a warrior; I pushed -- I

8    would, again, Your Honor, not say that he is happy and

9    bragging that some plan to overthrow the government was

10   carried out.  And even the comment of -- what was it -- We

11   -- let me find it -- took over the Capitol unarmed, I would

12   say -- contend that that's -- wasn't a comment made as

13   saying that a group of Proud Boys did it but that the people

14   -- a lot of people that were there -- the thousands of

15   people that were there reacted and acted in a way, and

16   whether he was celebrating it; whether he was commenting on

17   it; whether it was the rush of the moment, I don't believe

18   and I would contend that it wasn't somehow him bragging that

19   his plan or his group's plan was somehow carried out, you

20   know?  I think when you look at these other comments, that

21   -- I think that all fits within that explanation as opposed

22   to him somehow, you know, bragging about the achievements of

23   the Proud Boys.  I mean, clearly, there was a lot of

24   unhappiness about this election.  But, again, Your Honor, I

25   just contend that that wasn't -- that didn't bring about a

1    plan on his part or anybody he was associated with to

2    somehow bring down the government.  The evidence just

3    doesn't support that.

4           The Government, in their pleadings, point out some

5    conversation that happens, I think, a couple weeks later

6    about bug-out bags and that my client was, you know, telling

7    these other folks on Telegram about, you know, how to put

8    together a bug-out bag.  I read that conversation, and what

9    I see as opposed to -- I didn't see anything about, Well,

10   how do we escape, you know, the law?  How do we hide and not

11   get arrested to -- for, you know, our plan that we tried to

12   carry out?  What I see is, The inauguration is coming, you

13   know?  The world as we know it may be over.  There was a lot

14   of, you know, emotion expressed about, What's going to

15   happen with this new administration, you know?  We -- do we

16   need to be survivalists?  It was more like a zombie

17   apocalypse, not, you know -- but, you know, what -- I mean,

18   more of a, you know, How do we protect ourselves going

19   forward, as opposed to, How do we, you know, all go

20   somewhere where the law can never find us?  And they talk

21   about equipment and survival equipment and, certainly,

22   Mr. Donohoe is a Marine and knows about that equipment.  And

23   he even posts a list on Face- -- I'm sorry, not on Facebook

24   -- on Amazon of items and supplies they can get.  Well,

25   again, Your Honor, first of all, you know, Amazon doesn't

1    allow you to post a list of, you know, dangerous stuff.  I

2    don't think you can, like, you know, put guns and things

3    like that.  It's, you know, a sleeping bag, a water bottle,

4    things like that, but it's an Amazon list.  The Government

5    could see the Amazon list.  I think anybody probably could,

6    you know, if they looked it up.  And so, you know, nobody's

7    trying to be secretive or, you know, hiding anything.

8              And, you know, looking at Mr. Donohoe's behavior

9    after January 6th, you know, what we do see is a man that

10   finds a ride home, because his ride left him, and gets back

11   to Kernersville, North Carolina, where he lives; he goes to

12   work; he parents his son; he does the things that a normal

13   person does, not a person on the lam, you know?  Your Honor

14   can see where, you know, in -- and I didn't repeat all of

15   this in my pleadings to Your Honor because I felt sure that

16   you had read the other ones, but he participates in a search

17   and rescue, you know?  He's on TV.  He's at his -- at work

18   when authorities come and serve this warrant on him.  He

19   cooperates.  He has no weapons; never had a weapon; didn't

20   take a weapon to -- on January 6th; didn't have weapons

21   then; had a couple articles of Proud Boy clothing which he

22   gave them.  They were in his house -- they weren't secret --

23   I think, somewhere, maybe, in the laundry, if I recall from

24   the Government's pictures, but -- so, you know, there was

25   nothing about that that was surreptitious or somehow

1    avoidant, you know?

2            Then in one their pleadings, the Government argued

3    or discussed how he was in communication with Mr. Nordean

4    about Mr. Nordean wanting to move to North Carolina, but

5    there's no conversation of, I can hide you.  Here's a

6    hideout.  It's, Hey, I may know some people in Charlotte if

7    you want to talk to them.  And there's even a chat on

8    Telegram where Mr. Nordean goes to North Carolina and

9    doesn't tell Mr. Donohoe.  So there's no, you know,

10   interaction where he's trying to help anybody hide or do

11   anything.  He's just living his normal life.

12           And so in finding that, you know -- when Judge

13   Harvey finds that Mr. Donohoe is a threat to the community

14   and, you know -- I would ask -- one thing he says, in

15   looking at Mr. Donohoe's history and characteristics, is

16   that Mr. Donohoe hadn't been on pretrial release so we can't

17   really gauge his track record.  Well, that hardly seems fair

18   because he's been in custody.  I mean, how can, you know --

19   how can he show -- I mean, how can that be a factor when

20   he's never even had the opportunity to show the Court --

21           THE COURT:  Well, I just saw Judge Harvey as --

22   not to interrupt you, Ms. Costner.  I don't know that Judge

23   Harvey counted that against your client so much as he was

24   simply drawing a contrast between your client and the

25   co-defendants and saying, Well, those other -- the -- his

1    co-defendants -- some of them -- had that in their corner as

2    something they could offer and argue and your client doesn't

3    have that -- through no fault of his own, obviously -- but

4    he doesn't have that evidence, for lack of a better way to

5    put it.  He doesn't have that record to be able to argue

6    from.  That's all.

7            MS. COSTNER:  Right, and I understand that, and

8    this is certainly something he can't help, and I would just

9    ask the Court not to weigh that in comparison to what

10   Mr. Donohoe does -- can bring to the table and --

11           THE COURT:  No, I certainly am not going to weigh

12   that against your client.

13           MS. COSTNER:  Thank you.

14           You know -- I mean, as you know -- I mean,

15   Mr. Donohoe is an honorably-discharged Marine.  He went into

16   the military.  He basically got his Eagle Scout, he

17   graduated from high school, and then within a couple weeks

18   was at Parris Island training and saw two tours of combat

19   and was honorably discharged, worked for the government

20   in -- as a contractor -- military contractor.  So basically,

21   was involved, you know, in some way for 10 years, 4 in the

22   military and then 6 as a contractor, comes out and, you

23   know, is working, living his life, parenting his son.  He's

24   lived in his community most of his life.  He has family in

25   this community.  He has friends in this community.  He has a

1    job.  He has an employer that should, you know -- and I

2    understand that the recommendation is home incarceration and

3    he understands that, but I think the fact that his employer

4    says, Look, if he's out and he's available, I'll take him

5    back in a minute, you know -- New York minute, you know,

6    says a lot about Mr. Donohoe, especially considering the,

7    you know -- all of the publicity that -- in, you know -- in

8    news and all of that about Mr. Donohoe and -- but his

9    employer just without hesitation would take him back, you

10   know?  He's a good father.  He sees his son.  He's got him

11   part of the week and -- a young son who needs his dad and,

12   you know, he's a volunteer to the community.  He's not

13   hidden.  He's not eluded.  He's just been here living the

14   life that you -- one would expect a person -- just an

15   ordinary citizen to live.

16          And the, you know -- the plan that's been proposed

17   by Pretrial is a very restrictive plan.  It is home

18   incarceration.  It is living with his grandparents.  His

19   grandparents are suitable, good people who have lived in

20   this community and are willing to have him under these very

21   restricted conditions.  And I think when you look at his

22   track record and his life, there's no reason to believe or

23   to -- that -- or to fear that he would not abide by every

24   single condition that the Court sets out and that, you know,

25   these worries about somehow marshaling or getting online and

1    starting some other insurrection are just de minimis if not

2    -- I mean, the -- it just won't happen and he's shown that,

3    I would say, through his military service that he obeys

4    orders and -- order -- the Court orders, you know?  He has

5    no significant criminal history.  And so he has lived a life

6    that shows that he abides by the law; that he respects

7    authority; and that -- and there's no reason that the Court

8    could not find that this combination of conditions would

9    assure the safety of the community.

10             And, Your Honor, I would just ask that you set

11   aside the prior order of detention and that you allow

12   Mr. Donohoe to come home on these conditions of release, and

13   anything else that the Court orders or sets he will abide

14   by.  I -- and I ask the Court to find that.

15             THE COURT:  All right.  Thank you very much,

16   Ms. Costner.

17             I'll hear from whoever from the Government is

18   going to be taking this.

19             MR. MCCULLOUGH:  Thank you, Your Honor.  Jason

20   McCullough for the United States.

21             Ms. Costner stated in her discussion that

22   Mr. Donohoe's actions did not back up his words, and she

23   makes very much of this idea that there's just a slew of

24   words that Mr. Donohoe might have said in the heat of the

25   moment and there are various statements that he would have

1    made about criminal activity and about the pride in his
2    accomplishments but none of his actions backed up those
3    words, and, Your Honor, that's just simply not the case.
4    Mr. Donohoe's actions indeed did back up those words and we
5    see it quite plainly.
6            Ms. Costner also mentioned a number of times as to
7    Mr. Donohoe wasn't successful in overthrowing the government
8    or there's fear of overthrowing the government.  Your Honor,
9    Mr. Donohoe's not charged with overthrowing the government
10   or attempting to overthrow the government.  He's charged
11   with interfering with the count of the Electoral College on
12   January 6th.  He's charged with interfering with law
13   enforcement on January 6th on the -- on Capitol grounds.
14   He's charged with interfering with democracy itself.
15           And, Your Honor, when we look at Mr. Donohoe's
16   words, Mr. Donohoe says, you know, Everyone stop what you're
17   doing.  We could be facing gang charges.  He's discussing
18   the idea that, at least in his mind, there's contemplation
19   of criminal activity.  In celebration of the event, he says,
20   We stormed the Capitol unarmed and we took it over unarmed.
21   He says, I stood on that front line and I pushed it twice.
22   He says, Got a shield.  And when we piece together the
23   evidence of Mr. Donohoe's involvement, we see exactly that.
24   We see Mr. Donohoe advance onto Capitol grounds.  He storms
25   Capitol grounds contemporaneous with other individuals that

1    he is marching with and, as he does so, the contemporaneous

2    statements across that group confirm the evidence of the

3    plan.  Mr. Biggs is recording himself as he walks down the

4    First Street pedestrian walkway.  He says, Dude, we're in

5    front of the Capitol right now.  American citizens are

6    storming the Capitol, taking it back right now.  And then a

7    short time later, Mr. Biggs, while standing with Defendant

8    Nordean, says, So we just stormed the fucking Capitol, took

9    the motherfucking place back.  That was so much fun.

