IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 1:22CR175-4-TJK |
| | ) | |
| CHARLES DONOHOE | ) | |

**MR. DONOHOE'S SENTENCING MEMORANDUM**

NOW COMES the Defendant, CHARLES DONOHOE ("Mr. Donohoe"), by and through his attorneys, Lisa Costner and Ira Knight, and respectfully requests the Court to consider the sentencing factors relevant to 18 U.S.C. § 3553(a) and find that a sentence of 36 months is sufficient, but not greater than necessary.

Procedural History

On March 10, 2021, a federal grand jury returned a six-count superseding Indictment against Mr. Donohoe, along with co-defendants Ethan Nordean, Joseph Biggs, and Zachary Rehl. PSR ¶ 4; Doc. 26. All four defendants were charged in six counts. *Id.*

On March 7, 2022, the grand jury returned an eight-count second superseding Indictment. PSR ¶ 8; Doc. 305. The second superseding Indictment added two new defendants: Enrique Tarrio and Dominic Pezzola. *Id*.

The second superseding Indictment charged in Count One, Conspiracy to Obstruct Official Proceedings, a violation of 18 U.S.C. §1512(k); Count Two, Obstruction of an Official Proceeding and Aiding and Abetting, violations of 18 U.S.C. §§1512(c)(2) and 2; Count Three, Obstruction of Law Enforcement During Civil Disorder and Aiding and Abetting, violations of

1

18 U.S.C. §§231(a)(3) and 2; Counts Four and Five, Destruction of Government Property and Aiding and Abetting, violations of 18 U.S.C. §§ 1361 and 2; Counts Six and Seven, Assaulting, Resisting, or Impeding Certain Officers, a violation of 18 U.S.C. § 111(a); and Count Eight, Robbery of Personal Property of the United States, a violation of 18 U.S.C. § 2112. All of the defendants were named in Counts One through Seven. *Id.* Count Eight charged only Dominic Pezzola.[1] *Id.*

On April 8, 2022, Mr. Donohoe pled guilty to Counts One and Six of the second superseding Indictment pursuant to a plea agreement. PSR ¶ 16; Doc. 337. Notably the following guideline computation with respect to Count 1 was agreed to by the parties:

| | |
|---|---|
| U.S.S.G. § 2J1.2 Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) Causing/Threatening Injury or Damage | +8 |
| U.S.S.G. § 2J1.2(b)(2) Substantial Interference With Justice | +3 |
| U.S.S.G. § 2J1.2(b)(3)(C) Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3B1.1(b) Aggravating Role | +3 |
| Total[2] | 30 |

PSR ¶ 17. A presentence report ("PSR") was prepared. Mr. Donohoe was given a three-level reduction for acceptance of responsibility, making his total offense level 27. PSR ¶¶ 102-103. Mr. Donohoe has no criminal convictions; therefore his criminal history category is I. PSR ¶ 107. After a 3-level downward adjustment for Mr. Donohoe's acceptance of responsibility, Mr. Donohoe's advisory guideline range is 70 – 87 months. PSR ¶ 163.

---

[1] On June 6, 2022, a third superseding Indictment was returned. Mr. Donohoe having already plead guilty, was not named in this Indictment. PSR ¶ 12.
[2] Counts one and six are grouped together for purposes of calculating Mr. Donohoe's total offense level. Count 1 carries a higher total offense level, therefore Mr. Donohoe's combined offense level is 30. PSR ¶¶ 90-91.

2

The parties have no objections to the draft presentence report. Mr. Donohoe requests that this Court grant him a downward variance from the advisory guideline range to a sentence of 36 months.

## REQUEST FOR A VARIANCE

Mr. Donohoe requests the Court to consider the following sentencing factors relevant to 18 U.S.C. § 3553(a), and find that a sentence of 36 months imprisonment is sufficient, but not greater than necessary.

