**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 21-CR-175-4 (TJK)** |
| | : | |
| **CHARLES DONOHOE,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States respectfully submits this Sentencing Memorandum for defendant Charles Donohoe. This Court presided over a months-long trial of Donohoe's co-conspirators, and the government incorporates the facts set forth in its opposition to those defendants' motions for judgement of acquittal and new trial. ECF 833 at 4-31. This sentencing memorandum for Donohoe does not repeat all these facts, but instead focuses on Donohoe's role and personal contributions to the conspiracy to obstruct the electoral college certification.

As this Court rightly observed, "[w]hat happened on January 6th harmed an important American custom that helps support the rule of law and the Constitution. That day broke our tradition of peacefully transferring power, which is among the most precious thing[s] we *had* as Americans." *United States v. Joseph Biggs*, 21-cr-175-2 (TJK), Hr'g Tr. at 87:4-8 (Aug. 31, 2023) (emphasis added). But Donohoe did not take aim the heart of our democracy by himself. He joined a criminal collective that celebrated the use of violence to achieve its objectives. For this reason, Donohoe's conviction for conspiracy to obstruct the electoral college certification is far worse. That is because "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be

successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961).

Even within the conspiracy, Donohoe was instrumental. He served as a trusted lieutenant on Enrique Tarrio's leadership team in the Ministry of Self Defense ("MOSD"), and Donohoe served to organize and keep the men in line in the immediate aftermath of Tarrio's arrest by "nuking" the original MOSD chats and creating a new encrypted chat from which the group could organize its activities. Donohoe also served a key role on the ground on January 6— communicating and organizing others. During the riot, he communicated the conditions on the ground back to the MOSD leadership, including a real-time video report at approximately 12:56 p.m. that the men had "stormed the Capitol building." Once on Capitol grounds, Donohoe joined in the group's efforts to push forward by throwing two water bottles at a line of officers. And he joined other Proud Boys who had marched to the Capitol as they reassembled for a final, fateful push toward the Capitol building. After the attack, Donohoe celebrated with the other participants in the conspiracy, declaring in messages that January 6 made him "feel like a complete warrior" and he celebrated that "We stormed the capitol unarmed […] And we took it over unarmed."

Donohoe accepted responsibility at an early stage for his participation in this dangerous assault on American democracy, ███████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

After adopting the PSRs' factual findings, Chapter Two specific offense characteristics, and Chapter Three adjustments, the Court should apply the following Guidelines ranges set forth below and impose a term of incarceration between 35 – 43 months, which represents a 50 percent reduction from the advisory guidelines calculation set forth in the Plea Agreement.

## I.     CHARLES DONOHOE'S ROLE IN THE CONSPIRACY TO ATTACK THE CAPITOL ON JANUARY 6, 2021

Charles Donohoe served as an infantry marine and has continued to embody the characteristics of that role, including loyalty and respect for the chain of command. These traits were evident to Enrique Tarrio and the other MOSD leaders, who seized upon Donohoe's strengths to help them achieve the group's objectives. Donohoe willingly joined them because, like many of the other men, Donohoe believed the 2020 Presidential Election had been stolen. Donohoe joined the leadership of the conspiracy and helped them lead the attack on the Capitol on January 6.

Donohoe was not present in Washington, D.C. for the election-related rally in November 2020, but he joined other members of the Proud Boys for the rally in December 2020. Donohoe had seen videos depicting massive street brawls between Proud Boys and counter-protestors from November 2020, and Donohoe came to Washington, D.C. in December 2020 prepared to physically engage with any perceived enemies, such as Antifa. As a member of the Proud Boys since 2018 and an attendee at prior national rallies attended by the Proud Boys, Donohoe knew and understood that some members of the Proud Boys—known internally as the "rally" boys— would resort to unlawful conduct to achieve an objective. PSR ¶ 26.

3

Shortly after former President Trump announced plans for the rally on January 6, Tarrio approached Donohoe and asked him to be part of a new chapter, called the MOSD. Donohoe understood that the chapter would operate under a strict chain of command and would consist of hand-selected "rally boys." PSR ¶¶ 27-28. As a regional leader, Donohoe committed to follow the commands of those above him, including co-defendants Tarrio, Nordean, Biggs, and Rehl, and he was responsible for recruiting trusted Proud Boys members to join the MOSD. PSR ¶ 33.