10   January 6th will be a day in infamy.  That is the same

11   language that erupts within the Telegram chat where, as set

12   forth in the indictment, there are statements as to,

13   Storming the Capitol right now; get there; storming the

14   Capitol right now, four times in a row.

15          And what does Mr. Donohoe do and say?  Mr. Donohoe

16   finds himself with Dominic Pezzola and he is leading Dominic

17   Pezzola through the course of carrying the shield.  Now, as

18   to whether he -- whether Dominic Pezzola needed help

19   carrying the shield or otherwise, as Your Honor pointed out,

20   that's -- that doesn't really push one way or the other.

21   What it does show is that Dominic Pezzola was allowing

22   himself to be led -- marched forward by Mr. Donohoe, and

23   that is incredibly significant, and then a -- and, as

24   Mr. Donohoe says and announces, Got a riot shield, in fact,

25   he did get a -- the group did get a riot shield.

1        And then when they move towards the Capitol,

2    Mr. Donohoe is prepared.  Mr. Donohoe is looking towards the

3    steps.  He's not looking at the Capitol.  He's not looking

4    behind him.  He's looking forward.  He's got the mask up

5    over his face.  And when the crowd surges forward, he surges

6    forward, as well.  And, Your Honor, that is -- I appreciate

7    that Mr. Donohoe was not on the front lines, as he reported

8    in that video, but he is lending his trained body to a

9    violent act.  Those are government employees.  Those are

10   United States Capitol Police officers that are attempting to

11   protect the Capitol and its occupants, and Mr. Donohoe, he

12   lends his body to that effort willingly.  And after the

13   fact, he celebrates it, Your Honor.  He says, We stormed the

14   Capitol unarmed and we took it over unarmed.  That is the

15   group achievement.

16        Your Honor, I think, as you -- there was some

17   discussion about Mr. Donohoe's level of leadership.

18   Mr. Donohoe -- I think the statements that Mr. Donohoe makes

19   and his presence within the group demonstrate that he has a

20   leadership role among the larger group.  He is among a small

21   group of individuals that's in discussion of what to do

22   following the arrest of Proud Boys chairman.  He's within

23   the Ministry of Self-Defense, as it's described.  He reports

24   to the group that until Ethan Nordean and Zach Rehl arrive

25   at the Washington Monument, he has the keys; that,

1    effectively, he's appointing himself as the person who

2    others should be following.  And, as we talked about, Your

3    Honor, Dominic Pezzola, who ripped a riot shield away from a

4    Capitol Police officer, allowed Mr. Donohoe to lead him

5    forward on Capitol grounds with it.  I think that also

6    demonstrates a degree of leadership and the, I would say,

7    acceptance or acknowledgement of Mr. Donohoe as among the

8    leaders of the group that were there that day.  I should

9    also mention that, as Your Honor knows, he's the president

10   of his chapter, as well.

11          Your Honor, as to Mr. Donohoe's dangerousness, I

12   mean, in many ways, this is a question of -- Ms. Costner

13   raises this idea that Mr. Donohoe has served his country and

14   he has, you know, done two tours, and that is to be honored

15   and to be celebrated.  That is also the point that

16   Mr. Donohoe knows better.  Mr. Donohoe knows that he is

17   attacking a U.S. Government building.  Mr. Donohoe knows

18   that, notwithstanding the fact that he may not like the

19   result of the election, Mr. Donohoe is attacking -- using

20   force with a group against people that have taken an oath to

21   defend and serve their country.

22          And in terms of the restrictive conditions that

23   might be imposed, Your Honor, the -- there is the --

24   Mr. Donohoe's familiarity and wherewithal to think about,

25   How do we move encrypted communications?  How do we move

 1     this chat to another channel to make sure that they don't --
 2     as he said, They don't get our plans -- at least they won't
 3     get our boots-on-the-ground plans because we're one step
 4     ahead of them?  I think there's -- in terms of Mr. Donohoe's
 5     wherewithal in advance and his apparent willingness to
 6     destroy or nuke or hide or conceal chats after the fact,
 7     there's a wherewithal and a knowledge and a facility there
 8     that should give the Court significant concern about
 9     Mr. Donohoe's willingness to abide by the conditions and his
10     ability to evade those restrictions and find other modes of
11     secure communication.  He demonstrated that in advance of
12     January 6th and he described that in some detail after
13     January 6th, as well.
14          So Your Honor, for the reasons that Magistrate
15     Harvey found and Your Honor has described with respect to
16     Mr. Nordean and Mr. Biggs, we do ask that you not grant
17     defendant's motion to revoke the order of detention.
18     Mr. Donohoe does pose a danger to the community and does
19     have a position of leadership and control and responsibility
20     that could motivate others to continue to engage in these
21     types of activities not to perhaps overthrow the government
22     but certainly to disrupt and oppose government, and that is
23     a significant danger, Your Honor.
24          THE COURT:  Very well.
25          Ms. Costner, do you -- I want to give you, of

1    course, the final word.  It's your motion and you should be

2    able to respond to anything -- representations -- oh, let me

3    -- before I go to you Ms. Costner --

4            Mr. McCullough, I have -- as I said, I have the

5    hearing -- the set of slides that, I guess, you have in the

6    record before Judge Harvey.  I presume, for purposes of this

7    hearing, this is something the Government is proffering to

8    me, as well; is that fair?  I say that only because it's

9    possible that some -- I'm not 100 percent sure -- but some

10   of these messages and some of the -- well, some of the

11   messages may not be represented elsewhere in the record.

12   I'm not 100 percent sure of that, but it's possible that

13   that is -- particular -- I think this last Telegram message

14   that I have on -- it's on Page 12 of the slide that I have

15   and, frankly, I think both sides have referenced it.  It's a

16   message from Mr. Donohoe, it looks like, at approximately

17   7:00 p.m. on January 6th talking about, Feeling like a

18   complete warrior; stood up on the -- stood on the front line

19   and pushed it twice; and then, later on, a reference to, you

20   know, Taking the Capitol -- storming the Capitol unarmed;

21   wait until Joe Biden tells us we're all criminals; by --

22   another person saying, By then, it's too late; and the

23   defendant saying, It's never too late; and then Mr. Donohoe,

24   later on, making the statement that, Facial recognition

25   doesn't mean shit when you've got 5.56 green tip.

1            I -- number one, again, are you -- I don't think

2     that's elsewhere in evidence, and I want to make sure the

3     Government is proffering this set of slides that you used

4     with Mr. -- with Magistrate Judge Harvey to me.  And then

5     the Government had made representations before Judge Harvey

6     about what "5.56 green tip" means, and I'd just like to hear

7     you reaffirm that one way or the other about what that --

8            MR. MCCULLOUGH:  Yes, Your Honor.

9            THE COURT:  -- means.

10            MR. MCCULLOUGH:  Yes, Your Honor.  And the

11     Government is submitting the videos -- the Government would

12     ask Your Honor to consider the videos that it submitted to

13     Magistrate Judge Harvey -- those are exhibits in -- as well

14     as the PowerPoint and the Telegram slides -- or I'm sorry,

15     Telegram messages and excerpts --

16            THE COURT:  Right.

17            MR. MCCULLOUGH:  -- that were submitted to Judge

18     Harvey and consider those as exhibits.

19            The Government does indeed submit that -- those

20     statements into evidence.  The Government -- those are on --

21     in the Government's brief at ECF 87, 14-15.  And when

22     Mr. Donohoe -- Mr. Donohoe writes in his words, Facial

23     recognition doesn't mean shit when you've got 5.56 green

24     tip.  Your Honor, it's the Government's understanding that

25     "5.56 green tip" refers to ammunition and for assault-style

1    weapons.  "Green tip" refers to what is, kind of, armored or

2    wrapped ammunition -- steel-wrapped ammunition that would be

3    considered armor-piercing.  I think there's a question --

4    there's been debate, Your Honor, as to whether it

5    technically fits an ATF definition, but it is a penetrating

6    bullet used for assault weapons.  And that statement does,

7    as you said, follow some dialog in which Mr. Donohoe

8    basically objects -- seems to object to others saying, It's

9    too late, and he says, No, it's not.  It's never too late,

10   ever, and then goes on to say, Facial recognition doesn't

11   mean shit when you've got 5.56 green tip.

12          THE COURT:  All right.  Very well.  And I see that

13   there.  I hadn't -- I had not noticed it's also referenced

14   in your brief, but very well.