A. The Nature and Circumstances of the Offense

1. Mr. Donohoe's History With the Proud Boys and Participation on January 6

Mr. Donohoe joined the Proud Boys in 2018, after watching a documentary on YouTube and seeing a video of Antifa smashing a Berkeley United States Marine Corps window in 2017.[3] Eventually, he became a fourth-degree member and helped create a local chapter in North Carolina. For a period of time, he served as president of the local chapter.

Mr. Donohoe met Enrique Tarrio in July of 2019 at a Freedom of Speech rally and then again in 2020. He believed Tarrio recognized him after a photograph of Mr. Donohoe and a former Marine Corps buddy "went viral" on the Internet.[4] Tarrio quickly elevated Mr. Donohoe to a regional leadership position.[5]

---

[3] Facts are presented from the Government's evidence, the presentence report, and the attached exhibits.
[4] Donohoe was photographed with D.C. Metropolitan Police Officer Collin Cole, who was also a Marine veteran. This photograph widely circulated the internet.
[5] "Historically, individuals with military experience are highly sought-after by various domestic violent extremist (DVE) organizations." This is War Daniel Milton, Andrew Mines, Program on Extremism, The George Washington University at 32. Available at: (https://www.jstor.org/stable/pdf/resrep31126.1.pdf (last accessed Dec. 11, 2023).

3

Mr. Donohoe attended the election rally in Washington, D.C., on December 12, 2020. He was not involved in the planning of the rally and did not participate in any of the violence that occurred involving other Proud Boys.

On December 20, 2020, Enrique Tarrio recruited Mr. Donohoe to join the leadership of a new chapter of the Proud Boys, called the Ministry of Self Defense ("MOSD"). Mr. Donohoe enthusiastically agreed to join.[6] Mr. Donohoe understood from Tarrio that the purpose of the group was to plan and execute national rallies. The expectation of those in MOSD was to follow orders, and if someone did not follow orders, they would be kicked out of MOSD. This top-down leadership structure was different than how the Proud Boys normally operated but felt familiar to Mr. Donohoe.

Ethan Nordean, Joseph Biggs, and Enrique Tarrio formed the top tier of MOSD's top-down structure. On paper, Tarrio, Biggs, and Nordean had equal leadership authority. However, Mr. Donohoe felt that Tarrio controlled the group and made all the decisions. Tarrio was the chairman, and he knew to "always trust Enrique." Zachary Rehl and two other members made up the middle tier.

Tarrio also formed a special MOSD Telegram chat group for hand-picked Proud Boys. Tarrio decided who was going to be placed into the group. MOSD members soon became involved in the planning for the protest scheduled on January 6, 2021, in Washington, D.C., the same day as Congress's certification of the Electoral College vote. Although Mr. Donohoe did not plan to

---

6 "When Charley was asked to be part of the MOSD, he stated he felt 'joyed,' and 'flattered' because he felt like he would be putting his skills to use, unlike how he felt in his civilian jobs." Reynolds Report ¶222.

4

attend the rally himself, he agreed to help with the planning of the protest.

As regional leader, Mr. Donohoe's job was to recruit trusted Proud Boy members to join MOSD. He had no decision-making authority. His role was to carry out commands of those above him as a kind of secretary. Mr. Donohoe was not included in many of the leadership meetings. He did participate in a video call for prospective members on December 30, 2020 and emphasized the importance of following the commands of the leaders of MOSD.

On December 4, 2021, Tarrio was arrested and as a result, was not permitted to travel to Washington D.C. to participate in the January 6 rally. After learning of Tarrio's arrest, Mr. Donohoe took steps to "nuke" the existing MOSD channel and created a new MOSD channel, advising the leaders to clear their chat history out of the old MOSD channel. Mr. Donohoe added Tarrio to the new MOSD channel.

A few days before January 6, Mr. Donohoe made a last-minute decision to attend the J6 rally and arrived in Washington D.C. in the early morning hours of January 6. He was aware that Biggs and Nordean had made a plan for the rally but was not included in the planning details. During this time, he reposted instructions to MOSD for everyone to meet at the Washington Monument at 10:00 am. On the morning of January 6, Mr. Donohoe attempted to assume a greater leadership role, informing members of MOSD that he "had the keys" until Biggs and Nordean arrived at the rally.