Donohoe understood that the purpose of the rally in Washington, DC, on January 6, 2021, was to stop the certification of the Electoral College vote, and he understood that Congress was responsible for certifying the Electoral College vote on January 6. PSR ¶¶ 30-34. Donohoe participated in communications among the MOSD members in which others discussed the need to take action by, among other things, storming the Capitol. On December 27, Donohoe reposted a message that read: "They want to limit the presence so that they can deny Trump has the People's support. We can't let them succeed. This government is run FOR the People, BY the People....Congress needs a reintroduction to that fact." PSR ¶ 34. At least as early as January 4, 2021, and prior to Donohoe's decision to travel to the District of Columbia, Donohoe was aware that members of MOSD leadership were discussing the possibility of storming the US Capitol. PSR ¶ 37. Donohoe believed that storming the US Capitol would achieve the group's goal of stopping the government from carrying out the transfer of presidential power. *Id.*

Donohoe was not originally planning to travel to Washington, D.C., but shortly after Tarrio's arrest January 4, Donohoe announced that he would join the group in Washington, D.C. on January 6. PSR ¶ 38. Donohoe believed that co-defendant Tarrio's arrest could create a leadership void for the MOSD, and he wanted to assist the group. *Id.*

Donohoe began to exert personal control over efforts by the leaders of the conspiracy to

plan for the January 6 event. Donohoe took the initiative to create new encrypted chat groups for the members of the MOSD out of concern that the secrecy of earlier communications with Tarrio and others had been compromised because law enforcement had seized Tarrio's phone. PSR ¶ 39. Donohoe directed others to leave the earlier chats so that the previous chats could be nuked, *i.e.*, destroyed. PSR ¶¶ 39-40.

Donohoe understood from discussions among the leaders of the conspiracy and other Proud Boys that the objective in Washington, DC, on January 6, 2021, was to obstruct, impede, or interfere with the certification of the Electoral College vote. PSR ¶ 43. Donohoe understood from discussions that the group would pursue this through the use of force and violence, in order to show Congress that "we the people" were in charge. *Id.* On the morning of January 6, Donohoe exchanged messages with other leaders of the conspiracy in the encrypted chat for the leaders of the MOSD. Exhibit 1 (Trial Ex. 509-26). The messages anticipated violence by the Proud Boys and the "normies" (that is, ordinary Trump supporters) against law enforcement, e.g. "I want to see thousands of normies burn that city to ash today" and "I will settle with seeing them smash some pigs to dust" and "Fuck these commie traitors" and "Fuck it let them loose." *Id.*

Donohoe arrived early at the Washington Monument, and he told others that he "had the keys" until Nordean and Rehl arrived. PSR ¶ 46. Donohoe understood Nordean and Rehl to be his superiors in the MOSD and deferred to their leadership. *Id.* Nordean arrived and subsequently made an announcement that the group would be marching to the U.S. Capitol but would be returning for the speech. PSR ¶ 47. It soon became evident to Donohoe that Nordean did not intend to lead the group back to President Trump's speech. *Id.*

Shortly after 10:00 a.m., Nordean and Biggs led a group of 100 or more Proud Boys, including Donohoe, on a march away from the Washington Monument towards the U.S. Capitol.

5

PSR ¶ 48. During the march, Nordean and Biggs addressed the men through a megaphone—telling them that in their view the police and government had failed them. *E.g.*, Video Exhibit 2 (Trial Ex. 1000) at 4:10-5:33. As the group walked past the front face of the Capitol at approximately 11:20 a.m.—more than an hour prior to the initial breach—Nordean announced, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution . . . Let us remind those who have forgotten what that means." *Id.* at 10:23-10:36. The group continued to the east side of the Capitol. As the group stood on the east side of the Capitol, Donohoe was present as one of the Proud Boys with them yelled out, "let's take the fucking Capitol." The man was chastised by others in the group and told not to "say" that. *Id.* at 14:10-14:30.