15          Ms. Costner, anything from you?  And in

16   particular, you know, that's quite a statement here, you

17   know?  I think, in evaluating all the evidence here, I have

18   to do just that, evaluate all the evidence as best I can

19   together.  And there are, you know -- and you've made, I

20   think, skillful arguments about slices of that evidence in

21   isolation.  We haven't -- you haven't -- we haven't

22   addressed this particular one, but, you know, certainly, it

23   gets -- when I have a situation where I have a defendant

24   saying -- someone saying, Well, by then -- that is, when Joe

25   Biden tells us we're all criminals -- by then it's too late,

 1    and then for your client to respond, No, it's not.  It's

 2    never too late, and then reference ammunition of some kind,

 3    when part of my analysis here has to do with the, sort of,

 4    forward-looking -- a forward-looking analysis of the danger

 5    your client poses, I, you know -- I think that's something

 6    that's going to get a judge's attention.  It certainly got

 7    mine.  So I -- if you can -- whatever else you want to

 8    address regarding what Mr. McCullough mentioned, please do,

 9    and if you want to try to put that evidence in the best

10    possible light to your client, I am all ears.

11              MR. MCCULLOUGH:  Oh.  (Indicating.)

12              MS. COSTNER:  I think Mr. McCullough's holding up

13    his hand.

14              THE COURT:  All right.

15              MR. MCCULLOUGH:  I just -- Your Honor, I just

16    don't want to -- I want to give Ms. Costner a chance to

17    respond all in -- all told.  I do believe that the Pretrial

18    recommendation from D.C. -- from Washington, D.C., is for

19    detention.  And so I did want to just point that out.

20    Pretrial's on the line and can also address that.

21              THE COURT:  All right.  So actually, that's a fair

22    -- let me just -- I want to check the docket really quickly

23    here.  Do I have a -- I'll just ask you, Mr. McCullough.  Do

24    you know whether that -- is that recommendation reduced to

25    writing?

```
1              MR. MCCULLOUGH:  Yes, Your Honor.  I'm pulling it
2    up right now.
3              THE COURT:  Okay.
4              MR. MCCULLOUGH:  It's --
5              THE COURT:  Is it --
6              MR. MCCULLOUGH:  -- at ECF 50.
7              (Brief pause.)
8              THE COURT:  Very well.  And who do I have -- is it
9    -- do I remember -- is it Ms. Schuck on the line from
10   Pretrial?
11             THE PROBATION OFFICER:  Yes, Your Honor.
12   Christine Schuck, Pretrial Services.
13             THE COURT:  All right.  Well, thank you for being
14   here, Ms. Schuck.
15             Why don't you -- would you -- it -- would you go
16   ahead and simply lay out your -- Pretrial's recommendations
17   and the reasons for it.  This is not -- I had not focused on
18   this, but it's something I definitely want to take into
19   consideration.
20             THE PROBATION OFFICER:  Our recommendation is that
21   there are no combination of conditions that will assure the
22   safety of the community or the defendant's appearance in
23   court, and that is stated in our Pretrial Services report
24   that was provided to Judge Harvey at his initial appearance
25   and it is based on the nature of the charge.
```

1            THE COURT:  All right.  I do see that report.

2            All right.  Very well.  Thank you for correcting

3       that, Mr. McCullough.

4            Ms. Costner, I assume you were referencing --

5       although I don't know.  If you can clarify, I -- your part

6       about your argument you made before.  I don't know whether

7       there was an analysis done in North Carolina.  I assume

8       that's probably what you were referencing.  But you can

9       clarify that and address anything else you want to in

10      response.

11           MS. COSTNER:  Yes.  Thank you, Your Honor.

12           The Pretrial Services report that I was provided

13      with was the one that was prepared in the Middle District of

14      North Carolina.  And so, you know -- so it's really -- this

15      -- Pretrial Services -- is based on the charge.  I would

16      just contend that in -- the one in the Middle District, the

17      probation officer had an opportunity to interview my client;

18      to interview a couple of potential third-party custodians;

19      look at his criminal history or lack thereof; his work; all

20      of those things, and made the recommendation of being placed

21      with his grandmother and placed on home incarceration.  And

22      so I would -- I guess I would just argue, Your Honor, that

23      that was really based on an investigation of Mr. Donohoe,

24      his circumstances, and that's where that comes from, and I

25      would ask the Court to certainly put some weight on that as

1    opposed to just this is based on what he's charged with.

2              It -- Your Honor, just to move forward, with

3    respect to the slides, I'll just, kind of, get to that with

4    the comments that were made after the, you know -- the --

5    what happened on January the 6th with respect to, you know

6    -- and I think what I would argue to the Court is, again,

7    you know, certainly, emotions were high and there was a lot

8    of adrenaline produced by what took place not -- and, again,

9    not as a result of a carrying out of some type of plan but

10   just in what happened that day and what happened with a lot

11   of people that day and the emotion that you see and that

12   people feel, the disappointment in the election.  And, you

13   know, certainly, it's an unfortunate comment, but I don't

14   think the Court -- and I would ask the Court not to take it

15   as some evidence that somehow, you know, Mr. Donohoe's

16   planning to get a gun and shoot up a government agency.

17   That's, you know -- the -- his behavior, his history, his

18   characteristics certainly belie that, you know?  He has no

19   -- he had no weapons when he was arrested.  There's no

20   evidence of him committing any sort of violent act,

21   possessing, you know, any types of firearms like that,

22   ammunition like that, making threats like that, you know?

23             This was part of the discussion, but -- and I

24   understand the Court's concerns about a statement like that,

25   but, you know, I think you have to look at it in light of

1    all of -- all the statements and all the communications, and

2    what you don't find are other statements of that nature, and

3    if there were I'm sure you would see a list of them -- a

4    more, you know -- a whole bunch of them, you know, or

5    whatever -- the Government would provide them, but that's

6    not what you see.  And so, you know, venting and being

7    emotional about an event in an election is certainly one

8    thing.  Somebody, though, who engages in a pattern or a, you

9    know -- of any such threats, talking about ammunition;

10   talking about, you know, shooting or whatever it is, that's

11   something entirely different and that's not what you see.

12   And so I would ask the Court not to weigh that heavily in

13   making a decision about whether or not Mr. Donohoe poses a

14   danger to the community.

15           With respect to some of the other things that were

16   brought forth by the Government, you know, they talked about

17   some of the comments made by Mr. Biggs during the time when

18   all of this was taking place.  Again, that was Mr. Biggs,

19   not Mr. Donohoe.  You didn't hear any type of comment like

20   that from Mr. Donohoe during it.  So you know, Mr. Biggs

21   also, you know, is accused of going inside the Capitol and

22   taking a picture and that sort of thing, not anything that

23   Mr. Donohoe did or posted or anything like that.

24           As far as lending his body to some effort of going

25   up the stairs, he does go up the stairs, but there's no

1    evidence that somehow he's pushing or utilizing himself in

2    any way to impede or to hurt or to help.  He's just going up

3    the stairs with everyone else.  There's a push up the

4    stairs.  I would vent-, you know -- venture that had he

5    turned around and gone the other way, he'd have gotten

6    trampled flat.  Now, again, that's not to stay he didn't

7    utilize his own, you know, volition to go up the stairs, but

8    at that point he had to go with the flow.  He couldn't turn

9    around and go some other way.  But what we do know is that

10   after that's over, he leaves and doesn't come back, and I

11   think that the Court can accept that as evidence that had,

12   you know, there had been some more nefarious objective, he

13   would have been going into the Capitol or assisting in

14   harassing officers or something along those lines, but he's

15   gone and --

16            THE COURT:  Ms. Costner, he says he's going to

17   come back; right?  Now, he doesn't --

18            MS. COSTNER:  That's -- and -- but he doesn't.

19            THE COURT:  -- but he does say that.  I mean --

20            MS. COSTNER:  He does say that.

21            THE COURT:  -- that's something.

22            MS. COSTNER:  But, again, you know, actions speak

23   louder than words, is what I would say, Your Honor, and he

24   does not come back.  He's gone.

25            As far as leading Pezzola, he is in front of

1    Mr. Pezzola.  But is he leading Mr. Pezzola?  That -- I

2    don't know that the, you know -- if he were, why wasn't he

3    with Mr. Pezzola later helping him go up the stairs?  I just

4    don't, you know -- you -- when you look at that video,

5    there's not a lot of people around it.  I don't -- it

6    doesn't look like Mr. Pezzola is in need of much assistance,

7    but it -- true, he's in front of him, but I would contend

8    that that doesn't show that somehow he's a leader, much less

9    a leader of Pezzola.

10          THE COURT:  Yeah, I agree with you.  I don't take

11   too much from who happened to be at the front end of the

12   shield and who happened to be at the back.

13          MS. COSTNER:  And then finally, you know, this

14   started out -- Mr. McCullough started out with, you know,

15   he's not charged with overthrowing the government.  True.

16   He is not.  So you know, I guess if the Court is looking at

17   what is his potential danger to, you know -- were he on

18   pretrial release, I, you know -- I guess, according to the

19   Government, just the Court shouldn't find that he's a danger

20   of overthrowing the government or inciting others to do so.

21          Is he a danger of interfering with the count?

22   That was, you know -- as the Government said, he's charged

23   with.  Well, no, that's over.  So you can't really find that

24   at this point, unless there's some other count, you know,

25   that we don't know about.

1              Is he a danger of interfering with law enforcement

2    or having others to do that?  Well, he's home.  He would be

3    on home detention.  There's no evidence that he incited or

4    told other people to interfere with law enforcement prior to

5    January 6th.  And on January 6th, he -- while it is true he

6    goes past law enforcement with this group, again, no

7    evidence that he harassed, touched, hurt, pushed, did

8    anything with respect to that or nor did he encourage others

9    to do that, and I would contend that you can look at that

10   and find that that's not a risk should he be on home

11   detention.