Once Biggs and Nordean arrived, Mr. Donohoe deferred to the leadership of Biggs and Nordean and followed their instructions. Biggs and Nordean led him and the other Proud Boys on a march towards the Capitol. As the crowd breached the barriers, Mr. Donohoe followed Nordean and Biggs onto the restricted areas of the Capitol grounds. Soon, Mr. Donohoe was separated from

his group and found himself in a mob. Angry and frustrated with the overall hostile environment, he threw two water bottles at law enforcement officers, an action that he deeply regrets.

While walking through the crowd, Mr. Donohoe encountered fellow Proud Boy Dominic Pezzola who was in possession of a riot shield. Mr. Donohoe grabbed a corner of it and walked with Pezzola through the crowd. He took Pezzola's photo with the shield and posted the comment "got a shield" on Telegram. Shortly after the photo was taken, the two men were separated, and Mr. Donohoe never saw Pezzola again at the Capitol.

As Mr. Donohoe stood near the steps in the West Plaza, he observed "Milkshake," a Proud Boy, initiate an altercation with law enforcement officers at the base of the concrete stairs. Mr. Donohoe joined the crowd as it surged forward and up the steps. While on the stairs, Mr. Donohoe decided that he did not want to be physically involved any longer and then made his way away from the Capitol grounds. As he left, he encountered several Proud Boys who agreed to go with him back to the hotel. After he arrived at the hotel, Mr. Donohoe began drinking heavily. Intoxicated, he began posting messages on Telegram.

2. <u>Acceptance of Responsibility</u>

Mr. Donohoe has been in custody since his arrest on March 17, 2021. He has spent this time wisely, reflecting on the decisions that brought him before this Court. Mr. Donohoe fully accepts responsibility for his acts and decisions, and he is committed to never repeating them. He wholly acknowledges his responsibility for the role he played in the events of January 6, and he regrets his actions and words.

After Mr. Donohoe decided to plead guilty and cooperate with the Government, the Proud Boys permanently banned him from their organization. However, when Mr. Donohoe made the

decision to accept responsibility for his actions, he did so with the intent of leaving the Proud Boys. He has not regretted breaking ties with the Proud Boy organization. It is his desire to move forward in his life in a positive manner and focus on his family, especially his young son. This is evidenced in part by the fact that since his arrest, Mr. Donohoe has not engaged in any public support of the Proud Boys or the events of January 6. Instead, he has focused on self-improvement, both spiritually and physically. He has spent his days at the Orange County Jail reading[7] and working on his physical fitness. He plans to continue with the positive changes he has made in his life when released from custody.

To publicly demonstrate his commitment to the remorse he felt and continues to feel, Mr. Donohoe authorized the release of a statement. Reporters broadcast that message to the public at large: "Charlie [sic] regrets his actions and is remorseful for the conduct that led to these charges. He accepts responsibility for his wrongs and is prepared to accept the consequences."[8]

B. Mr. Donohoe's History and Characteristics[9]

Charles Donohoe is 35 years old. He grew up in North Carolina living mostly in his Grandparents' home. He joined the Marine Corps, served in Iraq, and later protected CIA operatives in Afghanistan. Upon his return to the United States he drifted between jobs. In 2019,

---

[7] Mr. Donohoe's commitment to broadening his mind has become something of a legend in the Orange County Jail. It is estimated that he has read approximately 1,000 books since being incarcerated, from science fiction to historical biographies.

[8] *A Proud Boy Leader Pleaded Guilty To Conspiracy In the Jan. 6 Attack and Will Cooperate*, Zoe Tillman https://www.buzzfeednews.com/article/zoetillman/proud-boys-jan6-plea-trial-conspiracy (last accessed Dec. 11, 2023).

[9] Dr. Victoria Reynolds' report, "Report of Lifetime Exposure to Trauma & Its Impacts: Charles Donohoe," is filed under seal as an exhibit. It will be referred to in this memorandum as the "Reynolds Report."