Shortly before noon, Nordean, Biggs, and Rehl led the men back to the west side of the Capitol to a group of food trucks located at approximately 2nd Street and Constitution Avenue NW, arriving at approximately 12:10 p.m. There the group stopped and waited for approximately thirty minutes. At 12:45 p.m., fifteen minutes before the certification of the Electoral College vote was scheduled to start, Nordean mustered the men into a column and marched them back towards the Capitol. *Id.* at 19:05-19:20; Video Exhibit 3 (Trial Ex. 1001) at 00:50-1:15. In doing so, Nordean, Biggs, and Rehl led the men away from President Trump's speech, which was underway.

Donohoe understood that Nordean and Biggs were searching for an opportunity to storm the Capitol. PSR ¶ 50. And, at approximately 12:50 p.m., the group gathered near a pedestrian entrance to the restricted Capitol grounds. Within minutes of arriving at the pedestrian entrance, the crowd overwhelmed law enforcement and advanced onto Capitol grounds. PSR ¶ 55. Donohoe saw Nordean and Biggs advance onto Capitol grounds and followed them. *Id.* Donohoe believed these actions were intended to stop the certification of the Electoral College vote. *Id.*

6

As he advanced past the barricades, Donohoe posted a selfie-style video to the MOSD leaders chat group in which he filmed himself crossing the fallen barricades at the Peace Circle. Donohoe remarked sarcastically to the other leaders of the conspiracy, "Oops! Looks like we just stormed the Capitol building!" Video Exhibit 4 (Trial Ex. 1137). This prompted Bertino to react and tell the men on the ground to "form a spear." *Id.* After viewing this video in the MOSD message group, Bertino advised the members of the MOSD that they were "Storming the capital right now!!" Exhibit 5 (Trial Ex. 510-33). Bertino gave the same instruction to the Boots on Ground chat, which was created for all Proud Boys members in Washington, D.C. on January 6, and he told the men to "Get there." Exhibit 6 (Trial Ex. 512-8).

Donohoe advanced onto Capitol grounds and moved to the front of the crowd. Donohoe looked on as Biggs and Nordean tore down the black metal fence that served as the next barricade. Shortly thereafter, Donohoe personally joined in the fight against police. As police grappled with one rioter, Donohoe stepped forward and pulled the man back into the crowd. Video Exhibit 7 (Trial Ex. 160[1]). Donohoe then threw two two half-liter water bottles[2] at the officers. PSR ¶ 57; *Id.*; Video Exhibit 8 (Trial Ex. 440Ax). One of the water bottles traveled at head-height toward the line of officers, as can be seen in the still shot from Video Exhibit 8 below.

---

[1] Video Exhibit 7 presents a zoomed in, eighty second clip from Trial Exhibit 160, which clip shows the conditions in the West Plaza at approximately 1:25 p.m.

[2] A half-liter water bottle weighs approximately 1 pound. By comparison, a baseball weighs less than 1/3 of a pound.



*Still shot from Video Exhibit 8*

Donohoe next united with co-conspirator Dominic Pezzola in the west plaza and led Pezzola to the rear of the plaza as they both carried Pezzola's stolen riot shield. PSR ¶ 58. Donohoe took a picture of Pezzola with the shield while Pezzola was making a hand gesture associated with the Proud Boys. PSR ¶ 58. Donohoe posted the photo along with a message to the MOSD leaders that read, "Got a riot shield!" PSR ¶ 58.

Donohoe, Pezzola, and co-conspirator Matthew Greene then moved back toward the front of the plaza. PSR ¶ 59. They were among dozens of other Proud Boys who had reunited at the base of the stairs. Those stairs led to the Upper West Terrace, which abutted the Capitol building and many doors and entrances to that building. At this entrance, which was under scaffolding, a small group of outnumbered officers guarded the foot of the stairs. Daniel Lyons Scott, the same co-conspirator who had earlier yelled out, "let's take the fucking Capitol," initiated a push by shoving two officers and pushing them up the stairs. PSR ¶¶ 59-60. As can be seen in Video Exhibit 9

(Trial Ex. 451x) and in the three still shots from Video Exhibit 9 below, Donohoe was staring intently at the interaction before it unfolded, and Donohoe was prepared to take action. Donohoe immediately joined in the push forward, and the crowd overwhelmed the officers and pushed up the scaffolding. PSR ¶ 60. Donohoe quickly advanced with the crowd and under the scaffolding. PSR ¶ 60-61.