12             And then interfering with democracy was the third.

13   And, Your Honor, I would say the chances of Mr. Donohoe

14   being able to interfere with democracy while on home

15   detention are nonexistent.  And first of all, that's not

16   something he was doing to begin with, and that's not

17   something he would do were he to be on home detention -- or

18   home incarceration.

19             So Your Honor, you know, I would ask, again, that

20   Your Honor find that there are conditions of release that

21   would ensure that Mr. Donohoe would not be a danger to the

22   public -- not that I believe he is anyway, but -- and I

23   would just ask the Court to place him on home incarceration

24   with the conditions that were suggested and recommended by

25   Pretrial in the Middle District of North Carolina.

1          THE COURT:  All right.  Very well.

2          What I'd like to do is just take a 20-minute

3     break.

4          I guess, Ms. Harris, the best thing is for

5     everyone, I guess, to stay on the line and what -- we can

6     turn off our audio and video, but we'll come back in 20

7     minutes and I will endeavor to rule on the motion.

8          (Brief recess taken.)

9          THE DEPUTY CLERK:  We are back on the record in

10    criminal matter 21-175, United States of America v.

11    Defendant 4, Charles Donohoe.

12          THE COURT:  All right.  Well, thanks for

13    everyone's indulgence there.

14          Pending before me is Defendant Donohoe's motion to

15    revoke pretrial detention which is ECF No. 81.  I am going

16    to deny the motion and order him detained until trial for

17    the reasons that follow which are substantially the same as

18    those I relied on in detaining his co-defendants, Nordean

19    and Biggs, and that Judge Harvey relied on in detaining him,

20    as well.

21          First, let me briefly summarize the procedural

22    history for how we got here.  On March 10th, the grand jury

23    returned a superseding indictment against Donohoe and three

24    other defendants -- Nordean, Biggs, and Rehl -- and charged

25    them with, among other offenses, conspiracy under 18 United

1    States Code 371.  Donohoe was arrested shortly thereafter in

2    his home state of North Carolina.  He appeared there before

3    a magistrate judge and waived his right to a detention

4    hearing there, instead electing to have one here in the

5    District of Columbia.  And not long afterward, Magistrate

6    Judge Harvey ordered Donohoe detained pending trial, and

7    Donohoe has now appealed that ruling to me.

8            So let me quickly set out the legal framework

9    we're operating under.

10           In our society, liberty is the norm and detention

11   prior to trial or without trial is the carefully limited

12   exception.  That's United States v. Salerno, 481 U.S. 739,

13   755, a Supreme Court case from 1987.  Under the Bail Reform

14   Act, 18 United States Code Sections 3141 through 3156,

15   Congress limited pretrial detention of persons who are

16   presumed innocent to a subset of defendants charged with

17   crimes that are, quote, The most serious compared with other

18   federal offenses.  That's United States v. Singleton, 182

19   F.3d 7 at 13, a D.C. Circuit case from 1999 quoting Salerno.

20   Thus, a detention hearing must be held at the government's

21   request only in a case that involves a charged offense

22   falling into one of five enumerated categories, 18 United

23   States Code Section 3142(f)(1)(A) through (E), or if the

24   defendant poses a serious risk of flight or of trying to

25   obstruct justice or threaten, injure, or intimidate a

1     witness or juror.  That's Section 3142(f)(2)(A) through (B).

2           A subset of offenses requiring detention --

3     requiring a detention hearing triggers a rebuttable

4     presumption, quote, That no combination -- condition or

5     combination of conditions will reasonably assure the

6     appearance of the person or the safety of the community if

7     the judicial officer finds that there is probable cause to

8     believe that the person committed, closed quote, that subset

9     of offenses.  That is Section 3142(e)(3).  This subset

10    includes any, quote, Offense listed in Section

11    2332b(g)(5)(B) of Title 18, United States Code, for which a

12    maximum term of imprisonment of 10 years or more is

13    prescribed, closed quote.  That is Section 3142(e)(3)(C).

14    The presumption places, quote, A burden of production on the

15    defendant to offer some credible evidence contrary to the

16    statutory presumption, closed quote.  United States --

17    that's United States v. Taylor, 289 F. Supp. 3d 55 at 63, a

18    D.D.C. case from 2018 that's quoting United States v.

19    Alatishe, 768 F.2d 364 at 371, a D.C. Circuit case from

20    1985.  And even when the defendant offers evidence to rebut

21    the presumption, it, Is not a bursting bubble that becomes

22    devoid of all force once a defendant has met his burden of

23    production, closed quote.  That's the Taylor case again at

24    63 quoting United States v. Jessup, a First Circuit case

25    from 1985, 757 F.2d 378 at 387.  Instead, it is, quote,

1   Incorporated into the other factors considered by this court

2   in determining whether to grant a conditional release and is

3   given substantial weight.  That's United States v. Ali, 793

4   F. Supp. 2d 386 at 391, a D.D.C. case from 2011.

5          The BRA provides that a judicial officer, Shall

6   order -- quote, Shall order, closed quote, the, quote,

7   Detention of the defendant before trial, closed quote, if,

8   after a detention hearing held under 18 United States Code

9   3142(f), and upon consideration of, quote, The available

10   information concerning, closed quote, enumerated factors --

11   that's 3142(g) -- the judicial officer finds that no

12   condition or combination of conditions will reasonably

13   assure the appearance of the person as required and the

14   safety of any other person and the community.  That's

15   Section 3142(e)(1).  Quote, In common parlance, the relevant

16   inquiry is whether the defendant is a flight risk or a

17   danger to the community.  United States v. Vasquez-Benitez,

18   919 F.3d 546 at 550, a D.C. Circuit case from 2019.  The

19   justification -- quote -- the BRA, quote, Requires that

20   detention be supported by clear and convincing evidence when

21   the justification is the safety of the community.  That's

22   United States v. Simpkins, 826 F.2d 94 at 96, a D.C. Circuit

23   case from 1987.  And even if the defendant does not pose a

24   flight risk, danger to the community alone is sufficient

25   reason to order pretrial detention.  That's the Salerno case

1      at 755.  And finally, in assessing whether pretrial

2      detention or release is warranted, the judicial officer

3      must, quote, Take into account the available information

4      concerning four -- these four factors: one, the nature and

5      circumstances of the offense charged, including whether the

6      offense is a crime of violence; two, the weight of the

7      evidence against the person; three, the history and

8      characteristics of the person, including, among other

9      things, the person's character, physical and mental

10     condition, family ties, employment, financial resources,

11     length of residence in the community, community ties, past

12     conduct, history relating to drug or alcohol abuse, criminal

13     history, and record concerning appearance at court

14     proceedings; and, finally, four, the nature and seriousness

15     of the danger to any person or the community that would be

16     posed by the person's release.  That is 18 United States

17     Code 3142(g).  At the detention hearing, both the government

18     and the defendant may offer evidence or proceed by proffer.

19     United States v. Smith, 79 F.3d 1208 at 1210, a D.C. Circuit

20     case from 1996.

21              And if a defendant is ordered detained under

22     Section 3142 by a judicial officer, including by a

23     magistrate judge, the BRA allows the defendant to, quote,

24     File, with the court having original jurisdiction over the

25     offense, a motion for revocation or amendment of the order.

1    18 United States Code Section 3145(b).  The statute does not

2    specify the standard of review to be applied by a District

3    Court reviewing a magistrate's detention order and, quote,

4    The D.C. Circuit has not yet addressed the issue, closed

5    quote.  That's a quote from United States v. Hunt, 240 F.

6    Supp. 3d 128 at 132 through 133, a D.C. Circuit [sic] case

7    from 2017.  That said, both the BRA and the Federal

8    Magistrates Act support the conclusion, reached by every

9    Circuit to have considered the question, that a District

10   Court reviews a magistrate judge's release order -- release

11   or detention order de novo.  And courts in this District

12   routinely apply that standard, which I will do here today.

13          The Government mainly seeks to detain Donohoe

14   under 18 United States Code 3142(e)(3)(C) which provides a

15   rebuttable presumption of detention if there is probable

16   cause to believe that they committed an offense listed in

17   Section 2332b(g)(5)(B) of Title 18, United States Code, for

18   which a maximum term of imprisonment of 10 years or more is

19   prescribed.  The grand jury found in this case probable

20   cause to believe that Mr. Donohoe committed such an offense.

21   18 United States Code 1361, destruction of government

22   property, the offense charged in Count 4 of the indictment

23   -- of the superseding indictment, is specifically enumerated

24   in 18 United States Code Section 2332b(g)(5)(B)(i).  Count 4

25   charges defendant with the felony variety of that offense,

1    as it alleges that he, together with those known and

2    unknown, aided and abetted others known and unknown to

3    forcibly enter the Capitol and thereby cause damage to the

4    building in an amount more than $1,000.

5         That felony offense carries a maximum sentence of

6    10 years in prison.  And under Circuit precedent, the return

7    of that indictment, quote, Makes conclusive the existence of

8    probable cause to hold the accused for further prosecution,

9    closed quote.  That's United States v. King, 482 F.2d 768 at

10   776, a D.C. Circuit case from 1973.  Thus, the defendant is

11   eligible for detention and the rebuttable presumption

12   arises.

13        Now, moving on to the pretrial faction -- pretrial

14   detention factors that I must consider.  The first factor

15   requires me to consider the nature and circumstances of the

16   offense charged.  18 United States Code Section 3142(g)(1).