7

he joined the Proud Boys, after watching a YouTube video of ANTIFA defacing and trashing a Marine Corps recruitment office.

Mr. Donohoe voluntarily joined the Proud Boys. Mr. Donhoe now regrets that choice. While joining the Proud Boys was a conscious decision, Mr. Donohoe's life experiences readily pre-disposed him toward being recruited by that organization. Choices that Mr. Donohoe made for the "right" reasons early on in his life and factors outside of his control, including childhood trauma, paved a path toward Proud Boys membership.[10]

1. Childhood

Mr. Donohoe grew up in North Carolina, where he was raised with his twin brother Liam. As detailed in Dr. Reynolds's report, Mr. Donohoe's childhood was difficult at times.[11] The challenges he faced growing up have greatly impacted the trajectory of his life.[12] Dr. Reynolds notes that Mr. Donohoe "formed a part of his identity as a protector." Reynolds Report ¶65. Despite these challenges, Mr. Donohoe graduated from high school and earned the rank of Eagle Scout.

2. Military Service

Prior to graduation, Donohoe enlisted in the Marines.[13] He left for training at Paris Island

---

10 This is War, Daniel Milton, Andrew Mines, Program on Extremism, The George Washinton University (37% of individuals with military experience had affiliations to domestic violent extremist (DVE) organizations like the Oath Keepers and the Proud Boys, around four times more likely to be a part of such groups than those without military experience. Some individuals with military experience held leadership positions in these organizations. Many others, however, arrived at the Capitol either in organized clusters or alone).
11 Reynolds Report, ¶13 details Mr. Donohoe's psychological trauma due to verbal, physical, and emotional abuse and neglect.
12 The Reynolds Report chronicles Mr. Donohoe's childhood in paragraphs 35 to 76. The sensitive nature of report's details are best recounted in the sealed filing.
13 Reynolds Report, ¶14 describes how Mr. Donohoe's early entry to military service is related to past trauma.

on June 9, 2006. Mr. Art Cody, a retired Navy Captain with 34 combined years of service in the Army and the Navy, prepared a history of Mr. Donohoe's military service. Mr. Cody's report is illuminating and gives insight and detail into how Mr. Donohoe consciously placed himself at significant risk to serve his country. "Such close and frequent association with violent death does not leave one unscathed." Cody Report at 2.

Mr. Donohoe committed to enlisting with the United States Marine Corps at the most dangerous time, with the most dangerous force, in the most dangerous job within that force, and in the most dangerous places. Cody Report at 8. His first active deployment was as part of the 2007 "Surge." Cody Report at 7. "Predictably, the year 2007 became the worst year for US Killed in action in Iraq." *Id*. Mr. Donohoe estimated that he "was involved in 12 engagements in which Iraqis shot at them." Cody Report at 11. As usual, because of his demeanor, others looked to Mr. Donohoe for leadership. Cody Report at 13.

After Mr. Donohoe separated from the Marine Corps, he went back into the fray in Afghanistan with a private contractor. While guarding the CIA in Afghanistan, Mr. Donohoe regularly manned Entry Control Points, where he was exposed to repeated suicide bomber attacks. Cody Report at 18-19. As before, Mr. Donohoe was "far more concerned about being labeled a coward than the possibility of death." Cody Report at 19. "As a result of his PTSD and his experiences in the Marines, Charley had difficulty adjusting to civilian life." Reynolds Report ¶14.

3. <u>Post-Service Struggle</u>

The Reynolds Report states that Mr. Donohoe "was functionally and mentally unprepared to leave his life as a Marine…" ¶104. The economic reality of the post-2008 great recession was still harsh in 2010, and Mr. Donohoe struggled to find meaningful gainful employment. Reynolds

Report ¶105. "In sum, Charley found himself with a skill set and symptoms that made negotiating civilian work alienating and unfulfilling" and predatory para-military organizations like the Proud Boys did not yet exist. Reynolds Report ¶107.