*Still shots from Video Exhibit 9*

Law enforcement countered the attack with non-lethal measures, and Donohoe eventually was deterred by "pepper ball" munitions that had been deployed by officers. PSR ¶ 61. After becoming overwhelmed by lachrymatory agents, Donohoe left the Capitol grounds and traveled back to a hotel where he planned to stay on the evening of January 6, 2021. *Id.*

Although no longer on the Capitol grounds, Donohoe continued to act as the group's eyes and ears. Indeed, at 3:38 p.m., more than an hour after Pezzola and others had broken into the building, Donohoe indicated that he had left the Capitol grounds, but then posted a message in

Boots on Ground that "[w]e are regrouping with a second force." Exhibit 10 (Trial Ex. 512-11). Donohoe subsequently advised the group that the National Guard and "DHS agents" were "incoming." *Id*.

After storming of the Capitol, Donohoe rejoiced, bragging to the other leaders of the conspiracy that "I stood on that front line the entire time and pushed it twice[.]" Exhibit 11 (Trial Ex. 509-37). He also proudly declared in messages after the attack that such actions made him "feel like a complete warrior." *Id*. He celebrated the group's accomplishments, noting "We stormed the capitol unarmed […] And we took it over unarmed." *Id.*, PSR ¶ 65.

In the wake of the January 6 attack, as criminal charges against Proud Boys members and others mounted, Donohoe responded as he had when the Proud Boys chairman was arrested—with concern about covering his and others' tracks. As the creator of several of the Telegram groups that had been used in planning the attack, Donohoe asked others whether he should "nuke it," and he attempted to do so after being so directed by another leader. Exhibit 12 (Trial Ex. 509-42).

## II.     THE CHARGES AND PLEA AGREEMENT

On March 10, 2021, a grand jury returned a six-count indictment that charged Joseph Biggs[3], Ethan Nordean[4], Zachary Rehl, and Charles Donohoe with conspiracy to violate 18 U.S.C. §§ 1512(c)(2) and 231(a)(3), along with substantive violations of 18 U.S.C. §§ 1512(c)(2), 231(a)(3), 1361, and two misdemeanors. Following detention hearings, all four men were ordered detained pending trial.

---

[3] On January 19, 2021, Joseph Biggs was charged by complaint with violations of 18 U.S.C. § 1512(c)(2) and four misdemeanors.

[4] On February 2, 2021, Ethan Nordean was charged by complaint with violations of 18 U.S.C. §§ 1512(c)(2), 1361, and four misdemeanors.

On March 7, 2022, an eight-count superseding indictment added defendants Enrique Tarrio and Dominic Pezzola. The Second Superseding Indictment charged the defendants with conspiracy to obstruct an official proceeding in violation of 18 U.S.C. § 1512(k), along with substantive violations of 18 U.S.C. §§ 1512(c)(2) and 231(a)(3), and two counts each of 18 U.S.C. §§ 1361 and 111(a)(1). One of the assault charges (Count Six) was based on Donohoe's assault on law enforcement. As noted above, Donohoe threw two water bottles at a line of officers on the west front of the Capitol.

Shortly after the return of the superseding indictment, Donohoe agreed to plead guilty. On April 8, 2022, Charles Donohoe pleaded guilty to Counts One and Six of the Second Superseding Indictment, which charged violations of Conspiracy to Obstruct an Official Proceeding, 18 U.S.C. § 1512(k), and Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a). ECF 335. Donohoe's guilty plea was supported by a 12-page Statement of Facts. ECF 336.