17        Donohoe and his three co-defendants are charged

18   with six offenses.  Among the felonies they are charged with

19   are conspiracy, felony destruction of property, in violation

20   of 18 United States Code Section 1361; obstruction of law

21   enforcement during a civil disorder, in violation of 18

22   United States Code Section 231(a)(3); and obstruction of an

23   official proceeding, in violation of 18 United States Code

24   Section 1512(c)(2).  The three substantive felonies are

25   charged under an aiding and abetting theory, as well.

1        The 1512(c)(2) offense is one for which the

2    maximum term of imprisonment is 20 years.  So it is plainly

3    a serious offense, at least from that perspective.  In

4    addition, as a part of this factor, I must also consider

5    whether the offense is, quote, A crime of violence, a

6    violation of Section 1591, a federal crime of terrorism, or

7    involves a minor victim or a controlled substance, firearm,

8    explosive, or destructive device, closed quote.  That's 18

9    United States Code Section 3142(g)(1).  The Government

10   argues, and Defendant Donohoe does not contest, that

11   Congress has characterized one of the offenses, felony

12   destruction of property, as a federal crime of terrorism

13   under the facts proffered by the Government.  18 United

14   States Code Section 2332b(g)(5) defines "federal crime of

15   terrorism" as an offense that is, quote, Calculated to

16   influence or affect the conduct of government by

17   intimidation or coercion, or to retaliate against government

18   conduct, closed quote, and it is included in an enumerated

19   list of statutes which includes Section 1361.  See 18 United

20   States Code Sections 2332b(g)(5)(A) through (B).

21       But in addition to the maximum sentence that

22   Congress has established and the characterization of one of

23   those offenses as a federal crime of terrorism, it is the

24   broader circumstances of the alleged conspiracy that

25   underscore the seriousness of the charges against

1      Mr. Donohoe.  The grand jury has charged that he conspired

2      with his co-defendants and others, one, to stop, delay, or

3      hinder Congress's certification of the Electoral College

4      vote, in violation of 18 United States Code 1512(c)(2); and,

5      two, to obstruct or interfere with law enforcement officers

6      engaged in their official duties to protect the Capitol and

7      its occupants while that was happening, in violation of 18

8      United States Code 231(a)(3).  In other words, Mr. Donohoe

9      stands charged with interfering with the nation's peaceful

10     transfer of power, which is a grave matter to say the very

11     least.

12          But as I mentioned in connection with my ruling

13     relating to pretrial detention of his co-defendants, or at

14     least Biggs and Nordean, it is fair to say that the

15     allegations the Government is relying on here are not the

16     kind that courts in our District have relied on to detain

17     some January 6th defendants for trial -- before trial at

18     least so far.  For example, while Mr. Donohoe appears to

19     have helped carry a riot shield that was later used by

20     another individual as a weapon, there's no evidence that he

21     used that weapon himself; that -- there's no evidence he

22     fought police officers directly; or even that he entered the

23     Capitol.  So I want to walk through the factual allegations

24     here.

25          To begin with, it bears noting that it --

1      Mr. Donohoe is alleged to be a leader in an organization

2      known as the Proud Boys.  The grand jury charges that

3      Donohoe is president of his local chapter in North Carolina.

4      That's ECF No. 26, Paragraph 10.  The other three

5      co-conspirators are alleged to be leaders, as well:

6      Mr. Nordean as a member of the group's leadership through

7      what's known as an Elders chapter and president of his local

8      chapter, Mr. Biggs as a self-described organizer of Proud

9      Boys events, and Mr. Rehl as the manager [sic] of his local

10     chapter.  These allegations about the defendants are

11     relevant to the nature and circumstances of the offense

12     insofar as they show the defendants were leaders and shared

13     a pre-existing common bond which provides context to explain

14     how all of them, from disparate parts of the country, wound

15     up communicating and then together in Washington, D.C., on

16     January 6th.  That's ECF No. 26, Paragraphs 7 through 9.

17            In addition, defendant's alleged co- -- his --

18     defendant's co-conspirators are alleged to have made

19     statements well in advance of January 6th that they

20     considered the election stolen and that it was important

21     that something be done about it.  And by "the election," I

22     mean, of course, the 2020 presidential election.  Of course,

23     again, I want to emphasize there's no allegation that these

24     statements are crimes in and of themselves, but they do shed

25     light on the nature and circumstances of the offense.  And

1    while I certainly weigh what each co-defendant said against

2    that specific person more heavily, I do think I can consider

3    what one co-conspirator is alleged to have said against all

4    the co-conspirators to some degree when I consider the

5    nature and circumstances of the offense.

6          Given that, I refer back to, and I incorporate in

7    our hearing here today, the facts set forth in my prior

8    ruling on April 19th of this year ordering Defendants

9    Nordean and Biggs detained pending trial.  The parties will

10   be happy to know -- it took me a long time to put those on

11   the record, and I'm not going to repeat all of them here.

12   And they are laid out in -- on Pages 17 to 40 of the hearing

13   transcript which is docketed at ECF No. 71.  But I do want

14   to highlight some of the allegations and evidence which

15   overlaps with some of the evidence the Government has

16   brought to my attention here that the Government has

17   proffered relating specifically to Mr. Donohoe.

18          At ECF 87 at 4, the Government proffers that on

19   December 29th of 2020, Donohoe posted the following which

20   the Government represents reflected the creation of a new

21   Proud Boys chapter, the Ministry of Self-Defense, that would

22   have some kind of role on January 6th.  And the post is,

23   quote, As of right now, dot, dot, dot, the D.C. trip will

24   consist of two groups, none of which can be in colors.  One,

25   the first group of guys have been invited to a special

1    chapter within the organization.  If you haven't been

2    invited, please be patient.  We are growing the group

3    slowly.  Two, the second group consists of PBs that are just

4    attending the event.  You can coordinate with other PBs and

5    do whatever you guys want.  Group 1 and Group 2 will not

6    have any interaction with each other on the 5th at night and

7    the 6th throughout the day.  We are running a training

8    exercise at these times.  Group 2 is still expected to

9    conduct themselves as gentlemen and will always keep

10   themselves in a self-defense mindset at all times.  They way

11   we do national rallies will change drastically over the

12   course of the next couple of months.  After the 6th, you

13   will have to be part of Group 1 to attend national events,

14   closed quote.  Again, that's ECF No. 87 at 4.

15          On January 4th, 2021, Donahue -- Donohoe reported

16   intelligence to the group about the deployment of a limited

17   number of D.C. National Guard forces.  According to the

18   report identified by Donohoe, there would be, quote, No

19   arms, no riot control agent expected, closed quote.  That's

20   ECF No. 87 at 5.

21          On January 4th, 2021, shortly after the Proud Boys

22   chairman was arrested, Donohoe expressed concern that

23   encrypted communications that involved the chairman would be

24   compromised when law enforcement examined his phone.

25   Donohoe then created a new channel for the encrypted

1    messaging application entitled, quote, New MOSD, closed

2    quote, and the evidence suggests he took steps to destroy

3    or, quote, Nuke, closed quote, the earlier channel.  After

4    its creation, the, quote, New MOSD, closed quote, channel

5    included Rehl, Biggs, Nordean, and Donohoe, and a handful of

6    additional members.  That's ECF No. 26 at Paragraph 39.

7         More specifically, the Government, in its slide

8    presentation to Judge Harvey, referenced a Telegram message

9    that Donohoe -- that -- from Donohoe that day that read,

10   quote, Each one of us should personally clear out our

11   history of that MOSD chat, closed quote.  That's on the

12   slide presentation at Page 2.  Ten minutes later, he is

13   alleged to have sent another Telegram message that read,

14   Well, at least they won't get our boots-on-the-ground plans

15   because we are one step ahead of them, closed quote.

16   That's, again, Page 2 of that slide presentation.

17        On January 4th, 2021, at 7:15 p.m., Donohoe posted

18   a message on various encrypted messaging channels, including

19   New MOSD, which read, Hey, have been instructed, and listen

20   to me real good.  There is no planning of sorts.  I need to

21   be put into whatever new thing is created.  Everything is

22   compromised and we can be looking at gang charges, closed

23   quote.  Donohoe then also wrote, quote, Stop everything

24   immediately, closed quote, and then, quote, This comes from

25   the top, closed quote.  That's ECF No. 26 at 40 -- Paragraph

1    40.

2              About an hour after Donohoe's message to stop, at

3    8:20 p.m., an unindicted co-conspirator, who's identified as

4    UCC-1 by the Government, posted to the New MOSD channel, We

5    had originally planned on breaking the guys into teams.

6    Let's start divvying them up and getting BaoFeng channels

7    picked out.  ECF No. 26 at Paragraph 41.

8              And on January 5th, the next day, at 1:23 p.m., a

9    new encrypted messaging title -- channel entitled, quote,

10   Boots on the Ground, closed quote, was created for

11   communications by Proud Boy members in Washington, D.C.  And

12   in total, over 60 users participated in that channel,

13   including Rehl, Nordean, Biggs, Unindicted Co-Conspirator-1,

14   and Donohoe.  That's ECF No. 26, Paragraph 42.

15             Shortly after that channel's creation, Biggs

16   posted a message to the channel that read, We are trying to

17   avoid getting into any shit tonight.  Tomorrow's the day,

18   closed quote.  And then, quote, I'm here with Rufio -- using

19   Nordean's nickname -- with -- and a good group.  Again,

20   that's ECF No. 26, Paragraph 42.