> "Many trauma survivors describe indelible changes to their beliefs and perspectives about themselves, other people and the world which affects their ability to hold down jobs, how they connect and participate in relationships and how they function as a citizen in their communities.
> While sometimes these schematic changes facilitate the integration of the traumatic experiences into adaptive life functioning, more often with severe trauma such as childhood abuse, rape, and combat, the intensity of distress caused by these kinds of traumas can result in narrow, survival-based and maladaptive repertoires of functioning." Reynolds Report ¶125.

The Reynolds Report is littered with references to Mr. Donohoe's affinity for structured groups; from his wrestling team, to the Boy Scouts of America, to the Marine Corps and private contracting, and, ultimately, the Proud Boys. These groups provided opportunities for Mr. Donohoe to help numb or escape his feelings of fear and helplessness. Reynolds Report ¶75. When reflecting on joining the private contractor, Mr. Donohoe inadvertently provided a window into the future by stating, "I was expected to know what to do, and because of this, I felt respected. I felt important, like a badass." *Id* at ¶108. These feelings of self-importance were continually leveraged by Proud Boys leadership; this leverage was magnified by Mr. Donohoe's praise-seeking behaviors recounted in the Reynolds Report. See ¶116.

Mr. Donohoe's grandfather is retired from the Marine Corps. His grandfather encouraged Mr. Donohoe to participate in the Boy Scouts of America. When reflecting upon joining the Marine Corps, Mr. Donohoe said, "I liked the Americanness of it." Renolds Report ¶77. This patriotism was baked into Mr. Donohoe's childhood and life. It was something that Mr. Donohoe and those around him thought (and some still believe) was a good thing. However, an unintended

10

consequence of Mr. Donohoe's heartfelt allegiance to the United State, Esprit de Corps, and conditioned patriotism, was a paved road for the Proud Boys leadership to capitalize on Mr. Donohoe's effort and talents.

After finishing boot camp, Mr. Donohoe's interaction with alcohol was turbo charged by the Marine social life. Renolds Report ¶85. After receiving some alcohol treatment in the Marines for underage drinking, he believed that "[a]s long as I didn't get blackout drunk, I would be ok." This foundational misunderstanding of alcohol abuse again laid a solid foundation for a disastrous relationship with the Proud Boys. Mr. Donohoe unknowingly provided insight into how alcohol exacerbated and further enabled his bad decision making with the Proud Boys: "It helped me tolerate stupidity more. It got me out of my own head and made me feel more relaxed and content. Alcohol made me feel like I could have an actual conversation with people--- conversations *they* wanted to have. *It made me feel normal*." Reynolds Report ¶170. This interaction was not lost on outside observers. As recounted in the Reynolds Report, Liam stated, "[a] big part of the Proud Boys was that is was a drinking club, and this was a big draw for Charley." Reynolds Report ¶213. Liam further observed that, "…his common sense went out the window" when drinking. *Id*.

Mr. Donohoe has not received adequate treatment for PTSD nor alcohol use. "In summary, not only did Charley's familial and genetic inheritance put him at risk for alcohol and substance abuse, but his childhood and combat-related trauma exposure all but loaded the physiologic cards against him…" Reynolds Report ¶215.

The PTSD and trauma-based anxiety that Mr. Donohoe experienced also smoothed the road to the Proud Boys: "His trauma-based anxiety supported his belief that he needed to continually stay on guard and prepared to defend his safety and the safety of others who shared his

perspective and beliefs." Reynolds Report ¶176. This mindset was fertile ground for the tenants of the Proud Boys organization's demand of brotherhood and shared persecution complex. Dr. Reynolds states this directly in her report: "[i]n civilian life, his 'squad members,' were those he loved those who he felt he needed to protect ( e.g., his son, his girlfriend, his family members) and those who shared his beliefs and his sense of mission and purpose (e.g., other military members, fellow Proud Boys, etc.)." Reynolds Report ¶188.

For years, Mr. Donohoe held down jobs, but not for much more than year at a time. Like so many other combat veterans, Mr. Donohoe was "uncomfortable in many social situations" and had "difficulty feeling satisfied by work that lacks a higher purpose or sense of mission." Reynolds Report ¶218.