## III.   STATUTORY PENALTIES

Donohoe faces sentencing on conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, for his violation of Section 1512(k), the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

Donohoe also faces sentencing for his conviction for assault on a federal officer, in violation of 18 U.S.C. § 111(a). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, for his violation of Section 111(a), the defendant faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

11

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The parties agree, and the PSR correctly calculates, that Donohoe's advisory Sentencing Guidelines range for Count One is as follows:

<u>Count One: Violation of 18 U.S.C. § 1512(k):</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2 | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Causing/Threatening Injury or Damage | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference With Justice | +3 |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3B1.1(b) | Aggravating Role | +3 |
| | Total | 30 |

This Court thoroughly evaluated the advisory Sentencing Guidelines and Specific Offense Characteristics when sentencing Donohoe's co-defendants in this case. *See*, *e.g.*, *Biggs Sent Hr'g Tr.* (Aug. 31, 2023). Following extensive briefing and argument during a series of contested hearings, this Court applied all of the Specific Offense Characteristics listed above to Donohoe's co-conspirators. *See*, *e.g.*, *id.* at 17:16 – 25:17 (application of 2J1.2(b)(1)(B), (b)(2), and (b)(3)(C)), and *id*. at 38:14-25 (application of 3B1.1(b) for aggravating role).

The Specific Offense Characteristics are also correctly applied here. In addition to the conduct of his co-conspirators, Donohoe personally assaulted a law enforcement officer and thus his crime involved "causing or threatening to cause physical injury to a person." U.S.S.G. §2J1.2(b)(1)(B). Moreover, Donohoe's and his co-conspirators' actions in causing physical injury and property damage at the Capitol were reasonably foreseeable to Donohoe, which brings his co-conspirators' conduct within the scope of "relevant conduct" for sentencing. ECF 336 (Statement of Facts) at ¶¶ 37, 39. Likewise, the evidence also supports the application of the Specific Offense

Characteristic for extensive scope, planning, or preparation. U.S.S.G. § 2J1.2(b)(3)(C). The conspiratorial agreement formed among leaders of the MOSD was characterized by a degree of structure and organization that was uncharacteristic of the Proud Boys, and it supports the application of an additional +2 points under the Guidelines.

The Guidelines also provide for an increase in the offense level if the defendant played an aggravated role in the offense, as an "organizer" or "leader" (four levels) or "manager" or "supervisor" (three levels) of a criminal activity that involved five or more participants. U.S.S.G. § 3B1.1(a), (b). The PSR correctly applied the aggravating role adjustment by assigning a three level adjustment to Donohoe for his role as a manager or supervisor of the criminal activity. The following non-exhaustive factors are instructive in determining whether to apply the adjustment and, if so, whether to add three or four levels:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (quoting U.S.S.G. § 3B1.1, cmt. n.4). "No single factor is dispositive." *Id.* Here again, this Court evaluated the application of this Chapter Three adjustment and applied a four-level enhancement to each of Tarrio, Nordean, and Biggs, and the Court applied a three-level enhancement to Rehl. As the parties agreed, and the PSR concurs, the three-level enhancement is also properly applied to Donohoe. Donohoe was hand-selected by Tarrio to join the Ministry of Self-Defense, and Donohoe understood that he was to function in a leadership role. Proud Boys members recruited into the MOSD chapter were repeatedly admonished by MOSD leadership, including Tarrio and Donohoe, that they were to follow the commands of leadership and that, if they did not, they would be removed from the

MOSD chapter. Donohoe understood from discussions among the MOSD and other Proud Boys that the objective in Washington, D.C., on January 6, 2021, was to obstruct, impede, or interfere with the certification of the Electoral College vote. As reflected in the Statement of Offense, Donohoe repeatedly took a leadership role both in planning communications among the MOSD and on the ground on January 6. The role enhancement is thus properly applied to Donohoe.

With respect to Count Six, the parties agree, and the PSR correctly calculates, that Donohoe's advisory Sentencing Guidelines range for Count Six is as follows:

Count Six: Violation of 18 U.S.C. § 111(a)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2 | Official Victim | +6 |
| | Total | 20 |

The parties agree, and the PSR correctly calculates, that Counts One and Six are grouped together into a single group under U.S.S.G. 3D1.2(c). Accordingly, the total offense level is the highest offense level of the counts in the group, *i.e.*, that for Conspiracy to Obstruct an Official Proceeding. See U.S.S.G. § 3D1.3(a), and the combined offense level for these offenses is 30.