21             Subsequently, Rehl, who was traveling to

22   Washington on January 5th, stated he was bringing multiple

23   radios with him and that there was a person who was planning

24   to program the radios later that evening.  ECF No. 26 at

25   Paragraph 44.

1          And at 9:03 p.m. that evening, Rehl notified

2     Nordean, Biggs, Donohoe, and others that he arrived in

3     Washington.  Donohoe responded by requesting one of the

4     radios that Rehl had brought.  That's ECF No. 26, Paragraph

5     46.

6          At 9:09 p.m. that night, the Unindicted

7     Co-Conspirator-1 broadcast a message to the New MOSD and

8     Boots on the Ground channels that read, quote, Stand by for

9     the shared BaoFeng channel and shared Zello channel.  No

10    colors.  Be decentralized and use good judgment until

11    further orders.  That person also wrote, Rufio -- referring

12    to Nordean -- is in charge.  Cops are the primary threat.

13    Don't get caught by them or BLM.  Don't get drunk until off

14    the street, closed quote.  The UCC-1 then provided a

15    specific radio frequency of 477.985.  That's ECF No. 26 at

16    47.  Donohoe repeated this series of instructions to members

17    of a Telegram group and, as had others who posted the

18    message, also posted, quote, Any -- everyone needs -- quote,

19    Everyone needs to meet at the Washington Monument at 10:00

20    a.m. tomorrow morning.  Do not be late.  Do not wear colors.

21    Details will be made [sic] out at the pre-meeting.  Come out

22    as a patriot.  We will be meeting inside the ropes of the

23    monument on the side facing the White House, closed quote.

24    That's ECF No. 87 at 6.

25          The next morning was January 6th, and at 6:37 a.m.

1      that morning, Donohoe posted a message to the New MOSD that

2      asked, quote, Are we gonna do a commanders briefing before

3      the 10:00 a.m.?  ECF No. -- ECF 26 at Paragraph 49.

4      Subsequently, Donohoe communicated to others that he was on

5      his way to the Washington Monument.  He added, quote, I have

6      the keys until Rufio -- meaning, Nordean -- and Zach show

7      up, closed quote.  ECF 26 at Paragraph 50.

8            Later in the day, around 10:00 a.m., shortly after

9      the Unindicted Co-Conspirator-1 posted a message that

10     directed participants to, quote, Push inside, closed quote,

11     and another person asked, quote, They deploy the mace yet,

12     closed quote, Donohoe responded, We are trying.  ECF No. 87

13     at 7.

14           And after Dominic Pezzola, who is indicted in

15     another case, robbed a Capitol -- allegedly robbed a Capitol

16     Police officer of his riot shield, Donohoe was captured on

17     video carrying the shield with Pezzola.  Around the same

18     time, Donohoe relayed the news to those on the Telegram

19     message group, writing, quote, Got a riot shield, closed

20     quote.  That's ECF No. 87 at Pages 7 through 8.  Pezzola,

21     again, is alleged to have later used that shield to smash a

22     window, allowing rioters to stream into the Capitol.

23           The Government has also proffered video that

24     appears to show Donohoe present as part of a group,

25     including Pezzola, that overwhelmed law enforcement at a key

1    stairway leading to the terrace on the west side of the

2    Capitol.  He does not appear to have been close enough to

3    the officers to have fought with them directly, but in my

4    view, looking at the video, he does appear to help push the

5    crowd forward.

6              At 3:38 p.m., more than an hour after Pezzola and

7    others had broken into the building, Donohoe indicated that

8    he had left the Capitol grounds but announced over Telegram,

9    We are regrouping for a -- with a second force, closed

10   quote.  But that plan appears to have been short-lived, as

11   Donohoe subsequently advised the group that the National

12   Guard and DH- -- and, quote, DHS agents, closed quote, were

13   coming.  ECF No. 87 at 9.

14             After the breach, Donohoe posted in Telegram

15   messages that he, quote, Stood on that [sic] front line the

16   entire time, and, quote, Pushed it twice, closed quote.  ECF

17   No. 87 at 9.  He further stated, Thank God we were not

18   wearing colors.  We should never wear colors ever again for

19   any event, only for meet-ups [sic], closed quote.  That's

20   the slides at Page 12.  Donohoe also wrote that he felt,

21   quote, Like a complete warrior, closed quote, and marveled

22   that, quote, We stormed the Capitol unarmed and we took it

23   unarmed.  The people are fucking done.  Wait when Joe Biden

24   tells us we are all criminals.  That's ECF No. 87 at 9 and

25   the slides at Page 12.  Another person responded in the

1   chat, By then, it's too late, to which Donohoe responded,

2   No, it's not.  It's never too late, ever.  Again, that's

3   Page 12 of the slides.  And after a break in the chat,

4   Donohoe further stated, Facial recognition doesn't mean shit

5   when you've got 5.56 green tip.  The Government proffers

6   that this is a reference to a type of ammunition perhaps

7   with special piercing qualities.  That's, again, the slides

8   at Page 12.

9         Also later in the evening of January 6th, a

10  participant in the MOSD Telegram messages posted the

11  following:  So many of you have been calling for this for

12  weeks.  Patriots need to storm D.C.  Patriots need to take

13  the Capitol.  Now, it's happening, and the same people are

14  now yelling, It's Antifa.  Patriots wouldn't do that [sic].

15  For fuck's sake.  Knock off the cognitive dissonance.  Now

16  that you're getting what you wanted, you don't have the

17  stomach for the possible consequences and are looking to

18  blame already?  The reason -- there's a reason I've been

19  saying that discretion is the better part of valor.  You

20  either stand by your convictions or you don't.  The mental

21  gymnastics are ridiculous with some of you, closed quote.

22  ECF No. 87 at 12.

23        As the creator of several of the Telegram groups

24  that had been used in planning for January 6th, Donohoe

25  asked others, Want me to nuke it?  And he was directed to do

1    so.  About 10 minutes later, Donohoe was told, That didn't

2    nuke it lol, and then, You gotta nuke it.  A few minutes

3    later, Donohoe wrote, Hmmm, H-M-M-M.  That's ECF No. 87 at

4    10.

5         Finally, on January 13th, about a week later,

6    Donohoe and Nordean discussed future plans.  Nordean wrote,

7    quote, We can plan here, compile our experience, and make

8    rough draft plans to [sic] go from there, closed quote.

9    Donohoe responded, Okay.  So I will start, followed by,

10   quote, Everyone needs a bug-out bag.  They need a bag they

11   can carry on their shoulders that consists of items that not

12   only benefit themselves but benefit the team; and, quote, If

13   they don't have a rifle, then they need one.  If they are a

14   felon, then they need armor, closed quote.  The Government

15   represents that Donohoe later reported in the Telegram

16   message that he worked with others to develop a Proud Boy

17   bug-out kit.  Donohoe then shared the details of the kit

18   with others in the Telegram groups, including where to buy

19   it.  And, again, the Government represents that Nordean

20   subsequently passed on this information to his contacts in a

21   separate message room in Telegram.  That's ECF No. 87 at 17.

22        Finally, I guess, on January 18th, in discussions

23   of the possibility of future rallies, Donohoe indicated that

24   the only -- that only the MOSD members were likely to

25   continue:  Well, I think it's -- who we have in MOSD --

1       about all we are going to have; and, quote, Almost none of

2       my guys want to do rallies now.  ECF No. 87 at 16.

3             So that plus what's on the record with regard to

4       the other detention hearing are what the evidence of the

5       nature and circumstances of the offenses are.  And

6       considered as a whole, I do consider that these nature and

7       circumstances weigh strongly in favor of detention.

8             Chief Judge Howell has set forth a number of

9       considerations which I do find helpful to differentiate the

10      severity of the conduct of the hundreds of defendants

11      connected to the events of January 6th for purposes of

12      detention.  And she did so in the Chrestman case which is on

13      Westlaw at 2021 WL 765662 at Page 7.  It's a D.D.C. case

14      from February 26th of 2021.  And these considerations

15      include whether a defendant, one, has been charged with

16      felony or misdemeanor offenses; two, whether the defendant

17      engaged in prior planning before arriving at the Capitol;

18      three, whether he carried or used a dangerous weapon during

19      the riot; four, whether he coordinated with other

20      participants before, during, or after the riot; or -- and,

21      five, whether he assumed a formal or de facto leadership

22      role in the assault by encouraging other rioters'

23      misconduct; and, six, the nature of the defendant's words

24      and movements during the riot, including whether the

25      defendant damaged federal property, threatened or confronted

1    federal officials or law enforcement, or otherwise promoted

2    or celebrated efforts to disrupt the certification of the

3    electoral vote count during the riot.

4           Most of these considerations weigh in favor of

5    detention here.

6           On the first, the defendant is charged with

7    multiple felony offenses, as I mentioned, including one

8    Congress has characterized under these circumstances as a

9    federal crime of terrorism and another that exposes him to a

10   20-year sentence.  The grand jury has charged that he

11   conspired with his co-defendants and others, one, to stop,

12   delay, or hinder Congress's certification of the Electoral

13   College vote; and, two, to obstruct or interfere with law

14   enforcement officers engaged in their official duties to

15   protect the Capitol and its occupants while that was

16   happening.  I'm not going to belabor the point, but these

17   are gravely serious matters.  This weighs in favor of

18   detention.