For Mr. Donohoe, "when he met the Proud Boys, 'it felt like being back in the barracks. I got back the brotherhood and camaraderie I had lost.'" Reynolds Report ¶222.

   4. Community Involvement

The attached 35 character letters are varied in their perspective, but all of them convey the positive impact that Mr. Donohoe has had on his community. Where Mr. Donohoe is involved, he advances the lives, organizations, and communities around him. From his third-grade teacher to his immediate family members, Mr. Donohoe makes a positive, lasting impression with his thoughtfulness and worth ethic.

   5. Time-in-Custody

At the time of the sentencing hearing, Mr. Donohoe will have been in custody for 1008 days, or 33 months and three days. The time he has spent in custody has been impactful.

When Mr. Donohoe first entered custody, he experienced feelings of loss, regret, and

frustration. As time passed, Mr. Donohoe has "not had any alcohol, and that he has had time to reflect on the degree of violence he has been exposed to in his life. He stated that he has turned to the Bible and that he now just wants 'peace,' in his life." Reynolds Report ¶231.

Further, Mr. Donohoe has engaged with every possible educational course available through the Orange County Jail's Pathway to Achieve program. A list of the over-500 courses that Mr. Donohoe has successfully completed are attached hereto as an exhibit.

C. The Court Should Vary Downward to a Sentence of 36 Months

The Court is required to impose the minimum sentence necessary to accomplish the following:

(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) To afford adequate deterrence to criminal conduct;

(C) To protect the public from further crimes of the defendant; and

(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)

Mr. Donohoe's advisory guideline range is 70-87 months. A sentence in that range would be greater than necessary. A sentence of 36 months would accomplish the requirements of 3553(a).

There is no question that the violence and chaos that took place at the Capitol on January 6 posed a serious threat to our nation and the democracy that United States citizens enjoy. Mr. Donohoe's poor decisions with respect to the events of January 6, were uncharacteristic of a man who devoted ten years of his life to serving his country honorably. Since his arrest, he has spent

13

his days and nights behind bars and has had a lot of time to reflect on the bad choices he made and the consequences he faces as a result.

Mr. Donohoe has demonstrated respect for the law, and has accepted responsibility, notably pleading guilty almost a year before his co-defendants went to trial. He agreed to cooperate as a part of his plea agreement. On January 6, after ascending the steps at the West Terrace, Mr. Donohoe realized that he did not want to be a part of the crowd that was attempting to enter the Capitol.  He did not want to engage in the type of violence that he observed others directing at law enforcement officers. Mr. Donohoe exited the Capitol grounds, taking other Proud Boys with him to a hotel. Although he made several provocative comments on Telegram, he never intended to carry them out. He began drinking when he arrived at the hotel and the Telegram messages were the result of intoxication and the emotions of that day. Now, in the cold light of day, Mr. Donohoe regrets his behavior and his words and is resolved to never repeat those mistakes.

A sentence of 36 months is a significant sentence and would also promote respect for the law in the eyes of the public, especially considering the fact that Mr. Donohoe never went inside the Capitol.

A higher sentence is not needed to deter Mr. Donohoe from further criminal conduct. Mr. Donohoe comes before this Court with zero criminal history points. By pleading guilty, he has publicly acknowledged his wrongdoing and accepted responsibility for his actions.

This conviction is Mr. Donohoe's first criminal conviction, and he is now a felon, which will have a lasting effect on him. The collateral consequences of felon status are severe and well-

researched.[14] However, for Mr. Donohoe, who was and continues to hope to be, an avid hunter, the loss or serious limitation of his ability to engage in sport is a profound consequence. He will also be placed on supervised release, with numerous restrictions and monitored by a United States Probation Officer.