*Acceptance of Responsibility (U.S.S.G. § 3E1.1).* Section 3E1.1(a) provides a two-level decrease in offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Similarly, Section 3E1.1(b) provides for an additional one-level reduction in offense level in certain circumstances applicable here. In determining whether to apply the adjustment, a court should consider, among other things, whether the defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admit[ed] or [did] not falsely deny[] any additional relevant conduct for which the defendant is accountable under § 1B1.3"— which includes "all acts and omissions committed, aided, abetted, counseled, commanded,

induced, procured, or willfully caused by the defendant" and all harm caused by those acts or omissions or was the object of those acts or omissions. U.S.S.G. §§ 1B1.3(a)(1)(A), 3E1.1 cmt. n.1(A).

*Zero-Point Offender Reduction (U.S.S.G. § 4C1.1).* Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 was not considered at the time the parties entered into the plea agreement. Section 4C1.1 does not apply here because Donohoe does not meet the additional criteria. Specifically, Donohoe used violence in connection with the offense, including Donohoe's conviction for assault of a federal law enforcement officer. *See* 4C1.1(a)(3) (The Section 4C1.1 adjustment is applicable if the defendant meets the following criteria: "the defendant did not use violence or credible threats of violence in connection with the offense"). Further, the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See*, *e.g.*, *United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly

conduct of Government business or official functions"). Donohoe's conduct and personal contribution to the violence of the day make him ineligible for the reduction available at Section 4C1.1.

*Criminal History Category*. The U.S. Probation Office calculated the defendant's criminal history as Category I, which is not disputed. PSR ¶ 18, 107 et. seq.

*Advisory Sentencing Guidelines.* Based on the application of the Guidelines, Donohoe's properly calculated final offense level is 27 (i.e., Offense Level 30 *less* 3 points for acceptance). At Criminal History Category I and Offense Level 27, the advisory sentencing range is 70 – 87 months.

## V.       SENTENCING FACTORS UNDER SECTION 3553(a)

The Court's sentence must be guided by the factors in 18 U.S.C. § 3553(a). After weighing these factors, the Court should depart downward from the advisory guidelines range and sentence Donohoe to a term of incarceration between 35 and 43 months.

### A.   Nature and Circumstances of the Offense and Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol on January 6 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms. Indeed, it was one of the only times in our history when the Capitol was literally occupied by hostile forces.

On January 6, Donohoe fully committed to this attack. But he did not do so alone. Donohoe took action as part of a criminal collective. Donohoe and his co-conspirators organized and led a small army as they launched an attack on the heart of our democracy. They took these actions because they did not like the outcome of the election. Donohoe and his co-conspirators had countless options to address their grievances lawfully—engaging in peaceful protest, writing and

meeting with officials, filing lawsuits among them. But Donohoe and others chose to join together and use force to achieve an outcome that lawful means did not afford them. That crime is among the most serious that this court will consider because its means and objectives erode one of the foundations of our society—democracy and the rule of law.

For years, Donohoe and his co-defendants intentionally positioned themselves at the vanguard of political violence in this country. Donohoe conspired and combined with others to try to stop the peaceful transfer of presidential power. And Donohoe willingly joined in a criminal collective that brought violence to the Capitol on January 6 in an effort to change the course of American history. The sentence imposed by this Court must reflect the seriousness of that offense, and Donohoe's role in advancing it.

**B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

█████████████████████████████████████████████████Donohoe has demonstrated respect for the law and a desire to take responsibility for his actions. ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████Donohoe has exhibited a fundamental respect for the law, and Donohoe has acknowledged that there is no justification for his actions on January 6. Based on this history, it is unlikely that a lengthy additional period of incarceration will materially alter Donohoe's respect for the law and likelihood of recidivism.