19          On the second, fourth, and fifth considerations,

20   the allegations include extensive involvement in the prior

21   planning for January 6th, coordinating with other

22   participants before, during, and after the riot, and a

23   leadership role.  Although I do agree with Magistrate Judge

24   Harvey that Mr. Donohoe had a less prominent leadership role

25   than, say, Nordean or Biggs, the evidence strongly suggests

1    that he had a key role in maintaining the security of

2    communications and ensuring that they were not discovered by

3    law enforcement.  At least twice, the evidence suggests that

4    he destroyed or attempted to destroy evidence of certain

5    communications.  And he also relayed instructions from

6    senior leaders at times and at least temporarily

7    characterized himself as in charge on January 6th until

8    others arrived.  And after January 6th, he was engaged in

9    discussions with Nordean about preparing bug-out kits for

10   Proud Boy members and spreading the word on how to buy them.

11           Considerations three and six are a mixed bag but

12   also weigh in favor of detention.  On the one hand, there's

13   no evidence Donohoe himself laid his hands on anyone or

14   fought with anyone, including law enforcement, or that he

15   used a weapon.  But the video evidence proffered by the

16   Government shows that he was part of a group, along with

17   Pezzola, that pushed forward to overwhelm law enforcement at

18   a key access point to the Capitol, and his own statement

19   that he stood on the front line and pushed appears to

20   corroborate that.  He was captured on video helping to carry

21   the riot shield that Mr. Pezzola apparently stole and used

22   as a weapon to smash a window, allowing others to stream

23   inside.  He also stated that, quote, We are regrouping with

24   a second force, even if that force never materialized.  And

25   finally, he celebrated what happened that day when he wrote

1    that he felt, Like a complete warrior, and marveled that, We

2    stormed the Capitol unarmed and we took it over unarmed.

3    The people are fucking done.

4         Given all the above, and consistent with my prior

5    ruling relating to Nordean and Biggs, I agree with

6    Magistrate Judge Harvey that the nature and circumstances of

7    the offenses here weigh heavily in favor of detention.

8         The second factor I have to consider is the weight

9    of the evidence against the person.  And although much of

10   the evidence is uncontroverted insofar as it is in Telegram

11   chats, photographs, and video, it is also true that much of

12   the Government's evidence is circumstantial, as Ms. Costner

13   mentioned just a moment ago; that is, circumstantial about

14   the details of the alleged conspiracy.  Mr. Donohoe

15   essentially puts his own spin on the evidence, pointing out

16   that there is no evidence that he specifically planned

17   violence -- that articulates with specificity that he

18   planned violence at the Capitol or that he ever entered the

19   Capitol or used the riot shield as a weapon or assembled a

20   second force or succeeded in destroying any of the

21   communications channels.  Rather, he argues, he was merely

22   swept up in the crowd.  But in the end, Donohoe's

23   explanation for this piece of evidence, that piece of

24   evidence -- despite his explanation for this or that piece

25   of evidence that might be, in a vacuum -- have some

1    persuasiveness, the evidence, taken as a whole, against

2    Donohoe and his co-defendants is clearly strong enough to

3    weigh in favor of detention.  As Judge Harvey observed, the

4    best evidence of -- is not -- first of all, it is not

5    unusual to not -- in a conspiracy case to not have the

6    evidence -- the conspiracy detailed in a memo for everyone

7    to see.  The best -- and, as -- and the best evidence of the

8    conspiracy is what the co-conspirators acted in concert to

9    do, and here that includes interfering with the

10   certification of the Electoral College vote.  In addition,

11   the use of encrypted Telegram chats and radios to -- set to

12   a preset frequency suggests that Donohoe and his

13   co-conspirators were trying to evade detection by law

14   enforcement.  Donohoe's comment that, We can be looking at

15   gang charges, and UCC-1's admonition, incorporated from my

16   prior ruling, that they, Shouldn't be typing plans to commit

17   felonies into your phone, closed quote, suggests that what

18   was going on here was planning to do something unlawful.

19   Thus, consistent with my prior ruling relating to Nordean

20   and Biggs as well as Magistrate Judge Harvey's conclusion, I

21   do conclude that the weight of the evidence is strong enough

22   to weigh in favor of detention, even if, as in most

23   conspiracy cases, we don't have a document or a conversation

24   that lays out the conspiracy with specificity and in detail.

25          Next, I have to consider the history and

1    characteristics of the person, including the person's

2    character, physical and mental condition, family ties,

3    employment, financial resources, length of residence in the

4    community, community ties, past conduct, history related to

5    drug or alcohol abuse, criminal history, and record

6    concerning appearances at court proceedings.

7            Mr. Donohoe has strong ties to the area where he

8    lives.  He has lived in North Carolina for 30 years and

9    spends three days each week with his five-year-old son.  His

10   girlfriend submitted a letter describing his devotion to his

11   son, and his employer submitted a letter vouching for his

12   character and stating that he would have a job when

13   released.  He helped look for a missing girl in his

14   community before he was detained.  I've read all the

15   documents that were -- and letters that were submitted on

16   his behalf.  He has also served in the Marines, which is

17   extremely commendable, and he only has a minimal criminal

18   history, a conviction of underage possession of alcohol and

19   a currently pending DUI charge.  I agree with Magistrate

20   Judge Harvey that these facts -- and the -- and I agree with

21   Ms. Costner's argument that these facts are enough to rebut

22   the presumption.  But, as Judge Harvey also pointed out,

23   these factors are undercut by other considerations,

24   including that Donohoe celebrated the events of January 6th,

25   continued planning potentially for future events, and at

1    least attempted to erase potentially incriminating

2    conversations.

3            So accordingly, consistent with Magistrate Judge

4    Harvey's conclusion, this factor weighs in favor of release,

5    although not overwhelmingly so.

6            And the final factor I have to look at is the

7    nature and circumstances [sic] of the danger to any person

8    or the community that would be posed by the person's

9    release.  That is 18 United States Code 3142(g).  And in

10   some ways, this is the key -- for me, this is the key factor

11   here.

12           And then, as the Circuit found in the recent

13   Munchel decision, I have to justify detention -- to justify

14   detention on the basis of dangerousness -- which is the only

15   basis I find that is at issue here -- I must find by, quote,

16   Clear and convincing evidence, closed quote, that no

17   condition or combination of conditions will reasonably

18   assure the safety of any other person and the community.  18

19   United States Code 3142(f).  As the Circuit held in that

20   case, quote, A defendant's detention based on dangerousness

21   accords with due process only insofar as the District Court

22   determines that the defendant's history, characteristics,

23   and alleged criminal conduct make clear that he or she poses

24   a concrete, prospective threat to public safety, or as the

25   Supreme Court articulated in Salerno, An identified and

1    articulable threat to an individual or the community, closed

2    quote.

3          I do believe this factor weighs in favor of

4    detention and the ultimate -- and this ultimate standard

5    that I just articulated is met when all the factors are

6    considered here, including the last one.  So let me explain

7    a little bit why.

8          First, I think it's -- bears repeating that the

9    detention presumption, although I do find it has been

10   rebutted, remains in the case and weighs in favor of

11   detention.

12         Second, Donohoe is alleged, by his leadership and

13   planning, to have facilitated the political violence on

14   January 6th, even if he himself did not use a weapon or

15   strike a blow.  Thus, a finding that he poses a threat

16   accords with the Circuit's view in Munchel that, quote,

17   Those who actually assaulted police officers and broke

18   through windows, doors, and barricades, and those who aided,

19   conspired with, planned, or coordinated such actions, are in

20   a different category of dangerousness than those who cheered

21   on the violence or entered the Capitol after others cleared

22   the way.

23         Third, on this record, I don't think there is any

24   reason to believe that Donohoe's demonstrated willingness

25   and intention to plan what happened -- violence or what

1    happened on January 6th is in the past.  Certainly, many of

2    his co-conspirators expressed strong views that the 2020

3    presidential election was stolen and that violence was

4    adjusted in response -- justified in response.  I won't go

5    through those statements now, but I -- they are on the

6    record in the other ruling that I have incorporated here

7    today, but many of them spoke of revolution, they spoke of

8    war, and concepts like that.  And even if the election has

9    since passed, the idea that the election was stolen remains

10   a live issue in our politics.  And the evidence here

11   regarding Donohoe's willingness to use violence after

12   January 6th bears that out.  Like his co-conspirators, he

13   has never shown any remorse, that I know of, for what he did

14   or what happened on January 6th.  And more than that, he has

15   done and said things that, taken together, suggest that the

16   violence should continue.  For example, on January 6th, he

17   was involved in planning for Proud Boy bug-out bags and

18   noted that, If they don't have a rifle, they need one.

19   Again, there are, as Ms. Costner indicated, alternate

20   explanations for that, but, again, putting it in context and

21   in light of all the evidence, I think it does suggest that

22   violence might be necessary; then, celebrating what he did

23   on January 6th, he remarked that, The people -- quote, The

24   people are fucking done.  Wait when Joe Biden tells us we

25   are all criminals.  And another -- closed quote.  And after

1    another person responded, By then, it's too late, he

2    responded, No, it's not.  It's never too late, ever.  That

3    sentence is important in my evaluation of Mr. Donohoe's

4    willingness and intentions going forward.  And then,

5    chillingly, he added, quote, Facial recognition doesn't mean

6    shit when you've got 5.56 green tip, which the Government

7    says refers to a type of ammunition.  On this record,

8    Mr. Donohoe is not someone for whom the election was settled

9    and the fight is over.

10          Fourth, and as the court concluded in Munchel, the

11    threat must be considered in context, and whether a

12    defendant poses a particular threat depends on the nature of

13    the threat identified and the resources and capabilities of

14    the defendant.  In this case, he's -- there is significant

15    evidence of leadership.  There's significant evidence that

16    Mr. Donohoe was part of a network.  Through that -- through

17    his leadership and networks as well as his communications

18    experience and planning, Donohoe, along with his

19    co-defendants, has the capability to assist in producing

20    events that draw large numbers of people, including Proud

21    Boys, others sympathetic to their views, and even others on

22    the opposite side of the political spectrum that they may

23    attract.  And through what happened on January 6th, he's now

24    shown the capability to facilitate violence, either against

25    other civilians or law enforcement, at those events.  Even

1    if there is events that some -- even if there is evidence

2    that some Proud Boys, in the wake of January 6th, weren't

3    interested in rallying at that point in time, these

4    capabilities on behalf of Mr. Donohoe and his co-defendants

5    remain.

6              Fifth, I looked closely at the kinds of conditions

7    I could impose on Mr. Donohoe.  He suggests I release him to

8    a third-party custodian -- his grandparents -- home

9    incarceration, and location monitoring.  And I do understand

10   that the Middle District of North Carolina has a computer

11   monitoring program.  But at the end of the day, I don't

12   think these suffice.  And that is so because even these

13   conditions -- even those conditions cannot prevent

14   Mr. Donohoe from organizing or providing a leadership or

15   communications role for Proud Boys or others who believe

16   that violent action needs to be taken because the election

17   was stolen.  Mr. Donohoe can evade conditions like this --

18   like -- conditions like requiring no contact with other

19   people or even being prohibited from using a computer by

20   simply having a confidant come over to his grandparents'

21   house and slip him a smartphone or another device.  I don't

22   think there's any real way to prevent that from happening --

23   any foolproof way, and I would never know if it did.

24             Now, I want to also explain why I don't have

25   confidence that this -- that Mr. Donohoe would abide by

1    those conditions, because it's -- why I find that those

2    conditions do not reasonably assure the safety of the

3    community, because that is the standard.  No conditions can

4    give us 100 percent -- can give me 100 percent that the

5    community can be protected.  The standard is whether the

6    conditions will reasonably assure the safety of the

7    community.  I don't think they do here for a couple of

8    reasons.  First, we've seen, again, the evidence that I

9    described that suggests, again, that Mr. Donohoe and his

10   co-defendants are -- think that -- again, Facial recognition

11   doesn't mean shit when you've got 5.56 green tip -- that the

12   need for violence going forward is -- that there is a need

13   for -- that the -- that there is a need for violence going

14   forward.  And, as both parties have said, emotions have been

15   running -- have -- run high regarding the election and the

16   feelings about the election.  That alone wouldn't, of

17   course, do it.  But we have, in addition to that,

18   allegations here that Mr. Donohoe took steps to conceal

19   communications from others, including law enforcement, by

20   using Telegram and by using a specific radio frequency to

21   communicate with other Proud Boys on January 6th.  Whether

22   he used the Proud Boys or -- whether he used the radio or

23   not, that's what the group did, and he certainly was a part

24   of the steps to conceal communications.  Second, the

25   evidence suggests that, at a minimum, Donohoe tried to

1  destroy communications evidence relating to the Government's

2  investigation.  So this prior activity, showing some

3  experience with communications -- with concealing

4  communications from law enforcement, and in -- his alleged

5  participating -- participation in destroying or attempting

6  to destroy evidence, in addition to his above-described

7  ongoing intentions and capabilities or at least the evidence

8  I have about those intentions and capabilities, suggest to

9  me that he would not abide by the conditions I impose.  And

10  that's why, even though no conditions can give 100 percent

11  assurance, I don't think even those conditions can

12  reasonably assure the safety of the community.

13       And so consistent with Magistrate Judge Harvey's

14  conclusion, I do find that the last factor weighs in favor

15  of detention.  And upon review of all the factors, I find

16  by, quote, Clear and convincing evidence, closed quote,

17  because of the prospective danger Donohoe presents, quote,

18  No condition or combination of conditions will reasonably

19  assure the safety of any other person and the community,

20  under 18 United States Code 3142(f).  I will -- so I will

21  enter an order to that effect, and I will deny Mr. Donohoe's

22  motion.

23       Ms. Costner, you can -- obviously -- just in terms

24  of the path forward here, obviously, I still have -- my

25  ruling with regard to the co-defendants is still with the

1    Circuit.  You, obviously, are -- may appeal this ruling.  I

2    just wanted to mention, if you do and I get a decision from

3    the Circuit the next day, I won't be able to do anything

4    about this ruling.  So it's your choice how you proceed,

5    obviously, but I just mention that you, obviously, can,

6    obviously, appeal it or wait to hear what we -- what the

7    Circuit does since so much of the evidence is similar and

8    you can move to have -- reconsider -- for me to reconsider

9    this ruling and if it meets the standard for such a motion

10   I'll take that up, depending upon what the Circuit says, but

11   I just wanted to lay that out.  It -- you -- you'll have

12   to -- proceed as you will, but there is a risk of me losing

13   jurisdiction over deciding the question if you appeal very

14   quickly.  So again, however you're going to respond, you

15   may.

16          I guess the other thing is, we have -- let me just

17   ask, when is our -- I did not check to see when -- I think

18   we set both this matter and the other defendants for a

19   common status going forward.  Mr. McCullough, is that -- I

20   see Ms. Costner --

21          MR. MCCULLOUGH:  That is correct, Your Honor.

22          THE COURT:  -- nodding.  So that's -- that makes

23   me feel confident that we did do that.

24          MR. MCCULLOUGH:  On --

25          THE DEPUTY CLERK:  Judge Kelly --

1          MR. MCCULLOUGH:  On the hearing on --

2          THE COURT:  Yes?

3          MR. MCCULLOUGH:  -- June 3rd -- sorry.

4     Ms. Costner, please.

5          THE COURT:  Hold on one second.  I think that's

6     Ms. Harris.

7          THE DEPUTY CLERK:  Yes.  I have some information.

8     I have a note here that I was going to bring up with regards

9     to the next hearing.  We set the next hearing for July 15th

10    at 2:00 p.m., but I recently found out from my contact at

11    the facility where Mr. Donohoe is located that we can only

12    set our hearings in the morning because the afternoon is

13    reserved for that District Court's first appearances.  So he

14    wouldn't be able to appear on the 15th at 2:00 p.m.  It

15    would have to be in the morning.

16         THE COURT:  All right.  Well, we're not going to

17    be able to -- I think, obviously, we're going to have to

18    reach out to the other parties to try to align all of them

19    and we can do that after here, but only having Ms. Costner

20    here is not going to help -- I mean, it will help -- I guess

21    it -- we'll know one of the four, but other than that we're

22    not going to -- I think that's a project perhaps for after

23    we conclude today's hearing that we reach out to all the

24    parties -- all -- the Government and all four defendants to

25    see when -- if the -- if we -- if they can reschedule it

1    earlier in the day.

2            Ms. Costner, do you know whether you even could

3    reschedule it earlier that day?

4            MS. COSTNER:  Yes, I'm available anytime that day.

5            THE COURT:  Okay.  So I mean, I have a bunch of

6    other things on my calendar, but we can, of course, and

7    will, move them if we need to, to the extent -- I don't know

8    whether they're matters -- well, in any event, we'll take

9    that up afterward, but thank you for raising that.  We'll

10    take that up afterward.  You can take it up with the parties

11    in terms of scheduling and try to get us all on the same

12    page perhaps for earlier that day, if they can.

13            Are we -- since we set that date until the 15th,

14    do we have -- has -- with regard to Mr. Donohoe, is the

15    Speedy Trial Act waived until then or should I ask the

16    parties about the --

17            MR. MCCULLOUGH:  (Indicates affirmatively.)

18            THE COURT:  Mr. McCullough's waving his head.  He

19    thinks that it is.

20            MR. MCCULLOUGH:  Yes, Your Honor.  The parties did

21    agree at that time at least as to Mr. Donohoe that that time

22    would be tolled from June 3rd until July 15th.

23            THE COURT:  All right.  So we'll -- okay.  So no

24    further action on that.

25            And, as I said, then, Ms. Costner, you can proceed

1    as you will.  I had thought we would hear from the Circuit

2    by now, candidly, but we'll see what the future brings with

3    that.  Obviously, there is a lot of overlap between the

4    evidence in that case and the evidence -- I mean, it's the

5    same case, but -- the evidence against those defendants and

6    the evidence against your client.

7          Let's see.  Is there anything, then -- other than

8    the fact now that we know we're going to have to reset on

9    the 15th, is there anything further the Government thinks I

10    need to do today?

11          MR. MCCULLOUGH:  No, Your Honor.

12          THE COURT:  All right.  Ms. Costner, same question

13    to you.

14          MS. COSTNER:  No, Your Honor.

15          THE COURT:  All right.  Very well, then.

16          I will see you all on the 15th, if not, in the

17    Government's case, perhaps sooner.  And with that, our

18    hearing is concluded.  The parties are dismissed.

19          MR. JONES:  Thank you, Your Honor.

20          (Proceedings concluded at 12:39 p.m.)

21            * * * * * * * * * * *

22         CERTIFICATE OF OFFICIAL COURT REPORTER

23     I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby

24    certify that the above and foregoing constitutes a true and

25    accurate transcript of my stenographic notes and is a full,

1    true and complete transcript of the proceedings to the best

2    of my ability, dated this 12th day of August 2021.

3        Please note:  This hearing occurred during the COVID-19

4    pandemic and is, therefore, subject to the technological

5    limitations of court reporting remotely.

6                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                               Official Court Reporter
7                              United States Courthouse
                               Room 6722
8                              333 Constitution Avenue, NW
                               Washington, DC 20001
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25