With respect to affording deterrence to criminal conduct and protecting the public, Mr. Donohoe does not pose a danger and a long sentence is not required to accomplish this 3553(a) factor. Mr. Donohoe has no history of convictions for violent crimes. His behavior while incarcerated has been exemplary. He has had no discipline write-ups. Mr. Donohoe spends his days reading books and taking the online courses made available to him at the Orange County Jail. His goals upon release are to concentrate on family and become gainfully employed. He is not interested in participating in any type of political organization – extremist or otherwise. This experience has sufficiently deterred Mr. Donohoe from the possibility of engaging in any further criminal activity. A sentence of 36 months would also deter members of the public from committing similar crimes.

As discussed above, Mr. Donohoe has been diagnosed with PTSD and Substance Abuse Disorder. During his incarceration, he has reflected on these diagnoses and is receptive to treatment, both for mental health and substance abuse. Mr. Donohoe devotes a significant amount of time every day to exercise and has greatly improved his physical health. He spends the rest of his time reading and has read over 1,000 books since March 17, 2021. The books he reads are of

14 COLLATERAL CONSEQUENCES AND THE PREVENTIVE STATE, Mayson, Sandra, 91 Notre Dame L. Rev. 301, 302 (The "collateral consequences" of criminal conviction (CCs) - legal disabilities imposed by legislatures on the basis of conviction, but not as part of the sentence - have relegated that group to permanent second-class legal status).

a wide variety – and have served to educate and enrich him. Once released, he is committed to continuing his self-improvement journey, and also welcomes the addition of mental health and substance abuse counseling. These programs are available to him through the Veteran's Administration. The treatment programs available to Mr. Donohoe in the Bureau of Prisons are not needed – he has the self-discipline and motivation to continue with the changes he has made while incarcerated, and he is eager to participate in the counseling opportunities available to him at the VA.

## CONCLUSION

For the majority of his 35 years, Mr. Donohoe lived his life as a law-abiding citizen. He served his community through Scouting and his Eagle Scout project, served his country as a Marine, and later as a private contractor in Afghanistan. He faced significant challenges during his childhood and adolescence, and instead of letting those challenges defeat him, he found positive ways to cope. It was only after leaving the military that he gravitated towards and soon became ensnared in the type of thinking which culminated in the events of January 6.

Mr. Donohoe would respectfully ask this Court to keep in mind the reasons that led him to that place. He is determined not to let his past mistakes define him and asks this Court to allow him the opportunity to demonstrate his commitment to furthering the positive changes he has made since his arrest in March of 2021.

Mr. Donohoe respectfully requests that this Court vary downward from his advisory guidelines range and sentence him to 36 months imprisonment consistent with the analysis provided herein.

Respectfully submitted, December 12, 2023.

                                          Louis C. Allen, III
                                        Federal Public Defender

                                        /s/ Lisa Costner
                                        _____
                                        LISA COSTNER
                                        Assistant Federal Public Defender
                                        North Carolina State Bar No. 14308
                                        251 N. Main Street, Suite 849
                                        Winston-Salem, NC 27101
                                        (336) 631-5278, Ext. 5172
                                        Email: lisa_costner@fd.org

                                        /s/ Ira Knight

                                        _____
                                        IRA KNIGHT
                                        Assistant Federal Public Defender
                                        North Carolina State Bar No. 43817
                                        301 North Elm St., Ste 410
                                        Greensboro, NC 27410
                                        (336) 333-5455
                                        Email: ira_knight@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Jason McCullough
Erik Kenerson
Conor Mulroe
Nadia Moore
Assistant United States Attorneys

and by email to:

Crystal S. Lustig
United States Probation Officer

Respectfully submitted, December 12, 2023.


/s/ Lisa Costner
_____
LISA COSTNER
Assistant Federal Public Defender
North Carolina State Bar No. 14308
251 N. Main Street, Suite 849
Winston-Salem, NC 27101
(336) 631-5278, Ext. 5172
Email: lisa_costner@fd.org


/s/ Ira Knight
_____
IRA KNIGHT
Assistant Federal Public Defender
North Carolina State Bar No. 43817
301 North Elm St., Ste 410
Greensboro, NC 27410
(336) 333-5455
Email: ira_knight@fd.org