### C.  Need for the Sentence to Afford Adequate General Deterrence

A significant sentence is necessary "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). Here, the need to deter others is especially strong because of both Donohoe's choice of target (i.e., the Constitutionally-mandated certification of a democratic election) and Donohoe's participation in a conspiracy that sought to lead scores, if not hundreds, of men to achieve their objective.

Donohoe and his co-conspirators engaged in acts that were intended to bring government to heel. And Donohoe took these actions as part of a criminal collective. As noted at the outset, the Supreme Court has recognized that, "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan*, 364 U.S. at 593.

General deterrence is critical here for this reason. Any future actor who considers joining a criminal combination to engage in political violence or exert its political will on the country must know that it will be taken seriously at sentencing. Likewise, future actors may also look to Donohoe's decision to enter a cooperation plea and effectively abandon the conspiracy by acknowledging the scope and objectives to law enforcement. The Court's exercise of a downward departure here could send an important message that may deter others from joining a conspiracy or encourage others to abandon a conspiracy and expose its existence to authorities.

### D.  Donohoe's History, Characteristics, ▓▓▓▓▓▓

Charles Donohoe is a 35-year old father of one who has never had any prior criminal convictions as an adult. PSR at ¶ 106. Donohoe joined the marines in 2006 and served honorably for four years, including two deployments to Iraq. After his honorable discharge in 2010, Donohoe

continued to serve as a defense contractor and was stationed overseas, including in Afghanistan.



**E.  Need to Avoid Unwarranted Sentencing Disparities**

The government's proposed sentence of incarceration would not create any unwarranted sentencing disparities. Donohoe's timely plea ███████████████████████████████ ████████████ simply places Donohoe in a fundamentally different category than his co-conspirators.[5]

Donohoe pleaded guilty to his role as a leader in a conspiracy whose members and followers played critical roles at each fateful breach that led to the disruption to the certification. *See United States v. Enrique Tarrio*, 21-cr-175 (TJK) (Sept. 5, 2023), Sent. Tr. at 104:10 – 15 (The Proud Boys "played important roles at breach, after breach, after breach. And I haven't seen any other case, in fact, similar to this case in that regard. No party has raised any January 6 case with sort of similar evidence and sort of similar facts."). Donohoe admitted his own culpability, and Donohoe's guilty plea detailed the conduct of the other leaders of the conspiracy.

Moreover, in stark contrast to his co-conspirators, Donohoe admitted his role in the conspiracy and his responsibility for the commission of a serious crime. The government anticipates that Donohoe—either directly or through counsel—will communicate his profound remorse to the Court at sentencing. Even after their convictions and their sentences, Donohoe's co-defendants have continued to publicly minimize or outright deny their culpability in the crime. *See* Gov't Sentencing Memorandum, ECF 855-1 at 14-15; ECF 855-4 at 15-16; ECF 855-5 at 12-13; *see also* The Hill, Proud Boy claims 'Trump won' after sobbing for mercy and receiving 10-year sentence: reports, *available at* https://thehill.com/regulation/court-battles/4183555-proud-boy-reportedly-claims-trump-won-after-sobbing-for-mercy-at-sentencing/.

---

[5] It should also be noted that Donohoe was not convicted of an enumerated federal crime of terrorism under 18 U.S.C. § 2332(b)(g)(5)(B).

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

## F.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. As detailed above, the latest calculations reflect that the riot at the United States Capitol caused over $2.9 million in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Donohoe must pay $2,000 in restitution, which reflects in part the role Donohoe played in the riot on January 6. Plea Agreement at ¶ 12. This amount fairly reflects Donohoe's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Donohoe's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 190.

## VI.   CONCLUSION

For the reasons set forth above, the government asserts that this Court should sentence Charles Donohoe to a term of imprisonment between 35 and 43 months, along with a term of three years of supervised release and restitution in the amount of $2,000.

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Jason B.A. McCullough*
JASON B.A. MCCULLOUGH
    NY Bar No. 4544953
ERIK M. KENERSON, OH Bar No. 82960
NADIA E. MOORE, NY Bar No. 4826566
    On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530

*/s/ Conor Mulroe*
CONOR MULROE, NY Bar No. 5289640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW, Suite 700
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov